```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2                      CENTRAL DIVISION

 3
      UNITED STATES OF AMERICA,      )
 4                                   )
                    Plaintiff,       )  No. 12-04043-01-CR-C-BP
 5                                   )  April 22, 2013
                 V.                  )  Jefferson City, Missouri
 6                                   )  CRIMINAL
      CHRISTOPHER CURTIS KELLEY,     )
 7                                   )  Volume I
                    Defendant.       )  Pages 1-104
 8                                   )  (Pages 10-19 Ex Parte)

 9

10                  TRANSCRIPT OF JURY TRIAL

11
              BEFORE THE HONORABLE BETH PHILLIPS
12               UNITED STATES DISTRICT JUDGE

13       Proceedings recorded by electronic stenography
                 Transcript produced by computer
14

15                       APPEARANCES

16
      For Plaintiff:         MR. JIM Y. LYNN, JR.
17                           Assistant U.S. Attorney
                             80 Lafayette Street, Suite 2100
18                           Jefferson City, MO 65101

19    For Defendant:         MR. TROY K. STABENOW
                             Assistant Federal Public Defender
20                           221 Bolivar Street, Suite 104
                             Jefferson City, MO 65101
21

22

23

24

25


                  Kathleen M. Wirt, RDR, CRR
                  United States Court Reporter
      400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
                         816-512-5608
```

1                          I N D E X

2                            VOLUME I
                          (Pages 1-104)
3
APRIL 22, 2013
4
Pretrial hearing                              7
5    Ex parte proceedings                         10-19
     Government's Opening Statement               27
6    Defense Opening Statement                    37

7    GOVERNMENT'S WITNESSES:

8       LISA TODD
            Direct Examination by Mr. Lynn        40
9
        TONY COLEMAN
10          Direct Examination by Mr. Lynn        46
            Cross-examination by Mr. Stabenow     51
11
        LESLIE WILLEY
12          Direct Examination by Mr. Lynn        53

13      COREY BOWDEN
            Direct Examination by Mr. Lynn        58
14
        BRYAN LIEBHART
15          Direct Examination by Mr. Lynn        67

16      CRAIG HOLLOWAY
            Direct Examination by Mr. Lynn        71
17          Cross-examination by Mr. Stabenow     76

18      ANDREW DOLAN
            Direct Examination by Mr. Lynn        77
19          Cross-examination by Mr. Stabenow     80

20      CHRISTOPHER BRAYER
            Direct Examination by Mr. Lynn        85
21          Cross-examination by Mr. Stabenow     91
            Redirect Examination by Mr. Lynn      101
22
                          - - -
23

24

25

1                         VOLUME II
                       (Pages 105-281)
2

APRIL 23, 2013
3
GOVERNMENT WITNESSES (continued):
4
     BRIAN WASSON
5         Direct Examination by Mr. Lynn          114
          Cross-examination by Mr. Stabenow       119
6
     DEBBIE SORRELL
7         Direct Examination by Mr. Lynn          122
          Cross-examination by Mr. Stabenow       143
8
     JULIE ROGERS
9         Direct Examination by Mr. Lynn          148
          Resumed Direct by Mr. Lynn              161
10        Resumed Direct by Mr. Lynn              174
          Cross-examination by Mr. Stabenow       175
11        Redirect Examination by Mr. Lynn        187
          Recross-examination by Mr. Stabenow     188
12
     CHRISTOPHER HERBOLD
13        Direct Examination by Mr. Lynn          193
14   MICHAEL LAUGHLIN
          Direct Examination by Mr. Lynn          196
15        Cross-examination by Mr. Stabenow       210
16   APRIL COLVIN
          Direct Examination by Mr. Lynn          211
17        Cross-examination by Mr. Stabenow       215
18   JOSEPH KINGSBURY
          Direct Examination by Mr. Lynn          216
19        Cross-examination by Mr. Stabenow       218
20   KEVIN RODGERS
          Direct Examination by Mr. Lynn          219
21
     BRITTANY CARNEY
22        Direct Examination by Mr. Lynn          221
          Cross-examination by Mr. Stabenow       224
23        Redirect Examination by Mr. Lynn        225
24   MATTHEW CAVANAH
          Direct Examination by Mr. Lynn          226
25        Cross-examination by Mr. Stabenow       230

CASEY GRAY
    Direct Examination by Mr. Lynn                 231
    Cross-examination by Mr. Stabenow             235

PHILIP THUNHORST
    Direct Examination by Mr. Lynn                 236

ANN RILEY
    Direct Examination by Mr. Lynn                 242

MICHAEL BAKER
    Direct Examination by Mr. Lynn                 247
    Cross-examination by Mr. Stabenow             250
    Redirect Examination by Mr. Lynn              250

DEFENSE WITNESSES:

MATTHEW CAVANAH
    Direct Examination by Mr. Stabenow            253
    Cross-examination by Mr. Lynn                 254

GREGORY WILLS
    Direct Examination by Mr. Stabenow            255

TARA BALLENGER
    Direct Examination by Mr. Stabenow            257
    Cross-examination by Mr. Lynn                 261

WAYNE CURTIS KELLEY
    Direct Examination by Mr. Stabenow            262

NICHOLAS BROWN
    Direct Examination by Mr. Stabenow            265
    Cross-examination by Mr. Lynn                 267

                  - - -

              VOLUME III
            (Pages 282-318)

APRIL 24, 2013

Government's closing argument                     286
Defense closing argument                          296
Government's rebuttal argument                    306

Verdict read                                      314

                  - - -

| | E X H I B I T S | | |
|---|---|---|---|
| 1 | | | |
| 2 | GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
| 3 | 1-11 - Audrey Webb photos | 48 | 48 |
| 4 | 12-21 - search photos | 63 | 63 |
| 5 | 22 - ViewSonic monitor | 69 | 70 |
| 6 | 23 - keyboard | 69 | 69 |
| 7 | 24 - Mac Mini computer | 70 | 70 |
| 8 | 25-48 - Ellis Library fire photos | 130 | 130 |
| 9 | 49 - surveillance camera photo | 157 | 157 |
| 10 | 50 - surveillance camera photo | 157 | 157 |
| 11 | 51 - surveillance camera photo | 157 | 157 |
| 12 | 52 - surveillance camera photo | 159 | 159 |
| 13 | 53 - surveillance camera photo | 159 | 159 |
| 14 | 54 - surveillance camera photo | 159 | 159 |
| 15 | 55 - surveillance camera photo | 162 | 162 |
| 16 | 56 - surveillance camera photo | 162 | 162 |
| 17 | 57 - surveillance camera photo | 162 | 162 |
| 18 | 60 - surveillance camera photo | 167 | 167 |
| 19 | 61 - surveillance camera photo | 168 | 168 |
| 20 | 62 - surveillance camera photo | 168 | 168 |
| 21 | 63 - surveillance camera photo | 168 | 168 |
| 22 | 64 - surveillance camera photo | 165 | 165 |
| 23 | 65 - surveillance camera photo | 165 | 165 |
| 24 | 66 - surveillance camera photo | 164 | 164 |
| 25 | 67 - surveillance camera photo | 164 | 164 |

```
 1   69 - surveillance camera photo         69        69

 2   70 - surveillance camera photo         69        70

 3   71 - surveillance camera photo         170       170

 4   72 - surveillance camera photo         170       170

 5   73-88 - Ellis Library damage photos     198       198

 6   89 - photo of sign                      198       198

 7   90 - photo of metal pole                198       198

 8   91 - photo of handwritten note          198       198

 9   92 - diagram of Ellis Library
         first floor                        140       140
10
     94 - diagram of Ellis Library
11        fourth floor                      202       202

12   95 - photo of handwritten note         213       213

13   96 - photo of handwritten note         213       213

14   97 - note                              214       214

15   99 - disk of Ellis Library video       154       154

16   100 - metal pole                       209       209

17   104 - defendant's clothing             218       218

18   105 - fire panel report                238       239

19   106 - surveillance camera              200       200

20   107 - handwritten note                 209       209

21
     DEFENSE EXHIBITS                     OFFERED   ADMITTED
22
     1 - map of Ellis Library               24        24
23
     2-5 - photos of Ellis Library          24        24
24
                          * * * * *
25                          * * * *
```

1                    APRIL 22, 2013

2                        - - -

3          (The following proceedings were had in the courtroom

4    out of the presence of the jury panel:)

5          THE COURT:  We're here on the case of United States

6    of America versus Christopher Kelley, Case No. 12-4043.  Could

7    counsel please enter their appearance?

8          MR. LYNN:  Your Honor, Jim Lynn appearing for the

9    United States.

10         THE COURT:  Thank you.

11         MR. STABENOW:  Your Honor, Troy Stabenow from the

12   Federal Defender's Office appearing on behalf of Mr. Kelley,

13   but Mr. Kelley, as I sent everybody an e-mail last night,

14   wishes me to no longer be on his case, and we should probably

15   take that up before the jury comes.

16         THE COURT:  Okay.  It's my guess, at least, that

17   this will involve some discussions of some attorney-client

18   privileged material; is that right?

19         MR. STABENOW:  I would certainly believe so, Your

20   Honor.

21         THE COURT:  Mr. Lynn, I'm going to have to ask

22   you -- and is this your case agent?

23         MR. LYNN:  This is Case Agent Craig Holloway.

24         THE COURT:  Hi, Mr. Holloway.  Unfortunately, I'm

25   going to have to ask the two of you to leave the courtroom.

1                    (So done.)

2                    THE COURT:  I don't know who else is in the

3    courtroom, but I also think it's probably necessary that -- Mr.

4    Stabenow, who do you think --

5                    MR. STABENOW:  I have two members of my staff here,

6    and Chris's immediate family and girlfriend is here.  I've

7    previously advised him about the risk of having them present

8    during conferences like this, and it's up to him if he wants

9    them to be here, as far as I'm concerned.

10                   THE COURT:  Mr. Kelley, Mr. Stabenow has indicated

11   he's shared with you the risks of having individuals present

12   when you're having conversations with your attorney,

13   specifically that that in certain circumstances can waive your

14   attorney-client privilege.  Do you understand that?

15                   THE DEFENDANT:  Yes, ma'am.

16                   THE COURT:  And knowing that information, do you

17   wish your family members to remain in the courtroom during this

18   conversation?

19                   THE DEFENDANT:  I think they can stay, I'm fine with

20   that.

21                   THE COURT:  Okay.  Just so that I understand, there

22   are people sitting on two sides of the courtroom.  Are all of

23   the individuals in the courtroom, in the back of the courtroom

24   family members?

25                   THE DEFENDANT:  Except for Jennifer, yes, they're

1  family.

2          MR. STABENOW:  And Jennifer is my secretary.

3          THE COURT:  Okay.  You said your staff.  Sorry,

4  Jennifer.

5          (Ex parte proceedings began.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Ex parte proceedings concluded.)

2          THE COURT:  Just so the record is clear, Mr. Lynn,

3    the attorney for the government, has now entered the courtroom.

4          I'm going to take a quick break to review some

5    information that Mr. Kelley has provided me on the issue of

6    retaining new counsel.  But while I do that, it occurred to me

7    that during jury selection, I will want the witnesses that both

8    parties intend to call to be listed to the jury, and I'd ask

9    that one of you list -- that you put together a joint list and

10   that one of you, at the time that I request, stand up and list

11   all of the witnesses so that we can determine whether or not

12   any of the jury members know any of the witnesses.

13         MR. LYNN:  We'll be happy to do that.

14         THE COURT:  Okay.  Well, if we could take, then,

15   about a ten-minute recess, I will review this material and be

16   back out.

17         (A recess was taken from 9:11 a.m. to 9:25 a.m.)

18         THE COURT:  I have had the opportunity to review the

19   motion to replace court-appointed attorney for ineffective

20   assistance of counsel that Mr. Kelley provided.  And, Mr.

21   Kelley, I don't see anything in this document that changes my

22   opinion or is essentially anything new from the conversation

23   that you and I had.

24         THE DEFENDANT:  Okay.

25         THE COURT:  So I'm going to deny your motion, deny

your request for substitute counsel, and proceed today with a trial. We're going to seat the jury -- excuse me, the jury panel in the back of the room which, unfortunately, is going to take up the place that you're seated right here. What we're going to do is put chairs over here on the right. So these chairs are actually more comfortable than the benches you're sitting on, so I think it will work out best for you. I know that there was at one point a third person who was sitting in the back of the room.

THE DEFENDANT: She went to grab something from the car. It's Tara Ballenger. She'll be back in a second, I think. I just wanted to ask if the document I gave you will be entered into the record.

THE COURT: We can have it filed under seal.

THE DEFENDANT: Thank you.

THE COURT: When will Ms. Ballenger be back?

UNIDENTIFIED FEMALE: In just a minute, I think.

THE COURT: Okay. I think it will be a few minutes before the panel is ready, do you think?

COURTROOM DEPUTY: They're in the hallway.

THE COURT: Is it a few minutes before the seating chart --

COURTROOM DEPUTY: Actually, the seating chart is about ready.

THE COURT: Okay. Well, I'll tell you what, I'm

going to make a record, and I would like Mr. Stabenow, Mr.

Kelley, and whoever else to share it with Ms. Ballenger. After

the jury panel is in here and while the jury is in here, it is

very important that the individual who communicates with me is

the attorney for each of the parties. And it's also very

important that the communications be between the attorneys and

me. And I understand that it was important for you to hear

information from Ms. Ballenger during the discussion on your

motion and, for that reason, I let the rule be a little lax.

But I want to make sure that Ms. Ballenger and everyone else is

aware that once the jury, the jury panel comes into the room,

it is inappropriate for anyone from the gallery to be making

statements at all or facial expressions or anything of that

sort.

If we do see it, then, unfortunately, I will have to

ask the person to leave the courtroom. This is a public

proceeding, I would not take that action lightly, which is the

reason that I want to give everyone the warning that in the

courtroom, really only the attorneys, the witnesses, or the

judge are the ones who should be speaking. So if -- I'm sure

that there won't be any problems now that everyone understands

the rules, so I just wanted to make sure that that was clear.

Well, I think, then, that we should be close to

having the panel ready. I will go ahead and give this to

Kelly. If you could file that. I'll go back to chambers, and

1  just let me know when the panel is ready.

2          (Jury selection was conducted, after which the

3  following proceedings were had in the courtroom out of the

4  presence of the jury:)

5          THE COURT:  In looking through the instructions, I

6  noticed that the defendant submitted Instruction No. 1.02 with

7  the elements of the offense, and the government didn't.  I

8  don't know, Mr. Lynn, if you're familiar with what I'm

9  referring to.  I'm inclined to give this instruction prior to

10 the submission of the case.  As I understand the evidence, the

11 elements most likely are not going to change.  The likelihood

12 of this changing is slim and, therefore, I think it's wise to

13 give the jury a preview as to what the elements are.

14         MR. LYNN:  Very well.

15         THE COURT:  Do you have any objection to that?

16         MR. LYNN:  No objection.

17         THE COURT:  Okay.  I could see a case where it

18 wouldn't be appropriate; but in this case, I do think it's

19 appropriate to give.  So anything that the attorneys need to

20 take up?

21         MR. LYNN:  No.

22         MR. STABENOW:  No, Your Honor.

23         MR. LYNN:  I just have one quick question regarding

24 procedure.  When I am approaching a witness to authenticate an

25 exhibit, do I need to ask every time?

1          THE COURT:  No.  Actually, I think it goes much

2     smoother if you don't ask me at all.  So not only do you not

3     need to ask every time, you don't need to ask at all.  If you

4     choose to, I'm not offended by that; but just whatever is the

5     smoothest and easiest way to present the evidence is what I

6     support.  So I'll see you in an hour and 15 minutes.

7               (A recess was taken from 1:32 p.m. to 2:47 p.m.)

8          THE COURT:  Mr. Stabenow, it's my understanding that

9     you have something you want to talk about.

10          MR. STABENOW:  Just briefly, Your Honor.  I have

11     five exhibits that are marked as Defense Exhibits 1 through 5

12     for identification.  I'm just going to preoffer them into

13     evidence.  I understand the government does not have any

14     objection.

15          MR. LYNN:  We don't.

16          THE COURT:  Okay.  Then the record will show those

17     exhibits are admitted.

18          (Defendant's Exhibits 1-5 were admitted into

19     evidence.)

20          MR. STABENOW:  And I'll give a detailed list to the

21     court after we're finished.

22          THE COURT:  Anything that the government needs to

23     discuss?

24          MR. LYNN:  Nothing.

25          THE COURT:  Do we know if the jurors were back yet?

1    I'm not sure how long we need for lunch.  Check with them.  If

2    they think they need more than an hour and 15 minutes tomorrow,

3    we can do that.  Okay.

4              COURTROOM DEPUTY:  I'll check; and if they're there,

5    I'll go ahead and bring them in.

6              THE COURT:  Do the parties intend to invoke the

7    rule?

8              MR. LYNN:  I would invoke the rule, Your Honor.

9              MR. STABENOW:  Your Honor, I can understand that as

10   to Ms. Ballenger.  My other two witnesses are character

11   witnesses, and I would think that since they're not testifying

12   about facts in the case, they're just testifying about their

13   opinion, I would think that we would all want them to be privy

14   to the facts that come out in the case because that would be

15   used to test their opinion as to his character.  But if the

16   court disagrees --

17             THE COURT:  I don't know of any exception to that;

18   but Mr. Lynn, what are your thoughts?

19             MR. LYNN:  I don't know any exception to that

20   either.  I think the witnesses should be excluded, if so

21   requested.

22             THE COURT:  Unfortunately, I'm going to have to

23   grant that request.  Any witness that either party intends to

24   call needs to remain outside of the courtroom during testimony,

25   and each of the parties are responsible for keeping their

1  respective witnesses in the hallway and outside of the

2  courtroom.

3          MR. STABENOW:  Your Honor, there is one issue that

4  may come up during these early witnesses, I'll go ahead and

5  tell the court about it.  It's a hearsay issue.  I expect that

6  the government is going to offer some evidence about computer

7  serial numbers, that some computer equipment was taken from the

8  Stephens College setting.  And if it's somebody who didn't

9  actually do -- if it was somebody who was not actually from the

10 college who did the inventory of the computers, I'm going to

11 object because it's hearsay for them to report the serial

12 numbers that they were provided by somebody from the college.

13 I'll go ahead and give the court notice of that potential issue

14 right now, just in case it comes up since we're sitting here.

15         THE COURT:  Okay.  Until the evidence comes in, I

16 don't feel a need to hear a response, unless Mr. Lynn feels

17 compelled to give one at this time.

18         MR. LYNN:  No, we'll have to deal with that issue

19 when it comes up.

20         THE COURT:  Okay.  I do appreciate the heads-up.

21         (The following proceedings were had in the courtroom

22 in the presence of the jury:)

23         THE COURT:  Well, I realize that the location of the

24 courthouse sometimes makes it a little difficult to get lunch

25 in an hour and 15 minutes, so I apologize if we rushed your

1  lunch.  One alternative is to bring lunch with you, and you're
2  more than welcome to do so.  We have facilities that you can
3  keep them, keep your lunch in and things of that sort.  We can
4  also give you more time, if that's necessary.  The downside to
5  more time is that you're going to be here longer if you spend
6  more time at lunch.  So that's a decision that you all can
7  make, and you can let Ms. McIlvain know your decision on that.

8          The next thing that we need to do is have you sworn
9  in as jurors in this case, so I'm going to ask that you stand
10  and have Ms. McIlvain swear you in.

11          (Jury sworn.)

12          THE COURT:  The next step is for me to read you a
13  series of instructions.  They're instructions that are going to
14  apply to all aspects of the case.  There are quite a few of
15  them, so it's going to take me a few minutes to get through
16  these instructions.  However, at the end of this case when the
17  verdict -- when the evidence is completed and you go to retire
18  to your verdict, you will receive a copy of all of the
19  instructions that I've read throughout the entire case.

20          (Instructions were read by the Court.)

21          THE COURT:  Well, that's all the instructions at
22  this point.  Mr. Lynn, is the government ready to proceed?

23          MR. LYNN:  We're ready to proceed, Your Honor, thank
24  you.

25          Ladies and gentlemen of the jury, I anticipate that

1   the evidence will show that back on May 18th of 2011, between 3

2   and 4 o'clock in the morning, a fire took place upon the

3   Stephens campus in what's called the Audrey Webb Children's

4   School.  The firefighters were called about 3:59 a.m., and they

5   arrived at the scene shortly after 4 a.m.

6           You will hear the testimony of Lieutenant Lisa Todd

7   with the Columbia Fire Department.  She was among the first of

8   the fire personnel to arrive there at the scene.  She will tell

9   you that she arrived there, that she was allowed entry into the

10  children's school, that she surveyed the premises to determine

11  the source of the fire, and that they were finally able to

12  locate the source of the fire.  It was in a classroom,

13  Classroom 108 of the children's school.  It was a small fire in

14  the southeast corner of the room.  She and other firefighters

15  were able to quickly extinguish the fire using their fire

16  extinguisher.

17          Tony Coleman of the Stephens College, he was a

18  director of the campus security, he was also called in to

19  assist those early morning hours.  He again surveyed the scene.

20  He was able to ascertain that an item of property had been

21  taken during the course of this event, and specifically it was

22  a computer system.  He was able to identify the computer

23  system.  It was a Mac Mini computer system.  There was a

24  monitor and there was a keyboard, and he was able to determine

25  the serial number to that Mac Mini computer.

1       The evidence will show that that computer was later
2  recovered.  On February 1st of 2012, several officers, officers
3  with the Columbia Police Department, ATF, went to the
4  defendant's house in Columbia, Missouri, on Hubbell Street.
5  They made contact with the defendant there.  They identified
6  themselves, they requested consent to search.  The defendant
7  instructed the officers to leave his premises, so they agreed
8  to do so.  They told him that they would be posting officers
9  there and that they would be going in search of a search
10 warrant.

11      The evidence will show that they thereafter left,
12 seeking a search warrant; and a number of hours later, they
13 returned, search warrant in hand.  That was about 9 o'clock in
14 the evening.  The evidence will show that a search then took
15 place, and up in the attic hidden among insulation there was a
16 Mac Mini computer system that was recovered.

17      You will hear the testimony of Brittany Carney.  She
18 was the defendant's girlfriend back in May of 2011.  She will
19 tell you that back during that time period, she had actually
20 moved to Portland, Oregon, but she maintained continuous
21 contact with the defendant.  She will tell you during one of
22 the conversations between the two of them, the defendant told
23 her that he had stolen an Apple computer system from Stephens
24 College.  He will tell you that during the course of that
25 stealing, during the course of taking that computer, he

1 accidentally started a fire. He said when he pulled the wires
2 out, he may have caused a fire. He indicated that he heard
3 sirens and emergency personnel responding to the scene.

4       The evidence will further show that on September the
5 10th of 2011, a number of fires took place at the University of
6 Missouri campus in Ellis Library. At 3:26 a.m., Chris Brayer,
7 he's an officer with MUPD, he received a general fire alarm
8 indicating a possible fire in Ellis Library. He immediately
9 responded and went to Ellis Library. He made entry, I think
10 through the west entrance on the ground floor, he made his way
11 up to the first floor, and he headed north toward what appeared
12 to be the source of the fire. He will tell you that the smoke
13 was thick, fire extinguishers were deploying, but he was able
14 to see that there was apparent property damage, computer
15 monitors appeared to be knocked over.

16       He tried to ascertain the source of those fires, but
17 it simply -- he just didn't have the visibility to do so, so he
18 withdrew, he exited the library. He went out, and he met up
19 with Columbia firefighters who had assembled there at Lowry
20 Mall on Ninth Street there.

21       Lieutenant Brian Wasson with the Columbia Fire
22 Department was the first firefighter to go into the library.
23 He went into the north entrance, which is the main entrance
24 there to the library. He was able to locate a number of fire
25 sites in several different offices, all kind of on the west end

1  of -- or excuse me, the north end of the library, the hallway,

2  the west end and the east end.  Two or three fires in the west

3  end, several fires in the east end.  Again, the fire

4  extinguishers had deployed, so there was water coming down.  He

5  was able to locate these fires and knock them down in a fairly

6  quick amount of time.

7           Fire Marshal Debbie Sorrell was a fire investigator

8  with the Columbia Fire Department.  She was called in to locate

9  the cause and origin of the fires at Ellis Library.  She

10 arrived that morning.  She began her investigation.  In

11 summary, she found seven separate fire sites there in Ellis

12 Library.  She will tell you all about those.  There were two

13 fires in Room 115.  One was on a table in the area of the

14 corkboard, the second in the area behind the time clock.

15          In the reserve area, there was fire origin on top of

16 a rolling car with a clipboard.  And you will see diagrams, and

17 you will see photographs depicting these areas of this fire

18 scene.

19          In a room behind the reserve desk, there was a fire

20 on top of a metal shelf that contained postal envelopes.  There

21 was significant fire damage in that area, there was also water

22 damage where the sprinkler system had deployed there.  In Room

23 102, there were two fire sites.  There was a fire site on the

24 floor where papers were stored.  Also in Room 102, there were

25 papers stored and burnt, fires on desktops that were burned.

1    In Room 103, there was a cardboard box on a rolling cart that
2    had burned.

3           Now, then, as to each of the seven fire origins,
4    Lieutenant Sorrell, Debbie Sorrell, the fire marshal, was able
5    to investigate those.  She was able to eliminate accidental
6    ignition sources there.  So she was able to determine that
7    those fires were intentional and were, indeed, arson.

8           I think I left her completely out of the Stephens
9    fire, because she also investigated the Stephens fire.  She was
10   called in the early morning hours, she investigated the fire.
11   She found that the fire had occurred in the southeast corner.
12   She was able to investigate, eliminated accidental cause, and
13   she determined that fire was intentional, as well.

14          In addition to the fire damage, there was also
15   extensive property damage in the areas where the fires were
16   concentrated.  You will hear the testimony of Detective Mike
17   Laughlin with the MU Police Department.  He was a detective at
18   the time, he was kind of the case agent in this matter, and one
19   of his primary responsibilities was to try to document -- was
20   to locate and document property damage, and he made a number of
21   photographs of that.  He discovered a number of items of
22   apparent property damage, including there were five computer
23   screens in the access services and interlibrary loan area.
24   These computers appeared to have been struck, and the monitors
25   were damaged.

1    In the reserve area on a door containing a window,

2  there was a window beside the door, the window had been struck

3  by an object and contained kind of circular shadowing damage.

4    The library was also equipped with surveillance

5  cameras.  They were located at various locations around the

6  north area there.  They had been knocked -- several of them had

7  been knocked down or were hanging by the wires.  One camera

8  behind the circulation desk had been completely knocked off of

9  the wall and was lying on the floor.  A second camera behind

10 the circulation desk had been knocked off the wall and was

11 dangling by its wires.  On the circulation desk there, four

12 computer monitors were damaged.

13    Additionally, up on the second floor of the library,

14 there was a quiet sign, and it had been disassembled.  Its --

15 the sign on its face had been detached, and the pole connecting

16 the sign to the base was ultimately found down on that first

17 floor in the access area.

18    There was damage to the fourth floor, as well.

19 There was a window that had been knocked out, and they also

20 determined that someone had urinated and defecated on one of

21 the study carrels there.

22    Also called to the library the morning of those

23 fires was Pat Jones.  She was the assistant head of the

24 security there, and one of her responsibilities was overseeing

25 and maintaining the video surveillance.  As I indicated, there

1    were video cameras positioned throughout the library.  And

2    Julie Rogers immediately began reviewing the video surveillance

3    to determine if she could identify a subject.  She reviewed

4    everything.  She reviewed the entire video surveillance from

5    the time the library had locked up the night before about 8:30.

6    Actually, she reviewed it until the following morning, until

7    actually library personnel had arrived, she saw those.

8            She was able to determine that, indeed, a subject

9    had been captured on video.  The subject first appears at 2:12

10   a.m.  It's clear from the video that the subject is the

11   defendant, Mr. Kelley.  The video shows Mr. Kelley walking

12   around the circulation area there.  3:07 a.m., Mr. Kelley again

13   appears on the video, only this time he's carrying a metal pole

14   in his hand.  He walks past the main doors, and he walks around

15   the circulation and back toward the reserve area; again, the

16   scene of a number of these fires.  The video surveillance

17   evidence will show that at about five minutes later at 3:12

18   a.m., two of the surveillance cameras were damaged, cameras 5

19   and 6.  They were located kind of above the circulation area.

20   Camera 6 was damaged first, it was east-most; and a few seconds

21   later, camera 5 was damaged.

22           The evidence will show that at 3:24 a.m., the

23   defendant again reappears on the surveillance video.  He

24   approaches the north entrance doors from the area of the

25   circulation desk, then he retreats back in, and then he quickly

1   moves west toward the copy services area.  That's the last time
2   he's seen on the video surveillance.

3          Again, Julie Rogers reviewed every hour of video
4   surveillance.  She will tell you that no other subject other
5   than Mr. Kelley was captured on video.  Moreover, she will tell
6   you that all of the fires were concentrated in the same area,
7   as was the property damage; and she will tell you that, given
8   the position of the cameras, no one could have entered the
9   offices without being captured on the video.

10          Now, you will recall that I indicated that MUPD
11  received their general fire alarm at 3:26 p.m. -- excuse me,
12  3:26 a.m.  You will hear testimony that the library was
13  equipped with fire monitoring devices and alarms that were
14  connected to a fire panel.  You will hear from Phil Thunhorst.
15  He's the fire protection technician.  He was responsible for
16  maintaining and testing the fire alarm and sprinkler system at
17  Ellis Library.  He obtained the fire panel report, which
18  reflected that at 3:24 a.m. -- again, the same time that Mr.
19  Kelley is captured on video surveillance -- a water flow alarm
20  was activated, indicating that the sprinkler system had
21  deployed.

22          Now, the university immediately sent out a
23  student-wide release, called a Clery release, notifying
24  students of this incident, providing a little information, but
25  also containing a couple of photo captures depicting Mr.

1  Kelley. Mr. Kelley's roommates, Casey Gray and Matthew
2  Cavanah, saw this release, and they immediately recognized Mr.
3  Kelley. They lived with him there, so they went up to his
4  bedroom, they woke him up, and they told him he needed to turn
5  himself in.

6      The evidence will show that Mr. Kelley did, in fact,
7  go to MUPD later that morning. He was wearing the same
8  clothing that he had been wearing in the video, a gray shirt, I
9  think light-colored, khaki-colored shorts and brown shoes.
10 Officers noted that he was wearing the same clothing, so they
11 seized that clothing for evidentiary purposes.

12     One of the detectives, Detective Laughlin,
13 questioned him about his activities that previous evening. He
14 recounted his activities. He admitted during the early morning
15 hours that, in fact, he had ended up wandering around Lowry
16 Mall, which is right there in the university area there, but
17 indicated he didn't want to discuss that issue. He claimed he
18 didn't start any fires, and no further questions were asked of
19 him.

20     Mr. Kelley's clothing was sent to the Missouri State
21 Highway Patrol Crime Lab where it was examined by a forensic
22 examiner. The forensic examiner determined that the clothing
23 contained glass fragments. They also examined a metal pole
24 that had been recovered from the scene. They indicated that
25 also contained glass fragments.

1    The evidence will also show that both Stephens

2  College and the University of Missouri are extensively involved

3  in various and assorted activities which have an impact or

4  effect -- or somehow affect interstate commerce.

5    And that, in a nutshell, will be the government's

6  evidence.

7    THE COURT:  Mr. Stabenow?

8    MR. STABENOW:  Thank you, Your Honor.  Ladies and

9  gentlemen, you are going to see evidence that Mr. Kelley went

10 into the Ellis Library when he shouldn't have been there.  You

11 are going to see him on video camera.

12    This map, as you will -- or this diagram that you

13 will see during the course of the trial discussed by a number

14 of witnesses, marked as Defense Exhibit No. 1, is a

15 representation of the layout of the main floor of the Ellis

16 Library.

17    You're going to see -- you see on the diagram there

18 are things marked with numbers.  There's a No. 7 with a blue

19 arrow above it, there's a No. 9 with a blue arrow above it, a

20 No. 16, a No. 5, and No. 6.  Those represent the positions of

21 cameras that were videotaping the interior of the Ellis Library

22 that night.  The angle of the blue lines indicates the field of

23 view of the cameras.  So where you see 7 and the line goes up

24 on the page, that means that's the direction it's facing.

25    Now, you heard the government say that the evidence

1   is going to say that Mr. Kelley went into an area where fires
2   were found and that the only way in and out of that area was
3   what was caught on videotape.  But, in fact, the evidence will
4   show you something different.  On this diagram, there were
5   fires found in the copy area, labeled as copy area; and there
6   were fires found where it says reserve, work area, in this area
7   right back here, which is reserve and work area that I'm
8   indicating with my pencil.  What the government did not say but
9   what the evidence will show you is that there are separate ways
10  to get back in and out of those areas.  You'll see that there's
11  an elevator lobby right here.

12          And I'm showing you Defense Exhibit, or No. 3, which
13  you will hear is a photograph showing the circulation desk on
14  the right, with the access back into those rooms.  And you'll
15  see that there's a set of stairs on the left and a set of
16  elevators on the left.  And as you will hear during the course
17  of this trial, those stairs and those elevators were not on the
18  video footage, that you could not see on the video cameras if
19  somebody had walked back and forth from the elevators and those
20  stairs into those back rooms.  Similarly, on the opposite side
21  of the hallway where there were two fires in the copy area
22  room, Defense Exhibit No. 5 which you will hear about shows
23  that there's a staircase directly across from the copy area
24  room that was also not under video surveillance.

25          The video surveillance you will see in this case

1  terminates shortly after Mr. Kelley is last seen on video, but
2  it does not continue through any fire, through any smoke,
3  through the arrival of any law enforcement officers, through
4  the arrival of any firefighters.  You'll see him on video and,
5  no doubt, you will conclude that he was improperly in the
6  library and that he carried a broken quiet sign around; but
7  there will not be evidence to establish that he set any of
8  those fires.

9          In regards to Stephens College, you heard that there
10 was a computer stolen from Stephens College, and you will hear
11 evidence that there was a small fire in the Stephens College
12 student building.  But the only person you will hear evidence
13 from directly linking those two events, saying the computer was
14 stolen at the same time the fire was set, is from this witness
15 named Brittany Carney.  Brittany is my client's ex-girlfriend,
16 my client's jilted ex-girlfriend who had had a nasty breakup
17 with him when she found out he was dating Tara Ballenger.  And
18 you will hear evidence that over the course of several months,
19 what she said that my client told her got progressively worse.
20 So as she talked to law enforcement, you'll hear that she gave
21 one version of what she said, and the next time she talks to
22 law enforcement she claims he confessed more, and the next time
23 she claims he confessed more, and a steady escalation that
24 makes him look worse and worse.  And we believe that when you
25 hear that evidence, you'll be able to put it in context and

1  that you'll be looking for independent evidence that links

2  those two events and that you will not find such independent

3  evidence.

4        So what we ask you to do as you go through the trial

5  is to consider that there will be very clear evidence that

6  Chris was where he shouldn't have been, doing things he

7  shouldn't have been doing; but what you need to be focused on

8  is the counts of did he set fires on those locations, did he

9  maliciously burn those buildings affecting interstate commerce.

10 Thank you.

11       THE COURT:  Mr. Lynn, you may call your first

12 witness.

13       MR. LYNN:  Lisa Todd, Your Honor.

14                        - - -

15                      LISA TODD,

16  being first duly sworn by the courtroom deputy, testified as

17 follows:

18       THE COURT:  You may proceed.

19                        - - -

20                  DIRECT EXAMINATION

21  By Mr. Lynn:

22  Q.    Would you state your name, please?

23  A.    Lisa Todd.

24  Q.    And how are you employed?

25  A.    I'm a lieutenant with Columbia Fire Department.

1  Q.      Okay.  And how long have you been so employed?

2  A.      I've been with the Columbia Fire Department for 12

3  years.

4  Q.      And generally, would you tell the jury what your duties

5  are?

6  A.      Currently I'm in the Assistant Fire Marshal's Office.

7  Q.      Okay.  Back on May 18th of 2011, what was your

8  position?

9  A.      I was the lieutenant on the fire truck, so I was in

10  charge of the truck and the two people on the truck with me.

11  So when we went to a fire, it would be my decisions as to what

12  we did; or a medical emergency, I would be the one to tell my

13  crew what to do.

14  Q.      Were you kind of a first responder to a fire?

15  A.      Yes, when there's a fire dispatched, we are usually --

16  if it's in our area, we'll be the first on.  On the scene, I'm

17  sorry.

18  Q.      Do you kind of assess the fire and determine what to do

19  from there?

20  A.      Yes, sir.  When we pull up on the scene, we look and

21  see if we see anything showing, we see what we've got.  And

22  depending on what we see, we call for more resources or we just

23  start attacking the fire at the time.

24  Q.      I want to take you back to May 18th of 2011.  Were you

25  called to the scene of a fire on that day?

1  A.     Yes, sir.

2  Q.     And about what time?

3  A.     I'm looking at my report.  We were called at 3:58 in

4  the morning.

5  Q.     And how were you notified of the presence of a fire,

6  possible presence of a fire?

7  A.     At that time we were asleep; and what happens at the

8  fire station is all the lights come on, the tones go off, and

9  they tell us where we're going and what we're going to.

10  Q.     So the tones go off and what do you do?

11  A.     They told us we were going to a fire alarm.  So we get

12  up; and at that time when it's a fire alarm, it's just one

13  truck responds because a lot of times fire alarms are not an

14  actual fire, they're a mistake with the system.

15         So we got up and got dressed, put our bunker gear on

16  and got in the truck, and we responded emergency with lights

17  and sirens.

18  Q.     When you say we, who assisted you?

19  A.     Myself, John Amber (ph.) was the driver of the truck,

20  and Jeff Hudson was my firefighter that day.

21  Q.     Okay.  So about when did you arrive at the scene?

22  A.     It would have been just a few minutes after that.

23  Takes us a couple minutes to get there; and this was just a few

24  blocks away, so probably two to three minutes later.

25  Q.     Okay.  And what was the scene that you were called to?

1   A.      We were called to a fire alarm at the day-care over on

2   Stephens College -- I can't remember the exact address.  It was

3   on Windsor Street.  And when we arrived -- do you want me to go

4   into what we saw?

5   Q.      When you arrived, what did you see?

6   A.      Nothing.  We arrived on the scene and we saw nothing.

7   There was a security guard outside the building, so I got off

8   the truck and he let me in the building.  My firefighter got

9   off too, he was right behind me, and he opened up the door and

10  let us in the building.

11  Q.      When you entered the building, did you see anything?

12  A.      As soon as we entered the building, we had heavy smoke

13  coming out of the structure.  So I entered the structure with

14  the security guard, and I was concerned it was in the basement

15  because all of the mechanical's in the basement, I'd been in

16  the building before to do an inspection.

17          So we went ahead, and he took me to the basement

18  entrance so I could see if it was coming from there because

19  that caused me concern that the basement is burning and it's

20  more likely that we'll get hurt.

21          My firefighter started a right-handed search of the

22  building, which means he goes to the right and searches

23  everything to his right.  So he'll -- we'll do a right or left,

24  and he did a right.  So he comes in, and he just stays to the

25  right.  So if I need to find him or he needs to find his way

1  out, he turns around and does everything to the left.  So he
2  started a right-handed search.  And when we opened the basement
3  door, there was nothing in the basement, and so we knew it
4  wasn't coming from the basement, or it was a pretty good
5  conclusion.
6   Q.     So what happened next?
7   A.     I heard my firefighter announce he had found the fire,
8  so I returned back.  We could still see low, so we returned
9  back.  We had just gone straight down the hallway, we turned
10 around.  The security guard and I turned around and headed back
11 to the front where he announced he had found the fire, and we
12 had a small fire in one of the classrooms, in the corner of one
13 of the classrooms.
14  Q.     When you state small fire, how did it appear?
15  A.     A few feet.  It was just flames in the corner.  We knew
16 it was small enough that we would not need the fire hose.  We
17 went and got the fire extinguisher off the truck and used a
18 water fire extinguisher to put it out.
19  Q.     Were you able to extinguish it fairly quickly?
20  A.     Yes, sir.
21  Q.     And what did you next do?
22  A.     At that point, I did -- I'm sorry, I did skip a step.
23 When we opened the door and had smoke in the building, at that
24 point I get on the radio and I announce that I have smoke
25 showing and to fill the box.  And what that means is for 911 to

1  send all the rest of the trucks because at that point there's

2  just one truck, and our normal component is five trucks that

3  come to a fire because we need all of the people and the help.

4          So at that point once we had it out, I notified 911

5  that we had extinguished the fire and just to continue the

6  ladder truck for assistance.  We tore some of the drywall out

7  around the fire to make sure it hadn't gotten into the wall.

8  Q.     Did it appear to have gotten into the wall?

9  A.     No, it did not.

10 Q.     How did you determine that?

11 A.     Well, when you look, if it had gotten into the wall,

12 the wood studs would have had charring, and they did not.

13 Nothing behind the gypsum board or the drywall had any

14 charring, so we knew it wasn't from back there.  And then I

15 asked for the investigator to come because anytime we have a

16 fire in a structure that causes any damage, we call for a fire

17 investigator, and at that time Marshal 6 was dispatched to come

18 up and assist us, so we waited until she arrived.

19 Q.     And who is Marshal 6?

20 A.     Her name is Debbie Sorrell.

21 Q.     Do you recall how long it took for her to arrive?

22 A.     It took her probably about 20 minutes.  She doesn't

23 live very far away, 15 or 20 minutes.

24 Q.     Did you stay at the scene there until she arrived?

25 A.     Yes, sir, we stayed at the scene.  And when she

1  arrives, we assist her.  We basically stay there in case she

2  needs us to dig something or help her with anything, so we just

3  kind of wait there until she needs something.

4           MR. LYNN:  I don't think I have any further

5  questions, Your Honor.

6           THE COURT:  Any cross-examination?

7           MR. STABENOW:  No questions, Your Honor.

8           THE COURT:  Thank you, you may be excused.

9           THE WITNESS:  Thank you.

10          MR. LYNN:  Your Honor, may I have just a moment?

11          THE COURT:  Sure.

12                            - - -

13                       TONY COLEMAN,

14  being first duly sworn by the courtroom deputy, testified as

15  follows:

16                            - - -

17                     DIRECT EXAMINATION

18  By Mr. Lynn:

19  Q.    Would you state your name; and spell your name for the

20  benefit of the court reporter, if you would.

21  A.    It's Tony Coleman, C-O-L-E-M-A-N.

22  Q.    What is your occupation?

23  A.    I'm the Director of Campus Security at Stephens College

24  in Columbia.

25  Q.    How long have you been at that position?

1  A.      Since February of 2009.

2  Q.      Do you have prior law enforcement experience?

3  A.      Yes, I do.

4  Q.      What sort of experience do you have?

5  A.      I started my law enforcement career in 1984 and ended

6  it full time in 2002.  The last seven years I spent as a

7  captain on patrol of detectives of a sheriff's department in

8  southwest Missouri.  After that time, I remained an active

9  reserve officer for the community I lived in until I came to

10  Columbia in 2009.

11  Q.      I want to direct you to May 18th of 2011, the early

12  morning hours.  Were you called into work during that time?

13  A.      I was.

14  Q.      What time, what time were you called, do you recall?

15  A.      Yes, it was approximately 4:10, 4:15, somewhere in that

16  neighborhood.

17  Q.      What was the nature of the call?

18  A.      One of my security officers had called to tell me that

19  the alarms had activated at the Audrey Webb Children's School;

20  and upon his arrival, the fire department had arrived and he

21  found the building full of smoke and an active fire inside.

22  Q.      And did you indicate what time you arrived?

23  A.      Yes, it was about 4:30, about 15, 20 minutes later.

24  Q.      And when you arrived, what did you see?

25  A.      Naturally, my concern was the building and the fact,

first of all, that the fire had been put out; and then

naturally, of course, would be the cause of how it started.

Q.      Did you also go into the classroom and look around?

A.      I did.

Q.      And what was your purpose in going in there?

A.      Actually, we checked the entire building with the

officer just to ensure there wasn't anything else going on

inside.  Then when it was safe to go inside, it was Classroom

108 where the fire was at, and I went inside there.

Q.      I'm going to show you what's been marked as

Government's Exhibits 1 through 11.  Look through those photos

and tell me if you recognize those.

A.      This is the exterior --

Q.      Before you get into particulars, just go through them

and tell me whether you recognize them.

A.      Yes, sir, I do.

Q.      And do those photos fairly and accurately depict how

the scene appeared to you that evening -- or early morning

hours, I should say?

A.      Later in the morning, yes, sir.

            MR. LYNN:  Offer 1 through 11, Your Honor.

            MR. STABENOW:  No objection.

            THE COURT:  Exhibits 1 through 11 will be admitted.

            (Government's Exhibits 1-11 were admitted into

evidence.)

1  BY MR. LYNN:

2  Q.      Showing you Exhibit No. 1.  What does that photo show?

3  A.      That's the, one of the exterior corners of the Audrey

4  Webb Children's School on Stephens campus.

5  Q.      Government's Exhibit No. 2, what does that photograph

6  depict?

7  A.      That is the front entrance door to the Audrey Webb

8  Children's School.

9  Q.      Photograph No. 3, what does that depict?

10  A.      Just because I'm familiar with the sign, the Classroom

11  108 in the Audrey Webb Children's School.

12  Q.      Photograph No. 4, what does that show?

13  A.      That is the interior of Classroom 108 of the Audrey

14  Webb Children's School.

15  Q.      Photograph No. 5, what does that depict?

16  A.      Again, that is the 108 classroom of Audrey Webb

17  Children's School.

18  Q.      Photograph No. 6, what does that show?

19  A.      That is also the inside of Room 108, the Audrey Webb

20  Children's School.

21  Q.      And what is depicted along the wall there?

22  A.      These are computers set up for the education classes

23  that are held in that room.

24  Q.      Okay.  This was a little challenging because of

25  perspective, but Exhibit No. 7, what does that show?  Turn it

1  right side, that would be helpful.  What does that show?

2  A.      Again, that's the interior of Room 108 at the Audrey

3  Webb Children's School, and that row of computers in this

4  particular photo is where we were able to see that something

5  was missing that had been sitting there on that counter.

6  Q.      Were you able to determine what was missing?

7  A.      Yes, I was.

8  Q.      What was determined to be missing?

9  A.      A Mac Mini, similar to the ones -- almost identical to

10  the one shown there in the photo.

11  Q.      Were you able to obtain identifying information related

12  to the computer equipment?

13  A.      I was.

14  Q.      What were you able to obtain?

15  A.      Our campus computing IT people were able to provide me

16  with a description and the serial numbers of the items that

17  they felt were missing from that location.

18  Q.      And what was the serial number for the Mac Mini?

19  A.      If I may refer to my --

20  Q.      If you need to look at that to refresh your memory, you

21  may.

22  A.      Can I, please?  Thank you.  The Mac Mini was a 2.4 gig

23  Intel Core 2 Duo.  It had a Stephens inventory tag number 2469

24  and the serial number of C, Charles, 07D, David, M, 30N, Nora,

25  D, David, D, David, 6H, Henry.

1  Q.    What were you able to find with respect to the Apple

2  keypad in the identifying information?  Anything particularly

3  identifiable about that?  Was the serial number --

4  A.    They were ordered in bulk.  There were a number of them

5  that were identical with no identifying numbers on them.

6  Q.    What was the monitors, just general identifying

7  information?

8  A.    The monitors were ViewSonic VG2236wm, 22-inch LED

9  monitors.

10         MR. LYNN:  No further, Your Honor.

11         THE COURT:  Mr. Stabenow, do you have any

12 cross-examination?

13         MR. STABENOW:  Yes, Your Honor.

14                        - - -

15                 CROSS-EXAMINATION

16 By Mr. Stabenow:

17 Q.    Mr. Coleman, in the course of your investigation, when

18 you looked into those computer numbers, you found that the last

19 time the computers had been inventoried was about a week

20 earlier, correct?

21 A.    That's correct.

22 Q.    All right.  And it was reported to you that there --

23 that your security personnel had found the building unsecured

24 with a door open the previous night at 7 p.m.; is that correct?

25 A.    That's possible.  I would have to review the logs for

1  that information.

2   Q.      I'm going to hand you something.  I don't want you to

3  read it out loud or anything, I just want you to take a look at

4  it yourself.  I'm specifically going to refer you to a section

5  right here in the middle, if you could take a look at that for

6  a minute and just look up when you're done reading that

7  section.

8          (So done.)

9   Q.      I'm going to retrieve that document that I'll mark as

10 Defense Exhibit No. 6 for identification.  Does that refresh

11 your memory as to whether or not it was reported to you that

12 there had been an unsecured door found at that specific

13 building that evening, the previous night at about 7 p.m.?

14  A.      Yes, sir.

15  Q.      All right.  And was it true that they found an open

16 door the previous night about 7 p.m.?

17  A.      That's correct.

18  Q.      When that unsecured building was found at about 7 p.m.

19 the night before, they checked to make sure nobody was inside,

20 they didn't see anything immediately apparent, and they locked

21 up and resecured the building; is that correct?

22  A.      Correct.

23  Q.      But they did not inventory the computer equipment at

24 that time.

25  A.      That's correct.

1  Q.     So nobody actually went in and put eyes on the specific

2  computer that ended up missing and can say that it wasn't

3  missing at 7 p.m. the night before.

4  A.     Not that I'm aware of, sir.

5         MR. STABENOW:  Thank you.  Nothing further.

6         MR. LYNN:  No redirect, Your Honor.

7         THE COURT:  You may step down.

8         MR. LYNN:  Leslie Willey.

9                        - - -

10                     LESLIE WILLEY,

11 being first duly sworn by the courtroom deputy, testified as

12 follows:

13                        - - -

14                  DIRECT EXAMINATION

15 By Mr. Lynn:

16 Q.     Ma'am, would you state your name for the court and for

17 the jury?  And spell your name for the benefit of the court

18 reporter, if you would.

19 A.     Sure.  Leslie Willey; L-E-S-L-I-E, W-I-L-L-E-Y.

20 Q.     And Ms. Willey, how are you employed?

21 A.     I'm the Dean of the School of Interdisciplinary Studies

22 at Stephens College and was chair -- and chair of the education

23 program.

24 Q.     Do you have any responsibilities with respect to the

25 children's school there?

1  A.      Yes, I do.  I'm the Director of the Stephens College

2  children's school.

3  Q.      And how long have you been in those various positions?

4  A.      I have been a faculty member at the college since 1996,

5  and I have been the Director of the children's school for the

6  past eight years and a faculty member for the past ten years.

7  Q.      And would you tell the jury, what sort of facility is

8  the children's school?

9  A.      It is a laboratory school that's housed on the campus.

10  It's the building that houses the education program.  There are

11  college classrooms, there are faculty offices, and there are

12  children's -- preschool children's classrooms, there are three

13  of those in that building.

14  Q.      So you've got college students utilizing the building,

15  as well, to take classes, et cetera?

16  A.      That's correct.  They take practices -- they take

17  practicum or internships in the preschool classrooms.  We also

18  have an elementary program, and that's in another building

19  right across the street.

20  Q.      Okay.  So you said there are children that utilize the

21  building, as well; is that correct?

22  A.      Yes.

23  Q.      For what purpose did you say?

24  A.      It is a preschool and it is -- they are there half

25  days, and then some are there full days, and there's a before

1  and after-school care.

2  Q.      Do the elementary students use the Audrey Webb

3  facilities ever?

4  A.      Yes, they do.

5  Q.      Now, these preschool and elementary students, is this a

6  fee-based kind of situation, is there tuition --

7  A.      Yes, there is.

8  Q.      -- discharged there?  Okay.  Now, you said that the

9  Stephens students, the education students also participate in

10  the program.  Is that -- what do they do?  Does this offer them

11  kind of a lab?

12  A.      It does.  It offers them their practicum in student

13  teaching, part of their student teaching experiences.

14  Q.      Are any of the students paid?

15  A.      They pay tuition for the college classes, and they get

16  college course credit for that.

17  Q.      Now, are there any students from out of state that

18  attend Stephens College?

19  A.      Yes, there are.

20  Q.      Do you have any kind of statistics as to --

21  A.      I do.  About 37, 38 percent of the total enrollment at

22  Stephens is from out of state.

23  Q.      So the geography expands all across the United States?

24  A.      That's correct.

25  Q.      Any international students?

1  A.      Some years there's a couple.  It's not a large -- we

2  don't have a lot.

3  Q.      Okay.  These out-of-state students, they pay tuition, I

4  assume, to attend Stephens?

5  A.      Yes, they do.

6  Q.      What was the tuition back in 2011, approximately?

7  A.      The approximate tuition was 22,500, and that was only

8  tuition.

9  Q.      Now, does Stephens College recruit students throughout

10  the country?

11  A.      Yes, they do.

12  Q.      How do they do that?

13  A.      We have -- through our admissions office, they have

14  admissions counselors or ambassadors that travel across the

15  United States to recruit students.

16  Q.      So they travel across the states.  I assume they stay

17  in hotels or motels?

18  A.      They do.

19  Q.      Does the children's school use any materials from

20  out-of-state vendors or suppliers?

21  A.      Yes, we do.

22  Q.      What sort of materials are acquired out of state?

23  A.      One of our main suppliers is School Specialty, and they

24  are out of Wisconsin.  We order our various supplies, such as

25  construction paper, paint, glue, all of that.  We also order

1  tables and chairs, and different kinds of manipulative blocks

2  and those kinds of things.

3  Q.      What about textbooks?

4  A.      For college classes, we do order textbooks from a

5  variety of publishers.  Some of the main ones are from New

6  Hampshire, Maine, New Jersey.

7  Q.      Obviously you pay for those materials?

8  A.      We do pay for those, yes.

9  Q.      Were you familiar with the fire that happened back on

10 May 18, 2011, at the children's school?

11 A.      Yes, I am.

12 Q.      Classroom 108, was that the site of the fire?

13 A.      That's correct.

14 Q.      What was that facility used for?

15 A.      The primary use of that classroom is college student

16 classrooms, but -- that's the primary use, but in conjunction,

17 there are various times where children would be in that

18 classroom.  It's filled with technology and our SMART Board,

19 and children would be in there, or they would be in doing

20 activities with the college students.

21 Q.      Understood.  Let me check -- you also have an online

22 class program?

23 A.      That's correct.

24 Q.      And could you tell the jury a little bit about that?

25 A.      It is a Master's program.  It's a Master's in Education

1  with an emphasis in curriculum and instruction.  Students come

2  to -- students must be certified teachers.  They come to campus

3  for one week in June and the rest -- the first summer and the

4  second summer one week in June.  It's a 13-month program.  The

5  rest of the program is taught online.

6  Q.      Who participates in that?

7  A.      Students from all across the country can.  It's open to

8  anybody.  It actually can be open to anybody in the world.

9  Q.      So you have participants in other states?

10  A.      That's correct.

11  Q.      And they pay tuition?

12  A.      That's correct.

13          MR. LYNN:  No further.

14          THE COURT:  Cross?

15          MR. STABENOW:  No, Your Honor.

16          THE COURT:  You may step down.

17                      - - -

18                   COREY BOWDEN,

19  being first duly sworn by the courtroom deputy, testified as

20  follows:

21                      - - -

22                DIRECT EXAMINATION

23  By Mr. Lynn:

24  Q.      Sir, would you state your name for the court, for

25  counsel, and for the jury, and spell your name for the benefit

1  of the court reporter?

2   A.      My name is Corey Bowden; C-O-R-E-Y, and Bowden is

3  B-O-W-D-E-N.

4   Q.      How are you employed?

5   A.      I'm a detective with the Columbia Police Department.

6   Q.      How long have you been involved with law enforcement

7  work?

8   A.      Approximately 16 years.

9   Q.      Officer Bowden, I want to take you back to February 1

10 of 2012.  Did you have occasion to assist Special Agent

11 Holloway in an investigation?

12  A.      Yes, I did.

13  Q.      And did you go to a particular location at about 4

14 o'clock in the afternoon?

15  A.      Yes.

16  Q.      And where did you go?

17  A.      108 Hubbell Street.

18  Q.      Do you remember about what time you arrived?

19  A.      It was right about 4 o'clock in the afternoon.

20  Q.      And did you make contact with any persons at that

21 location?

22  A.      Yes, we did make contact with the residents.

23  Q.      Okay.  With whom did you make contact?

24  A.      Ultimately made contact with Mr. Kelley.

25  Q.      Okay.  You say Mr. Kelley.  Is Mr. Kelley present in

1  the courtroom today; and, if so, would you point him out,

2  please?

3   A.      Yeah, sitting right there.

4          MR. LYNN:  And, Your Honor, may the record reflect

5  that the witness -- he's kind of been vague, but --

6   Q.      Can you be more specific?

7   A.      Purple shirt, dark beard.

8          THE COURT:  The record will reflect that the witness

9  has identified the defendant.

10         MR. LYNN:  Very well.

11  BY MR. LYNN:

12  Q.      Now, when you made contact with Mr. Kelley, did you --

13  how were you dressed, were you dressed in uniform or just

14  street clothes?

15  A.      Plainclothes.

16  Q.      Did you identify yourself to Mr. Kelley?

17  A.      Yeah, I did have a badge.

18  Q.      Did you ask any questions of him, did you seek

19  permission to do anything?

20  A.      Yeah, we were seeking permission to consent search his

21  apartment.

22  Q.      When you asked for consent to search, what did he do?

23  A.      He requested to talk to an attorney, and he immediately

24  made a phone call to an attorney or a friend or something.

25  Q.      Okay.  While he was making a phone call, did he provide

1  you with any instructions?

2          MR. STABENOW:  Objection, Your Honor, relevance.

3          THE COURT:  I'm going to have to overrule it at this

4  point.  It seems to be relevant, depending on where you're

5  going with that.

6  A.     While on the phone --

7  BY MR. LYNN:

8  Q.     What did Mr. Kelley tell you to do?

9  A.     While on the phone, he had asked us to leave the

10 residence.

11 Q.     Okay.  Now, did you agree to leave the residence?

12 A.     Yeah, we stepped back outside the front door.

13 Q.     But what, if anything, did you tell Mr. Kelley?

14 A.     We told him that we were going to go back and apply for

15 a search warrant for his residence and we would keep

16 surveillance on his residence while the search warrant was

17 being prepared.

18 Q.     When you retreated, where did you go?

19 A.     I actually positioned myself at the rear of the

20 residence, and Agent Holloway stayed out front.

21 Q.     Okay.  Ultimately did you depart from his residence?

22 A.     We took up those positions until uniformed patrol could

23 get there to assist us, and then they relieved us of those

24 positions.

25 Q.     After you left his residence, where did you go?

1    A.      I went back to the Columbia Police Department to

2    prepare the search warrant.

3    Q.      Did you successfully obtain a search warrant for his

4    premises?

5    A.      Yes.

6    Q.      Did you return to his residence at some point?

7    A.      Yes.

8    Q.      What time?

9    A.      It was approximately 9 p.m.

10   Q.      Did you thereafter execute the search warrant?

11   A.      Yes.

12   Q.      Serve the search warrant, I --

13   A.      Yes, we did.

14   Q.      Officer Bowden, let me show you what has been marked

15   Government's Exhibits 12 through 21.  Can you look through

16   those?  And my question is, do you recognize those photos?

17   A.      Yes, I do.

18   Q.      Go through those.  I know you've seen them before,

19   but --

20           (So done.)

21   Q.      Do those photos -- were those photos taken that

22   evening?

23   A.      Yes, they were.

24   Q.      You took a number of those photos; is that correct?

25   A.      Yes.

1  Q.     Do they accurately and fairly depict how that scene

2  looked that evening?

3  A.     Yes.

4         MR. LYNN:  Offer Government's Exhibit 12 through 21,

5  Your Honor.

6         MR. STABENOW:  No objection.

7         THE COURT:  Exhibits 12 through 21 will be admitted

8  into evidence.

9         (Government's Exhibits 12-21 were admitted into

10 evidence.)

11 BY MR. LYNN:

12 Q.     Showing you Exhibit 12, Officer.  What does that

13 photograph show?

14 A.     That is a photo from the street of 108 Hubbell.

15 Q.     Does that depict the residence that was the subject of

16 the search?

17 A.     Yes.

18 Q.     Show you Exhibit 13.  What does that photograph show?

19 A.     That's as you're coming through the front door of the

20 residence.

21 Q.     So was there two levels to this residence?

22 A.     Yes.  Kind of a little breezeway off to the left

23 there's like a living room area, and to the right there's

24 stairs straight up to Mr. Kelley's living area.

25 Q.     You say Mr. Kelley's living area was upstairs?

1   A.      Yes.

2   Q.      Were there other residents who occupied the residence,

3   as well?

4   A.      Yes.

5   Q.      Showing you Government's Exhibit No. 14.  Do you

6   recognize that?

7   A.      Yes.

8   Q.      Where is that within the residence?

9   A.      That is upstairs in a little, kind of office/closet

10  area off of a bedroom.

11  Q.      Now, what is depicted -- did you seize any item

12  depicted in that photograph?

13  A.      Yes, the ViewSonic monitor there on the floor.

14  Q.      And is this it?

15  A.      It would be the one right in front of it without the

16  silver strap.

17  Q.      And that item was seized?

18  A.      Yes.

19  Q.      Exhibit No. 15, what does that show?

20  A.      It's a Apple keyboard and mouse that was also, that was

21  located in this tote in that closet area.

22  Q.      That same closet area?

23  A.      Yeah, yes.

24  Q.      Show you Government's 16.  What does that photograph

25  depict?

1  A.      This is a closet that is to the other side of the same
2  bedroom from where we just were in the office/closet.
3  Q.      And what does it show?
4  A.      It's kind of difficult to see, but right at the top of
5  the picture where you see that metal shelving unit, right above
6  that is access to the attic.
7  Q.      Okay.  Show you Exhibit 17, what does that show?
8  A.      This shows after we had unfastened the shelving unit
9  and folded it up, we were able to access the attic at that
10 point.
11 Q.      Show you Exhibit 18.  Now, you didn't take that
12 photograph, did you, actually?
13 A.      No, sir.
14 Q.      Okay.  Who took that photograph?
15 A.      Agent Holloway took this photo.
16 Q.      Did you assist him in any way?
17 A.      Yes.
18 Q.      What did you do?
19 A.      He was actually at this point up in the attic access
20 hole, or what you might call, and I was standing down and
21 retrieving items from him as he photographed them.
22 Q.      How did you gain access to the attic?  How did you
23 climb up there?
24 A.      We had a ladder through the assistance of some of the
25 other tenants there.

1   Q.      There wasn't a ladder allowing access without obtaining

2   a ladder?

3   A.      No.

4   Q.      Show you Government's Exhibit 19.  Do you recognize

5   that?

6   A.      Yes, it's -- this is the Mac Mini that was taken out of

7   the attic.

8   Q.      Show you Exhibit No. 20.  What does that show?

9   A.      It shows a serial number to the Mac Mini.

10  Q.      Are you able to read that serial number?

11  A.      Might be able to.

12  Q.      Would it help with the photo?

13  A.      Are you ready?

14  Q.      Go ahead.

15  A.      It's C07DM30NDD6H.

16  Q.      And finally, Government's Exhibit 21, what does that

17  show?

18  A.      This is a photo of all the items collected from the

19  residence related to this case.

20          MR. LYNN:  No further, Your Honor.

21          THE COURT:  Do you have any cross-examination, Mr.

22  Stabenow?

23          MR. STABENOW:  No, Your Honor, thank you.

24          THE COURT:  Thank you, Officer, you may step down.

25                      - - -

                    BRYAN LIEBHART,

 being first duly sworn by the courtroom deputy, testified as

 follows:

                        - - -

                  DIRECT EXAMINATION

 By Mr. Lynn:

 Q.     Would you state your name; and spell your name for the

 benefit of the court reporter, if you would.

 A.     I'm Bryan Liebhart.  That's spelled B-R-Y-A-N; Liebhart

 is L-I-E-B-H-A-R-T.

 Q.     And how are you employed?

 A.     I'm a detective in the Major Crime Unit, Columbia,

 Missouri, Police Department.

 Q.     And how long have you been with the Columbia Police

 Department?

 A.     I've been employed as a, with the police department for

 22 years.

 Q.     I want to direct your attention back to February the

 1st of 2011.  Did you have occasion to assist officers in doing

 a search warrant?

 A.     I did.

 Q.     And to what residence did you respond; do you recall?

 A.     It was an address at 108 Hubbell in the city limits of

 Columbia.

 Q.     And what was your role or participation in that search

1   warrant?

2   A.      My role was simply somebody who was going to go along

3   to provide assistance with, you know, moving things out if

4   things were discovered, that type of stuff.

5   Q.      So you were the guy charged with collecting the

6   evidence; is that fair to say?

7   A.      Yes.

8   Q.      And packaging it and preserving it?

9   A.      That is right.

10  Q.      I want to show you what's been marked as Government's

11  Exhibit 23.  Do you recognize that as an item that you gained

12  possession of on that date?

13  A.      Yes, I do.

14  Q.      And how are you able to recognize it?

15  A.      It does look familiar, and I can confirm that by

16  looking at an evidence tag on the back side which has my name

17  and serial number and the department on it, so this is

18  definitely an item that I collected from the search warrant.

19  Q.      After you collected that item from the search warrant,

20  you obviously marked it for identification purposes for future

21  court use; is that correct?

22  A.      Yes, I did.

23  Q.      What other measures did you take to preserve its

24  integrity as evidence?

25  A.      I put some evidence tape on it so it would remain as a

1  piece of evidence intact.

2   Q.     And did you put it into a package of any kind and log

3  it into any place, secure location?

4   A.     I logged it into our computer system at the police

5  department; and then after doing so, I placed it into the

6  evidence section, which is a secure facility at the police

7  department.  Once they took custody of it, I get a receipt back

8  stating that I turned it in and they had received the property.

9             MR. LYNN:  Offer Exhibit 23, Your Honor.

10            THE COURT:  Any objection?

11            MR. STABENOW:  No objection.

12            THE COURT:  Exhibit 23 will be admitted.

13          (Government's Exhibit 23 was admitted into evidence.)

14  BY MR. LYNN:

15   Q.     And showing you Exhibit 22, same question, do you

16  recognize that as an item that came into your possession back

17  on February 1st of 2012?

18   A.     I do.

19   Q.     And again, same questions, it has your evidence tag on

20  it, et cetera?

21   A.     Same answers, same evidence tag, submitted into

22  evidence in much the same fashion as the keyboard.

23            MR. LYNN:  Offer Exhibit 22, Your Honor.

24            THE COURT:  Any objection?

25            MR. STABENOW:  No objection.

1          THE COURT:  Exhibit 22 will be admitted.

2          (Government's Exhibit 22 was admitted into evidence.)

3   BY MR. LYNN:

4   Q.     And finally, showing you Government's Exhibit No. 24,

5   do you recognize that as an item that came into your possession

6   back on that date?

7   A.     Yes, I do.

8   Q.     And, again, same question, you packaged it, marked it

9   for identification, logged it into evidence; is that correct?

10  A.     That's correct.

11         MR. LYNN:  Your Honor, I would offer Government's

12  Exhibit No. 24.

13         THE COURT:  Any objection?

14         MR. STABENOW:  No objection.

15         THE COURT:  Exhibit 24 will be admitted.

16         (Government's Exhibit 24 was admitted into evidence.)

17  BY MR. LYNN:

18  Q.     Does Exhibit 24 contain any identifying information or

19  a serial number?

20  A.     There's a serial number.

21  Q.     That's really small.  Can you read that?

22  A.     Yes, I believe I can.  C07D as in David, M as in Mary,

23  30N as in Nora, D as in David, D as in David, 6H as in Henry.

24         MR. LYNN:  No further questions.

25         MR. STABENOW:  No questions, Your Honor.

1          THE COURT:  You may step down.

2          THE WITNESS:  Thank you.

3          MR. LYNN:  Craig Holloway is the next witness.

4                          - - -

5                      CRAIG HOLLOWAY,

6    being first duly sworn by the courtroom deputy, testified as

7    follows:

8                          - - -

9                      DIRECT EXAMINATION

10   By Mr. Lynn:

11   Q.     Sir, would you state your name for the court and spell

12   your name for the benefit of the court reporter?

13   A.     Craig Holloway.  First name is C-R-A-I-G; last name is

14   H-O-L-L-O-W-A-Y.

15   Q.     And how are you employed?

16   A.     I'm a Special Agent with the Bureau of Alcohol,

17   Tobacco, Firearms and Explosives.

18   Q.     How long have you been with ATF?

19   A.     Ten years.

20   Q.     Do you have prior law enforcement experience?

21   A.     Yes, I spent six years as a military policeman in the

22   military reserve, five years as a municipal police officer for

23   the Village of Skokie, Illinois, and four years as a Deputy

24   U.S. Marshal.

25   Q.     I want to take you back to February 1st of 2012 at

1  about 4 o'clock in the afternoon.  Did you have occasion to go

2  to a location regarding an investigation?

3   A.    Yes, myself and Detective Corey Bowden went to 108

4  Hubbell Street in Columbia, Missouri.

5   Q.    Did you make contact with any persons there?

6   A.    Yes, we made contact with one of the residents there,

7  Chris Kelley.

8   Q.    Did you tell Mr. Kelley who you were, did you identify

9  yourself as law enforcement officers?

10   A.    Yes.

11          MR. STABENOW:  Objection, cumulative.

12          THE COURT:  Overruled.

13  BY MR. LYNN:

14   Q.    Did you make any requests of Mr. Kelley?

15   A.    Yes, we asked them for consent to search the upstairs

16  apartment.

17   Q.    And did he do anything in response?

18   A.    He said he wanted to check with a friend who was a

19  lawyer, called on his cell phone.  During the call, he told us

20  to leave.

21   Q.    Did you leave, did you agree to leave?

22   A.    We told him we would leave the area, but we were going

23  to be in the process of seeking a search warrant.  He was free

24  to leave, but we asked him not to remove anything from the

25  residence, and we would post police officers outside.

1 Q.      Okay.  Did you then retreat from his residence?

2 A.      Yes, we did.

3 Q.      And where did you go?

4 A.      I went to the front of the residence outside.

5 Detective Bowden went around to the side and back corner.

6 Q.      Okay.  Did you remain at those locations for a time?

7 A.      It was a short period, 20 or 30 minutes, I believe,

8 until uniformed officers arrived to relieve us.

9 Q.      Now, did you return to Mr. Kelley's residence that same

10 date?

11 A.      About 9 o'clock in the evening.

12 Q.      Okay.  And what did you have with you when you

13 returned?

14 A.      We had a state search warrant.

15 Q.      Okay.  Did you proceed to execute the state search

16 warrant?

17 A.      Yes, we did.

18 Q.      And did you participate in that search?

19 A.      Yes, I did.

20 Q.      And let me show you what's been admitted as

21 Government's Exhibit 14.  Do you recognize what's depicted

22 there?

23 A.      Yes, I do.

24 Q.      What is that, what does that show?

25 A.      That shows a closet that's used apparently as an office

1   because there's a desk and desk chair in it, right off the

2   bedroom, right off one of the bedrooms in the upstairs

3   apartment.

4    Q.      Any items seized from that area?

5    A.      Yes.  I believe the ViewSonic monitor is visible there

6   between some shirts.

7    Q.      Showing you what's been admitted as Government's

8   Exhibit 15.  Do you recognize that?

9    A.      Yes, I do.

10   Q.      What does that show?

11   A.      It's a green tote containing several computer

12   peripherals, including an Apple brand keyboard and mouse.

13          MR. STABENOW:  Objection, Your Honor.  On these

14   photos, we didn't object to their entrance, and we've already

15   had described what they are, so cumulative as an ongoing

16   objection.

17          THE COURT:  I do agree.  I'm going to have to

18   sustain that objection, unless you're getting into some new

19   area that you're going to cover with this witness.

20          MR. LYNN:  I'll get to a new area.

21   BY MR. LYNN:

22   Q.      Officer Holloway, did you encounter an attic there in

23   the residence?

24   A.      Yes, in one of -- the apartment, in the other closet

25   that wasn't shown on the picture, there was a narrow closet

1    which had an attic access panel.

2    Q.      Now, was that attic entrance readily accessible?

3    A.      No, there was a wire shelving unit shelf less than a

4    foot below it or around a foot below it.  And while it was in

5    the upright position, that would prevent anybody from getting

6    up into the attic.

7    Q.      Did you nonetheless gain access to the attic?

8    A.      After looking at it for a few minutes, we realized if

9    you would pull the support out from the shelf, it would just

10   pull down.

11   Q.      So did you drop --

12   A.      We dropped the shelf, we obtained a ladder, and I went

13   into the attic.

14   Q.      Where did you have to go to get the ladder?

15   A.      We asked one of the roommates from one of the

16   downstairs apartments, and they said there was a ladder in the

17   basement we were welcome to use.

18   Q.      Upon acquiring the ladder, what did you do with it?

19   A.      Used it, propped it against the wall of the closet and

20   went up into the attic, partially into the attic.  I was still

21   standing on the ladder, but my upper body was in the attic.

22   Q.      Got you.  So you were the guy that got to go to the

23   attic?

24   A.      I think I was wearing jeans that day, so I got

25   nominated.

1  Q.      Very well.  Let me show you Government's 18.  What does

2  that photograph show?

3  A.      That shows the brown material surrounding a Mac Mini

4  computer.  The brown material is of the blown-in type

5  insulation.

6  Q.      And does that show how that was situated when you

7  encountered it when you climbed up there?

8  A.      That's correct.

9              MR. LYNN:  No further.

10             THE COURT:  Any cross-examination?

11             MR. STABENOW:  Just briefly, Your Honor.

12                          - - -

13                   CROSS-EXAMINATION

14  By Mr. Stabenow:

15  Q.      Agent Holloway, did you test any of that equipment for

16  exposure to a fire or smoke or anything like that?

17  A.      No, I did not.

18  Q.      And did you -- up in the attic there where you found

19  the computer equipment, did you find fire-starting equipment

20  or, you know, a canister of gasoline or anything like that?

21  A.      No, I did not.

22             MR. STABENOW:  Thank you.  Nothing further.

23             THE COURT:  Any redirect?

24             MR. LYNN:  No redirect.

25             THE COURT:  Special Agent, you may step down.

1        THE WITNESS:  Thank you.

2                    - - -

3                    ANDREW DOLAN,

4   being first duly sworn by the courtroom deputy, testified as

5   follows:

6                    - - -

7                    DIRECT EXAMINATION

8   By Mr. Lynn:

9   Q.      Sir, would you state your name and spell your name, if

10  you would?

11  A.      Andrew Dolan; A-N-D-R-E-W, D as in dog, O-L-A-N.

12  Q.      And Mr. Dolan, what is your status?  Are you a student?

13  A.      I'm a student, yes, at the University of Missouri.

14  Q.      Are you also employed?

15  A.      Yes, I am employed at the Ellis Library.

16  Q.      And what do you do at the Ellis Library?

17  A.      I am a part-time student security officer.

18  Q.      Okay.  I want to take you back to September 9th of

19  2011.  Were you working as a part-time security officer there

20  for the University of Missouri?

21  A.      I was, yes.

22  Q.      What was your assignment?

23  A.      I was on duty for about six hours that day, and then

24  eventually charged with closing the building at night.

25  Q.      Okay.  You were posted there at the Ellis Library; is

1  that correct?

2   A.      Yes, sir.

3   Q.      Okay.  And generally speaking, what were your duties?

4   A.      I am required to patrol the building every hour and a

5  half and check for food and beverage violations and other

6  general rule breaking that would possibly occur in the library.

7   Q.      And you also have certain duties with respect to

8  closing?

9   A.      Yes.

10  Q.      All right.  Now, do you remember whether you worked on

11  September 9th of 2011?

12  A.      Yes, I did.

13  Q.      Do you recall your shift?

14  A.      I believe it was 2:30 to 8:30.

15  Q.      Okay.  What time did the library close at that time?

16  A.      The building closes at 8 o'clock sharp, and that's when

17  I start my closing round.

18  Q.      And what do you do in terms of your closing rounds?

19  A.      I begin on the fourth floor, make sure all doors and

20  windows are secure, and I proceed my way around the entire

21  building, checking all windows, doors, make sure everything is

22  locked down and no one is still in the building.

23  Q.      Okay.  Now, what is the last thing you did that

24  evening?

25  A.      After I secured all doors and everything, we have a

1  card swipe because the west door locks itself.  I swiped myself

2  out and left.

3   Q.    At the time you left, was everything secure, to your

4  knowledge?

5   A.    Yes, sir.

6   Q.    Now, you said you had to swipe your card.  Why would

7  you have to swipe your card?

8   A.    Both our main entrances, the north doors and the west

9  doors, lock automatically at respective times, and in order to

10  exit or enter either of those doors, you have to be authorized

11  with a card and swipe it.

12   Q.    What about other entrances or exits?

13   A.    Everything else is alarmed or completely locked down.

14   Q.    Okay.  So what happens if somebody gets locked in at

15  night?

16   A.    They're trapped.

17   Q.    Okay.  What about windows?

18   A.    Windows are just locked.  I mean, there's no sort of

19  card swipe to open a window, but they're just your standard

20  window locks.

21   Q.    Okay.  So the only way to get in undetected would be

22  through a window?

23   A.    Yes, sir.

24        MR. LYNN:  No further.

25        THE COURT:  Any cross-examination?

1        MR. STABENOW:  Yes, Your Honor.

2                        - - -

3                  CROSS-EXAMINATION

4   By Mr. Stabenow:

5   Q.      So Mr. Dolan, I'm going to show you Defense Exhibit No.

6   1.  Do you recognize the floor plan shown in Defense Exhibit

7   No. 1?

8   A.      Yes, sir, it's the first floor.

9   Q.      And this is a partial map of the first floor of the

10  Ellis Library, correct?

11  A.      Yes.

12  Q.      So -- and parts of it are cut off.  There's more in

13  addition to this?

14  A.      Correct.

15  Q.      And by the way, this map may not be perfectly to scale,

16  but this is a pretty accurate representation of the floor plan

17  of the Ellis Library, isn't it?

18  A.      Yeah.

19  Q.      Do you see that room in the upper left-hand corner that

20  says copy area, and it's kind of a hard number to read, but it

21  looks like it says 115?

22  A.      Yes.

23  Q.      All right.  Now, that room -- there's a little marking

24  on the bottom of that part of that room, it looks like a little

25  green -- and I'm pointing to it here, it's right about where it

1  says stairs, it's like a little green half line.  That's the
2  door to the copy services area, correct?
3   A.     Correct.
4   Q.     Now, you know -- when you're doing your security
5  checks, you go to copy services, you check that the copy
6  services door is locked, but you don't actually have access
7  into copy services, do you, because they've already closed
8  their own room up for the night.
9   A.     Correct.
10  Q.     And the windows on this building, these aren't modern
11 high-tech windows, these are windows from like 30 years ago
12 with just a little flip latch to lock them, correct?
13  A.     I'm not certain about how old they are, but, yes, they
14 are regular windows.
15  Q.     An older style.
16  A.     I would say they are.
17  Q.     And it's not been unusual in your experience for copy
18 services people when the weather is nice to leave a window
19 cracked or forget to lock it, and you can't be responsible for
20 whether they locked those windows because all you can do is
21 check their door.
22  A.     Correct.
23  Q.     Now, you'll see on this exhibit there's some numbers.
24 I'm going to point to them.  You see there's a No. 7 I'm
25 pointing to with a blue arrow going up.

1   A.      Uh-huh.

2   Q.      A No. 9, a No. 16, a No. 5, and a No. 6 with some

3   directional arrows.  Do those fairly and accurately show where

4   the video cameras were at that time, the video cameras for

5   surveillance for that area of the library?

6   A.      It looks correct, yes.

7   Q.      All right.  I'm going to show you Defense Exhibit 2.

8   Do you recognize the location in that picture?

9   A.      Yes.

10  Q.      All right.  And does that fairly and accurately show

11  what you see back in 2011 if you're standing there in that

12  lobby by the circulation desk and you're looking around that

13  part of the library?

14  A.      Yes.

15  Q.      All right.  And you see the staircase there in the

16  middle of that picture?

17  A.      Yes.

18  Q.      All right.  That staircase -- at the time that they had

19  the cameras back in 2011, those staircases and then the

20  elevators further off to the left, those weren't actually under

21  video surveillance, were they?

22  A.      Not direct surveillance, no.

23  Q.      Okay.  And I'm going to show you Defense Exhibit No. 3.

24  Same question, does this fairly and accurately show what the

25  library is like back in 2011 right next to the circulation area

1  when you're standing there in the hallway?

2  A.     Yes.

3  Q.     And, again, the stairway and the elevators that we're

4  seeing there were not under direct video surveillance at the

5  time, correct?

6  A.     No.  Or correct, yes.

7  Q.     I'm going to go back to Defense Exhibit No. 1 here for

8  a second.  Do you see where I have that 7 with the blue arrow?

9  A.     Uh-huh.

10  Q.     Now, that camera is actually mounted up -- that's a

11  ceiling-mounted camera, right?

12  A.     Yes.

13  Q.     Do you call it the bird's nest or the eagle's nest,

14  what do you call it?

15  A.     We have a birdcage there.

16  Q.     Birdcage, okay.  So it's a birdcage camera?

17  A.     Yes.

18  Q.     I'm going to move now to Defense Exhibit No. 4.  Give

19  the camera a second to catch up.  Does that fairly and

20  accurately show the area around the copy services section of

21  that hallway?

22  A.     Yes.

23  Q.     All right.  Now, up in the upper left-hand side, you

24  see two ceiling lamps, one on the left and one on the right,

25  they look white and they're kind of mounted from the ceiling?

1  A.     Yes.

2  Q.     All right.  And there's -- beneath it, there's a little

3  black dot, what looks like a black dot hanging from the

4  ceiling.  Is that that video camera we were talking about?

5  A.     Yes.

6  Q.     Now, in this diagram, there's a staircase here in the

7  diagram where the blue doors are, and across from it is the

8  copy services.  Those stairways were also not under direct

9  video surveillance, were they?

10  A.     No.

11  Q.     So, so showing you Defense Exhibit No. 5, that's just a

12  view of the hallway from the opposite direction, right,

13  standing on the other side of copy services looking back

14  towards circulation?

15  A.     Yes.

16  Q.     Again, fairly and accurately show the hallway?

17  A.     Yes.

18  Q.     So a person could walk from that stairway back and

19  forth to copy services, and they would not have been under

20  video surveillance back in September of 2011, correct?

21  A.     Correct.

22         MR. STABENOW:  Just a moment.  Nothing further, Your

23  Honor.

24         THE COURT:  Any redirect?

25         MR. LYNN:  No redirect.

1          THE COURT:  You may step down.

2          THE WITNESS:  Thank you.

3                         - - -

4                    CHRISTOPHER BRAYER,

5  being first duly sworn by the courtroom deputy, testified as

6  follows:

7                         - - -

8                    DIRECT EXAMINATION

9  By Mr. Lynn:

10  Q.     Officer, would you state your name and spell your name,

11  please?

12  A.     Yes, my name is Christopher Brayer;

13  C-H-R-I-S-T-O-P-H-E-R, last name is Brayer, B-R-A-Y-E-R.

14  Q.     How are you employed?

15  A.     I'm a police officer with the University of Missouri

16  Police Department.

17  Q.     And how long have you been so employed?

18  A.     About four years.

19  Q.     I want to direct your attention back to September 10th

20  of 2011.  Were you on duty at that time in the early morning

21  hours?

22  A.     Yes, sir, I was.

23  Q.     What shift were you working?

24  A.     Midnight shift.

25  Q.     So you started at midnight?

1  A.     I probably started at 9 o'clock that night on the 9th

2  and would have gotten off about 7 o'clock in the morning on the

3  10th.

4  Q.     Around 3:26 a.m., did you get any particular

5  notification?

6  A.     Yes, I got the call of a general fire alarm at Ellis

7  Library.

8  Q.     Okay.  Where were you situated at that time when you

9  got that call?

10  A.     I think at that time I was sitting in our police

11  department, possibly working on some reports.

12  Q.     And did you respond to that alarm?

13  A.     I did.

14  Q.     And where did you go?

15  A.     I pulled up to the east entrance, which is located

16  really close to the corners of Ninth Street and Conley Road in

17  Columbia there.  Pulled my car up to the west entrance, and I

18  entered Ellis Library via the west entrance there.

19  Q.     Okay.  Now, about what time -- how long did it take you

20  to arrive there, do you recall?

21  A.     I believe it was about three or four minutes.

22  Q.     Three or four minutes?  Okay.  So you arrived, you made

23  entry.  What did you have to do to gain entry?

24  A.     All -- well, most of the university police officers are

25  issued a, an employee swipe card.  And with that swipe card

1    you're allowed to, they give you access to different buildings

2    around campus in case of emergencies such as this.  So I took

3    my university-issued swipe card and swiped into the building.

4    Q.    So upon entering the building, where did you go?

5    A.    I went to the fire panel, which is located -- once you

6    enter the two sets of doors, it is on the wall on the left side

7    of that entrance.  There's a security desk there, and it's to

8    the left of that, as well.

9    Q.    And what is it?

10   A.    What is it?

11   Q.    Is it just a fire panel showing --

12   A.    It's a small, almost a box that gives a readout if

13   everything is all right or, if there's an alarm, where that

14   alarm would be located or which alarm is activated.

15   Q.    So you checked the fire panel, and what did you see?

16   A.    I observed it showing that there was an alarm located

17   at 106, or Room 106 near the elevators.

18   Q.    So where did you proceed?

19   A.    At that point I proceeded -- right in front of me, if

20   you turn away from the fire panel, there's a set of stairs.  I

21   proceeded up the stairs, at which time I detected an odor of

22   smoke.

23   Q.    Okay.  And in which direction did you go?

24   A.    At that point, I turned to the north or to the left

25   once I got to the top of the stairs.

1  Q.     Did you look to the north?

2  A.     I did.

3  Q.     And what did you see?

4  A.     I saw a smoke, a hazy smoke coming from that area, from

5  the northern end of the building.

6  Q.     All right.  So what did you do?

7  A.     I proceeded to that area.  The closer I got, the smell

8  of smoke got stronger, as well as the haze or the smoke became

9  thicker and visibly thicker.

10 Q.     Was anything else impairing your ability to see?

11 Smoke?  What about the extinguishers, were the sprinklers going

12 at that time?

13 A.     There were some sprinklers, I did not observe those

14 until a little later, but they had been activated.

15 Q.     Were -- what were you seeking to do at that time?

16 A.     At that time I exited the building, contacted the

17 supervisor on duty, let him know what was going on.  After

18 that, I reentered the building and grabbed a fire extinguisher

19 from one of the fire extinguisher boxes.

20 Q.     Did you go in search of the fires?

21 A.     I did.  The majority of the smoke was coming from the

22 circulation area of the library, which is on the north end of

23 the library.  Grabbed a fire extinguisher, tried going into the

24 area where the smoke was to try to find the fire and put it out

25 myself, as firefighters weren't on arrival yet.  But because of

1  the amount of smoke, how dense it was, as well as the

2  sprinklers going off, I was unable to find the actual flames or

3  the source of that fire.

4  Q.    While you were in there, did you see any indication of

5  property damage?

6  A.    I did.  I noticed that there was a scanner, like a bar

7  code scanner holder was on the ground.  I also noticed that

8  some computer screens that were on the circulation desk had

9  also been knocked over.

10  Q.    So what did you do next?

11  A.    At that point, I had gotten information that the fire

12  department was arriving.  Being that there's two main entrances

13  to the Ellis Library, both of them you have to swipe in to get

14  in, you also have to swipe to get out of them, knowing that, I

15  responded to the north door, exited the building, made contact

16  with the fire department, and let them into the fire -- or into

17  Ellis Library and let them, kind of gave them a rundown of what

18  I had already seen, where I had seen the majority of the smoke,

19  and where they may want to start directing their attention to.

20  Q.    Did they then make entry into the building?

21  A.    They did.

22  Q.    You allowed them access?

23  A.    I allowed them access in.

24  Q.    Did you accompany them?

25  A.    I did, real quickly.

1  Q.     Did you remain with them?

2  A.     I did not.  I made sure they got to -- and they

3  probably seen it their selves, but I entered with them, pointed

4  them in the direction.  At that time, if I remember correctly,

5  I exited the building.

6  Q.     At some point did you have occasion to search through

7  the library, the entire library?

8  A.     I did.

9  Q.     When was that?

10 A.     That was after a -- we had, I had exited, made contact

11 with my supervisor who had set up an incident command area on

12 Lowry Mall, which is north of the library.  I was standing

13 there with him talking to him.  At that point a firefighter had

14 exited the building and started talking to us about

15 electricity, how to shut it off, stuff like that.  When we were

16 standing there, my lieutenant brought it to my attention and

17 the firefighter's attention that there was another fire that

18 had flared up that was not in the area that I had initially

19 responded to.

20 Q.     Okay.  So then you had some concerns, so you went to

21 check it out?

22 A.     That's correct.

23 Q.     And did you search the whole library eventually?

24 A.     Eventually I did, yes.

25 Q.     Now, how long did you remain there on the scene, do you

1  recall?

2  A.     I believe it was about three hours or so, three or four

3  hours initially.

4            MR. LYNN:  No further.

5            THE COURT:  Mr. Stabenow, any cross-examination?

6            MR. STABENOW:  Yes.

7                         - - -

8                    CROSS-EXAMINATION

9  By Mr. Stabenow:

10 Q.     Officer Brayer?

11 A.     Yes, sir.

12 Q.     Just to try to establish a little bit of a timeline.

13 A.     Okay.

14 Q.     So you got to the scene at Ellis at about what time?

15 A.     It was about 3:31, according to our CAD.

16 Q.     What's a CAD?

17 A.     Our computer system that we use at the police

18 department, it documents when we're dispatched, when we arrive,

19 when we clear.

20 Q.     So all of the officers are on -- so you know if you say

21 a time, it's going to be the same time that some other officer

22 is talking about.

23 A.     That's correct.

24 Q.     All right.  So you got there about 3:31, you go inside,

25 and the first thing you checked was the fire panel?

1    A.       That's correct.

2    Q.       And then after checking that, that's when you -- did

3    you immediately smell the alert of smoke, or did you go

4    upstairs and then smell the smoke?

5    A.       If I recall correctly, I started going upstairs and

6    then detected the smell of smoke.

7    Q.       That got stronger as you headed toward the north side

8    of the library?

9    A.       That's correct.

10   Q.       That's when you went back, got the fire extinguisher,

11   and returned, hoping to put out whatever it was when the fire

12   department was en route?

13   A.       Eventually, yes.

14   Q.       When you say eventually, yes --

15   A.       If I remember correctly, I exited the building and

16   contacted our on-duty supervisor.  Fire alarms were going off,

17   get it a little quieter so he could hear me over the radio.

18   Exited, talked to him, and then I reentered the building, if I

19   remember correctly, grabbed the fire extinguisher and tried

20   to --

21   Q.       So when you went in the first time, checked the fire

22   panel, went upstairs, went towards the north side, and the

23   smoke got thicker on you?

24   A.       That's correct.

25   Q.       Were the sprinklers going off?

1   A.      I believe they were, not directly on me at that point.

2   I was walking down a hallway towards what would be the north

3   entrance or exit to the -- to my, if you're walking towards

4   that, or to the north.

5   Q.      Let me see if this helps.

6   A.      Okay.

7   Q.      I'm going to show you Defense Exhibit No. 1, which is a

8   map of the north part of the first, of the main floor of the

9   Ellis Library.

10  A.      Okay.

11  Q.      Does this help you to maybe explain to people what was

12  going on?

13  A.      Yes, it does.

14  Q.      Now, we're going to try this.  Every once in a while it

15  doesn't work.

16  A.      Okay.

17  Q.      But if you touch your screen, it will actually draw a

18  line.

19  A.      Okay.

20  Q.      So if you touch the screen -- and maybe I'll use an

21  example.  You can draw an arrow -- now it doesn't work.  It

22  worked right on the last break.  All right.  Let's do it a

23  different way.  Okay.

24  A.      It looks like it works for me, sir.

25  Q.      Can you draw a little arrow so we know which direction

1  that line is going?

2          (So done.)

3  Q.     So that's the direction you were going when you headed

4  there the first time, correct?

5  A.     That's correct, yes.

6  Q.     All right.  And if the sprinklers were going off, in

7  what area were they going off?  You can just kind of do like

8  zig-zaggy lines -- where you did the red circle?

9  A.     Yes, sir.

10  Q.     Now, at this point, you weren't personally getting wet,

11  but you could tell something was happening up there?

12  A.     That's correct.

13  Q.     So that's when you retreated, went out, and I assume

14  the sirens were very loud?

15  A.     Yes.

16  Q.     Went out and made the phone call or radio call, I need

17  backup, we've got a situation here, et cetera?

18  A.     That's correct.

19  Q.     How long did it take -- did you wait for backup before

20  you went back inside to try to put out the fire?

21  A.     No, sir.

22  Q.     So where was the, where was the fire extinguisher that

23  you tried to use?  I know it might not be on this map.

24  A.     I probably couldn't even tell you.  I don't know

25  exactly which one -- I know I grabbed two that night.

Q.      Let me put it this way.  Did you have to look to find
them, or did you know right where to go?

A.      I probably had to look a little bit.

Q.      And then you went forward to try and see if it was
something that you could deal with yourself, and by then you
said the smoke was too thick for you to get in to figure out
exactly where the fire might be.

A.      Yes, sir, that's correct.

Q.      All right.  Through all of this process and then going
back outside again to be there when the fire department
responds --

A.      Uh-huh.

Q.      -- how much time is passing, ten minutes, fifteen
minutes, best guess?

A.      Less than five, if I had to guess.

Q.      All right.  So you would -- is it fair to say you got
there about 3:31, through this whole thing it's maybe 3:40 by
the time you're out front -- you've gone in and out twice, and
now you're out front waiting for the fire department?

A.      That's fair to say.

Q.      Now, later on Lieutenant -- and please correct me if I
say this wrong.  Is it Stroer?

A.      Stroer.

Q.      Stroer?

A.      Yes, sir.

1  Q.     Lieutenant Stroer linked up with you to work with you

2  on that morning; is that correct?

3  A.     That's correct, he was the on-duty supervisor.

4  Q.     And when he got there, did he go into the building with

5  you and take a look around or anything?

6  A.     No.

7  Q.     What was his job?

8  A.     His job as on-duty supervisor at that time was to

9  basically set up an incident command or a command post where

10 all of the resources that were coming in could meet up and more

11 or less plan an attack plan.

12 Q.     All right.  Now, do you remember -- I know you alluded

13 to it in your testimony a couple of minutes ago.  At some point

14 when you and Lieutenant Stroer were standing outside, you saw

15 another fire appear to flare up inside from your viewpoint; is

16 that correct?

17 A.     That's correct.

18 Q.     Can you give us your best estimate of what time that

19 might have been?  How long had Lieutenant Stroer been on the

20 scene before you see that flare-up?

21 A.     I can't even give you a time.  Are you talking from the

22 time I exited and made contact with Lieutenant Stroer or --

23 Q.     Sure.

24 A.     I would say within three minutes of me exiting that

25 last time and making contact with him.

1   Q.      Okay.  So I'm going to suggest a time.  You tell me if

2   I'm close --

3   A.      Okay.

4   Q.      -- way off, whatever.

5   A.      Okay.

6   Q.      Maybe 3:45, 3:50 something?

7   A.      If I had to guess, probably somewhere in there.

8   Q.      All right.  And at that point, you then had concerns

9   that maybe somebody was moving around the library causing

10  damage.

11  A.      That's correct.

12  Q.      All right.  And is it fair to say when this fire flares

13  up, all right, the new fire, there it goes, right there in the

14  copy services window, right?

15  A.      Correct.

16  Q.      All right.  At that point, that whole area on that main

17  floor, lots of smoke and stuff happening in there.

18  A.      Correct.

19  Q.      All right.  Did your uniform get any, you know, water,

20  soot, smoke?

21  A.      Yes.

22  Q.      The sort of thing where you go home and your spouse is

23  oh, my goodness, good grief?

24  A.      Yes, that's exactly what happened, yes, sir.

25  Q.      And that was just in the short time you were in and out

1  those two times.  And then, of course, it got worse later on

2  when you went in and did more stuff inside, correct?

3  A.      Correct.  Correct.

4  Q.      All right.  How long did it take you moving around the

5  library to determine, I don't think there's anybody here

6  anymore, I feel comfortable with that decision?

7  A.      Well, the library is a very large place.  Many floors,

8  many -- I guess I would call them subfloors, floors between

9  floors.  And you got different sides.  So I would say when I

10 got done with my, when Officer Verble and I -- he had initially

11 or eventually come to the scene to assist me walking around the

12 rest of the building -- I did a quick check, but when he showed

13 up and we went through, from what we could tell, almost every

14 inch of that library, or close to it, that's when I felt

15 comfortable that there was probably nobody else in there.

16         But, again, in a library you've got stacks and

17 stacks of books, you've got different rooms that are locked.

18 So to say that it was 100 percent clear, I cannot say that.

19 Q.      I understand.  Looking again at Defense Exhibit No. 1.

20 A.      Okay.

21 Q.      Correct me if I'm saying this the wrong number of

22 times.  I think it's the second time you're going out, you're

23 going out -- well, point to right here in the middle, it has

24 double green section that says up, west something, right?  It's

25 right there in the middle?

1    A.      Yes.

2    Q.      That's the north --

3    A.      Entrance.

4    Q.      That's the north entrance?

5    A.      Yes, sir.

6    Q.      So the second time you went out the north entrance to

7    coordinate with the fire department and then Lieutenant Stroer

8    and everyone else?

9    A.      That's correct.

10   Q.      At that time you're going out there for the second

11   time, there was already smoke here in this corridor, middle

12   section corridor, correct?

13   A.      Yes, sir.

14   Q.      What quantity of smoke, like just a little trace amount

15   on the ceiling, was it coming down to eye level?

16   A.      At what point are you talking about?

17   Q.      Let's say the first time and second time.

18   A.      First time, when I first started walking towards that

19   corridor, upon my initial entry there was a little haze, a

20   little smoke.  I could tell that there was something coming

21   from that area.  Exited, came back in, a little bit more smoke,

22   a little bit heavier; and then when I exited the second time

23   and then came back in, the fire department had already been in

24   there taking care of what was going on in that circulation

25   area.  So I would say that the -- it was either the same, maybe

1   a little less at that point, but --

2   Q.      So when you saw the flare-up in copy services, there

3   were already fire department officials in the circulation area?

4   A.      That's correct.

5   Q.      So when you saw the flare-up here in the copy area,

6   there were fire department personnel over here fighting a fire.

7   A.      Correct.

8   Q.      All right.  When you saw that flare-up, did you

9   conclude there's a good chance there's somebody there in that

10  copy area room, or at least have a concern that there was?

11  A.      Yes.

12  Q.      So did you immediately go in to try and, if there was

13  somebody there, stop them or to deal with the situation?

14  A.      A firefighter and I that were talking to Lieutenant

15  Stroer at that time, we did enter the building and take care of

16  that fire, yes.

17  Q.      All right.  And when you went in there, again, smoke

18  and haze and --

19  A.      Yes.

20  Q.      Were the sprinklers going off in that room?

21  A.      I don't believe so.

22  Q.      Okay.

23          MR. STABENOW:  Just a moment.  No further questions,

24  Your Honor.  I'm sorry, Your Honor, before I sit down, let me

25  get this lined up.  Kelly, can you hit the print button on

1  that?

2          COURTROOM DEPUTY:  I can.

3          MR. STABENOW:  Your Honor, just for the record, that

4  will go into the record, just in case there's a question on it.

5          COURTROOM DEPUTY:  It's printing in your chambers.

6          THE COURT:  Oh, it's printing there?

7          COURTROOM DEPUTY:  Yes.

8          MR. LYNN:  Are we waiting?

9          THE COURT:  I think it's complete.

10          MR. LYNN:  Very well.

11                          - - -

12                  REDIRECT EXAMINATION

13  By Mr. Lynn:

14  Q.     Officer, you indicated as you approached traveling

15  north from your vantage point, the fire appeared to be

16  concentrated there in the circulation and reserve area; is that

17  correct?

18  A.     That's correct.

19  Q.     That's where you saw the heavy smoke; is that correct?

20  A.     Yes.

21  Q.     And you didn't notice anything in particular toward the

22  copy area?

23  A.     No.

24  Q.     Now, if there had been a big fire going in the

25  circulation/reserve area but there was a small fire that hadn't

1  really got going in the copy area, would that explain why you

2  hadn't detected it earlier?

3   A.     Yes.

4   Q.     Would that explain why you didn't detect it until it

5  had a chance to start building up?

6   A.     Yes.

7   Q.     Would that explain why you didn't notice it until you

8  were outside conferring with --

9   A.     Yes.

10   Q.     -- Lieutenant Stroer?

11   A.     Yes, there's also -- in the copy area there's a door

12  that opens and closes which closes the copy area off.  The

13  circulation area is more of an open area, not really having

14  doors to go in or out of.  So the smoke, my attention was drawn

15  to that area because it was more open at that point.

16   Q.     So it would have to be a more significant fire in the

17  copy area, then, for you to have noticed it?

18   A.     Correct.

19   Q.     If it had just been a small fire, you wouldn't have

20  seen it?

21   A.     No.

22          MR. LYNN:  No further.

23          THE COURT:  Anything further?

24          MR. STABENOW:  Nothing further, Your Honor.

25          THE COURT:  Could the attorneys approach real

1  quickly?

2          (Counsel approached the bench and the following

3  proceedings were had:)

4          THE COURT:  Do you have any witness you want to put

5  on because the person is here, or would this give you time --

6          MR. STABENOW:  Might be a good time to break.  I

7  think we're moving pretty quickly.

8          THE COURT:  If you have a witness that's short that

9  you want to put on, I'm open to that.  This is also a good time

10 to break.

11         MR. LYNN:  Either way.  Brian Wasson is the first

12 firefighter to come in.  He went in and knocked it down.  I

13 don't know if you have a lot of questions for him.

14         MR. STABENOW:  Depends on what he says.

15         (The following proceedings were had in open court:)

16         THE COURT:  I was talking with the attorneys about

17 whether or not we have a shorter witness that we can take five

18 or ten minutes of, but I think we've concluded that this is a

19 good time to take a break for the day.  We will reconvene

20 tomorrow at 9 o'clock.  And I know that Kelly has explained to

21 you where to convene in the morning.  As soon as all of you are

22 here, we will begin.

23         I have, I think, talked until I'm blue in the face

24 about the instruction that you're not to discuss this case with

25 anyone, and you're not to do any research on the internet.  So

1  since I've said it, I think, a good three times today, I won't

2  repeat it again, but I will urge you to follow that

3  instruction.  As you can tell by the number of times that we

4  give the instruction, it is a very important instruction.

5          So with that, we will be adjourned until 9 o'clock

6  tomorrow.

7          (The following proceedings were had in the courtroom

8  out of the presence of the jury:)

9          THE COURT:  Is there anything either of the

10 attorneys want to take up at this point?

11         MR. STABENOW:  No, Your Honor.  Would you like us to

12 come back on the record early tomorrow morning?

13         THE COURT:  I would like you to be here at 8:30.

14 There seem to be unexpected issues that come up; so if you

15 could be here at 8:30 to be available to take up any issues

16 that may, I would appreciate it.

17         MR. STABENOW:  Absolutely.

18         THE COURT:  I will see everyone tomorrow morning.

19         (Trial adjourned for the evening.)

20                       - - -

21                       - - -

22                  CERTIFICATE
         I certify that the foregoing is a correct transcript
23 from the record of proceedings in the above-entitled matter.

24  July 9, 2013

25                   /s/_____
                     Kathleen M. Wirt, RDR, CRR
                     U.S. Court Reporter