　　　　　IN THE UNITED STATES DISTRICT COURT
　　　　　　WESTERN DISTRICT OF MISSOURI
2　　　　　　　　CENTRAL DIVISION

3

　　UNITED STATES OF AMERICA,　　　　)
4　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　　)　No. 12-04043-01-CR-C-BP
5　　　　　　　　　　　　　　　　　　)　April 23, 2013
　　　　　　V.　　　　　　　　　　　)　Jefferson City, Missouri
6　　　　　　　　　　　　　　　　　　)　CRIMINAL
　　CHRISTOPHER CURTIS KELLEY,　　　)
7　　　　　　　　　　　　　　　　　　)　Volume II
　　　　　　　　　Defendant.　　　　)　(Pages 105-281)
8　　　　　　　　　　　　　　　　　　)

9

10

　　　　　　　　　TRANSCRIPT OF JURY TRIAL
11
　　　　　BEFORE THE HONORABLE BETH PHILLIPS
12　　　　　UNITED STATES DISTRICT JUDGE

13　　　Proceedings recorded by electronic stenography
　　　　　Transcript produced by computer
14

15　　　　　　　　　　　APPEARANCES

16
　　　For Plaintiff:　　　　　MR. JIM Y. LYNN, JR.
17　　　　　　　　　　　　　　　Assistant U.S. Attorney
　　　　　　　　　　　　　　　80 Lafayette Street, Suite 2100
18　　　　　　　　　　　　　　Jefferson City, MO 65101

19　　　For Defendant:　　　　MR. TROY K. STABENOW
　　　　　　　　　　　　　　　Assistant Federal Public Defender
20　　　　　　　　　　　　　　221 Bolivar Street, Suite 104
　　　　　　　　　　　　　　　Jefferson City, MO 65101
21

22

23

24

25

　　　　　　　　　Kathleen M. Wirt, RDR, CRR
　　　　　　　　　United States Court Reporter
　　400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
　　　　　　　　　　　816-512-5608

1                          VOLUME II
                        (Pages 105-281)
2
   APRIL 23, 2013
3
   GOVERNMENT WITNESSES (continued):
4
      BRIAN WASSON
5          Direct Examination by Mr. Lynn          114
           Cross-examination by Mr. Stabenow       119
6
      DEBBIE SORRELL
7          Direct Examination by Mr. Lynn          122
           Cross-examination by Mr. Stabenow       143
8
      JULIE ROGERS
9          Direct Examination by Mr. Lynn          148
           Resumed Direct by Mr. Lynn              161
10         Resumed Direct by Mr. Lynn              174
           Cross-examination by Mr. Stabenow       175
11         Redirect Examination by Mr. Lynn        187
           Recross-examination by Mr. Stabenow     188
12
      CHRISTOPHER HERBOLD
13         Direct Examination by Mr. Lynn          193

14    MICHAEL LAUGHLIN
           Direct Examination by Mr. Lynn          196
15         Cross-examination by Mr. Stabenow       210

16    APRIL COLVIN
           Direct Examination by Mr. Lynn          211
17         Cross-examination by Mr. Stabenow       215

18    JOSEPH KINGSBURY
           Direct Examination by Mr. Lynn          216
19         Cross-examination by Mr. Stabenow       218

20    KEVIN RODGERS
           Direct Examination by Mr. Lynn          219
21
      BRITTANY CARNEY
22         Direct Examination by Mr. Lynn          221
           Cross-examination by Mr. Stabenow       224
23         Redirect Examination by Mr. Lynn        225

24    MATTHEW CAVANAH
           Direct Examination by Mr. Lynn          226
25         Cross-examination by Mr. Stabenow       230

1       CASEY GRAY
            Direct Examination by Mr. Lynn           231
2           Cross-examination by Mr. Stabenow        235

3       PHILIP THUNHORST
            Direct Examination by Mr. Lynn           236
4
        ANN RILEY
5           Direct Examination by Mr. Lynn           242

6       MICHAEL BAKER
            Direct Examination by Mr. Lynn           247
7           Cross-examination by Mr. Stabenow        250
            Redirect Examination by Mr. Lynn         250
8
   DEFENSE WITNESSES:
9
        MATTHEW CAVANAH
10          Direct Examination by Mr. Stabenow       253
            Cross-examination by Mr. Lynn            254
11
        GREGORY WILLS
12          Direct Examination by Mr. Stabenow       255

13      TARA BALLENGER
            Direct Examination by Mr. Stabenow       257
14          Cross-examination by Mr. Lynn            261

15      WAYNE CURTIS KELLEY
            Direct Examination by Mr. Stabenow       262
16
        NICHOLAS BROWN
17          Direct Examination by Mr. Stabenow       265
            Cross-examination by Mr. Lynn            267

18

19                          - - -

20

21

22

23

24

25

APRIL 23, 2013

- - -

3   (The following proceedings were had in the courtroom
4   out of the presence of the jury:)
5   THE COURT:  I just wanted to check.  Are there any
6   issues that the parties would like to bring up at this point?
7   MR. LYNN:  Your Honor, one issue the government
8   would like to raise.  Yesterday during the cross-examination of
9   one of the government witnesses, it came to light that Stephens
10  College, the site where one of the computers was taken, had
11  been opened -- or a door had been unlocked or there was
12  reported an unlocked door the day or week before.  That
13  obviously opens up the question whether the computer was taken
14  prior to that.
15  Now, there is a evidence that this computer was
16  hooked up to a network with Stephens, and that network
17  reflected that it was taken offline at 3:45 on the 18th of May
18  at the time of this fire.  We have a witness, Mark (sic)
19  Herbold is his name.  He's prepared to come in and testify to
20  those issues.  He's not an endorsed witness.  I didn't
21  appreciate the significance of the issue; but when that came to
22  light, we started pursuing the matter.
23  He's available -- I told Mr. Stabenow about him
24  yesterday afternoon.  He's available for interview by the
25  defense if they so desire, and we're requesting leave to call

1  him, despite the fact that he's not endorsed.

2         MR. STABENOW:  We're going to object.  I was able to

3  talk very briefly to Troy Schnack, our IT expert up in Kansas

4  City, last night.  In the case file, there were -- the report

5  of Mr. Coleman, the witness we had yesterday on the stand,

6  there is a mention of two things, the idea that the door was

7  open the previous night at 7 p.m., and that an IT person had

8  told him that it appeared the computer had been taken off the

9  network at 3:45.

10         I've talked briefly to Mr. Schnack about this in the

11  past, and he said, I'm very skeptical about that, we can't even

12  tell that on our own network, and I would really need to see

13  how he had everything configured that he would be able to make

14  that claim, but I never pursued it because we never got notice

15  that they were going to bring in an IT specialist to say that

16  they had all the computer software that could do this function.

17         When I talked to Mr. Schnack last time about it, he

18  again said, look, I'm very skeptical about that.  I would have

19  to see the reports of how he had this whole system configured

20  to see if that would even be possible, and Mr. Schnack is not

21  available today, he's at a prison preparing for a trial.

22         So the fact that I could interview this witness does

23  nothing for me because I don't have that sort of IT

24  specialization.  And so obviously, this isn't like a lay

25  rebuttal witness, this is an expert witness who has specialized

testimony.  And it was in the reports and the government, for
whatever reason, opted not to call him ahead of time, so we're
going to object to it because here in the middle of trial, I
have no way to test that reporting structure of his.  I have no
way to test his network configuration.  Even if I did, that
affects my whole trial strategy and what I've been arguing.

THE COURT:  Well, however, you've acknowledged the
fact that you knew in the report that this evidence at least
existed, correct?

MR. STABENOW:  I knew that there was a mention in a
report that somebody had told him that it appeared that the
computer had been taken off the network.

THE COURT:  Okay.  Mr. Lynn, do you have any other
rebuttal of sorts?

MR. LYNN:  No.  No.

THE COURT:  Let me think about this for a few
minutes.  I'm not prepared to rule at this point.  I want to
think about it.

MR. LYNN:  Very well.

THE COURT:  Any other issues?

MR. LYNN:  None by the government.

THE COURT:  Where are we in terms of the evidence
and when you think that you'll rest, not -- I don't need an
answer that I'm going to hold you to, but just your ballpark
estimation.

1          MR. LYNN:  Well, I've got three really substantive

2    witnesses that are going to take probably the bulk of the

3    morning, but the rest of the witnesses are fairly short and

4    succinct, so I would expect -- I would certainly expect to

5    finish up by afternoon.

6          THE COURT:  Okay.  And then do you have witnesses

7    that you're going to put on?

8          MR. STABENOW:  Well, I have three witnesses right

9    now, Your Honor.  I would say my witnesses would take less than

10   an hour.  I mean, I can easily see it being half an hour.

11   Although once the government's case is over, I'll probably

12   request a 10 or 15-minute recess just to speak to my witnesses

13   quickly before we begin.

14         THE COURT:  So do you think it's possible that we

15   could close today, is that what we're thinking?

16         MR. STABENOW:  Based on how fast it went yesterday,

17   I think it's conceivable.

18         THE COURT:  We are working on -- we will shortly

19   have the instructions, and so I will try to get those to you as

20   quickly as possible.  It seems as though I had another

21   question, but I can't remember exactly what it was.

22         So let's take a break, and I will be back out in

23   about 10 or 15 minutes with a ruling on that other issue.

24         MR. LYNN:  Thank you.

25         (A recess was taken from 8:46 a.m. to 9:09 a.m.)

1              THE COURT:  I have done some research on this issue.
2    And as you may have been able to tell from my question, the
3    troubling aspect is that there may be evidence out there that
4    the defendant was provided in discovery and, through this
5    question, the inference is made to the jury, or a suggestion
6    was made to the jury that may not actually be true.  And so
7    that's one reason that I have weighed this issue heavily.

8              And to clarify, the fact is that there's evidence
9    that the computer was taken offline at 3:45.  That evidence may
10   be able to be cross-examined, but that would directly
11   contradict the inference that you're trying to bring up to the
12   jury through the suggestion that the window or the door was
13   opened the night before and thereby permitted someone to enter.

14             I also then did some research into the requirement
15   that the government -- or that either party disclose witnesses
16   and have found a 2012 Eighth Circuit case that specifically
17   says that criminal defendants have no right in noncapital cases
18   to require disclosure of the list of government witnesses.

19             And so for those two reasons, I am going to permit
20   the government to call this witness to the stand.  However, I
21   also want to give you the opportunity to give this information
22   to your IT guy and permit him to testify, although he hasn't
23   been disclosed.  I recognize that he is busy today, but if
24   we're going to close -- if we are close to closing today, we
25   can take a recess and have him available tomorrow.  If he's not

available tomorrow, we can even extend it to Thursday.  I know

we told the jury that this case would close on Wednesday; but

if we could get him in here first thing Thursday morning, have

him testify, do closings, I wouldn't feel too bad by asking the

jury to stay an extra day, given the directive that we gave

them at the beginning of the trial.

MR. STABENOW:  Obviously, Your Honor, I object; but

beyond that, I would ask that I at least be able to speak to

him or get some disclosure of what the substance of his

testimony is since he's coming in as an expert witness, not a

lay witness, and that I be able to consult with my IT guy

before their witness takes the stand, because otherwise I can't

effectively cross him.

THE COURT:  No, I wholeheartedly agree with that

request.  So I'll ask the attorneys to coordinate when your

witness is available, when Mr. Stabenow can talk to him, and

ask that all of that occur prior to the witness taking the

stand.

MR. LYNN:  Very well.

THE COURT:  Do you know if the jury is here?

COURTROOM DEPUTY:  We were missing one when I went

in and checked a few minutes ago.

THE COURT:  If you could go check again.  And then

as soon as everyone is here, we will begin this morning.

(A recess was taken from 9:12 a.m. to 9:14 a.m.)

1          THE COURT:  Kelly, do you want to go ahead and get

2  the jury?

3              (The following proceedings were had in the courtroom

4  in the presence of the jury:)

5          THE COURT:  Well, good morning.  I'm sorry we

6  couldn't do something about the poor timing of the rain this

7  morning and getting in, but I trust that everyone made it in

8  fine.

9          I think that we're ready to proceed with a new

10  witness.  Mr. Lynn, are you ready to proceed?

11          MR. LYNN:  Ready to proceed, Your Honor, government

12  calls Brian Wasson.

13                              - - -

14                          BRIAN WASSON,

15   being first duly sworn by the courtroom deputy, testified as

16  follows:

17                              - - -

18                        DIRECT EXAMINATION

19   By Mr. Lynn:

20   Q.     Sir, would you state your name and spell your name,

21  please?

22   A.     My name is Brian Wasson; B-R-I-A-N, W-A-S-S-O-N.

23   Q.     And how are you employed?

24   A.     I'm a lieutenant at the Columbia Fire Department.

25   Q.     How long have you been with the Columbia Fire

1  Department?

2  A.      Twenty-three and a half years.

3  Q.      And Lieutenant Wasson, generally speaking, what are

4  your duties there at the fire department?

5  A.      I'm a lieutenant on a front-line apparatus, which is in

6  charge of fighting fires, emergency, and medical emergencies.

7  Q.      I want to take you back to September 10th of 2011, the

8  early morning hours.  Were you dispatched to a fire in

9  Columbia, Missouri?

10  A.      We were dispatched to a general fire alarm.

11  Q.      Okay.  A general fire alarm?

12  A.      Correct.

13  Q.      Tell the jury what that is.

14  A.      A general fire alarm was that there was -- an alarm

15  agency detected a fire alarm, and they dispatched one company,

16  and that was us.

17  Q.      And what time were you dispatched?

18  A.      Approximately 3:27 in the morning.

19  Q.      3:27 a.m.  So how did you receive that dispatch?

20  A.      Through the joint communications.

21  Q.      And did you then respond?

22  A.      Yes, we responded.

23  Q.      When you say we, who are you talking about?

24  A.      My crew, I have -- I'm a lieutenant, I have an

25  engineer, and then I have a firefighter.

1    Q.       So there were -- a three-man crew initially responded?

2    A.       Three-man, correct.

3    Q.       What time did you arrive at the scene?

4    A.       Approximately 3:30.

5    Q.       Okay.  And where did you go?

6    A.       We went to South Ninth Street, 502 South Ninth Street.

7    Q.       What was the apparent site of the fire?

8    A.       It was the Ellis Library.

9    Q.       Okay.  So I assume you parked your vehicle?

10   A.       We parked our vehicle on South Ninth Street, and we

11   gained access to the library on the west side of the library.

12   Q.       Now, how did you gain access to the library?  Were you

13   assisted by MUPD?

14   A.       We used our Knox-Box, which allows us to get keys to

15   the building.  Once we were into the building, we met with

16   Officer Brayer.

17   Q.       All right.  And where did you go into the building?

18   A.       We went up to the first floor and headed north to Room

19   101.

20   Q.       All right.  And as you approached, what did you see?

21   A.       We saw light smoke.

22   Q.       Okay.  And as you proceeded further, what did you see?

23   A.       We had light smoke in Room 101 behind some desks.  We

24   noticed that there were a couple of fires, small fires there.

25   And we also noticed that there was a security camera behind the

1 desk, and then in front of the desk was some brackets.

2 Q.     So did there appear to be some property damage there?

3 A.     Yes.

4 Q.     So when you saw apparent property damage, what did you

5 then do?

6 A.     We used fire extinguishers to extinguish the small

7 fires.  And then as we went back, there was -- the smoke got

8 intense.  So at this time I radioed to joint communications and

9 had them fill the box out, which is respond more companies.

10 Q.     Send the whole company?

11 A.     We have a commercial structure fire at this time.

12 Q.     Okay.

13 A.     Okay.  And then my engineer and firefighter were

14 setting up to get hooked to the standpipe, and at this time we

15 realized that the sprinkler heads in the rooms behind 101 had

16 activated.

17 Q.     Okay.  So what did you then do?

18 A.     I went out to the north doors, and I was making my

19 final -- my first alarm assignments, and that is the other

20 companies coming in, I was letting them know what we had and

21 where I wanted them to stage and what kind of equipment I was

22 going to need to fight this fire.

23 Q.     So what happened next?

24 A.     Officer Brayer pointed out to me that he could see

25 flames in the windows to the west of the stairwell.

1   Q.      Okay.

2   A.      So I went up the stairs to Room 115 and found two small

3   fires, paper type fires on desks, and I used a fire

4   extinguisher to extinguish those fires.

5   Q.      How many fires did you encounter that you were able to

6   extinguish?

7   A.      In Room 115 there was two.  In 101 there were three

8   separate fires that we extinguished.

9   Q.      And were you able to knock those down fairly quickly?

10  A.      Correct.

11  Q.      And you say the sprinkler system was also deploying?

12  A.      Yes.

13  Q.      Now, while you were there, you alluded to you saw

14  possible property damage in the library?

15  A.      Yes.

16  Q.      Now, what measures did you take to preserve this scene

17  there?

18  A.      We let everybody know, Officer Brayer and I let

19  everybody know that this was, we considered a crime scene,

20  nobody touch the cameras.  And then when the crews came in,

21  when the next crews came in, we let everybody know that's up.

22  When we have a situation like this, we try to protect the

23  property by extinguishing fires, but we also try to protect the

24  evidence also.

25  Q.      Very well.  I'm sorry.  I'm kind of losing my voice.

1  You referenced a Knox-Box?

2   A.      Correct.

3   Q.      Can you tell us what that is?

4   A.      A Knox-Box is placed on the buildings, and those have

5  the keys to all of the buildings.  Sometimes they could be

6  keys, they could be swipe cards, there could be codes in there.

7  The Knox-Box is only accessed by the fire department; and when

8  we get on the scene and we're going to access the Knox-Box, I

9  have to let joint communications know that we're accessing the

10 Knox-Box.  They document it, and we have a Knox-Box in each

11 truck, and we have to put in our personal ID code to retrieve

12 the key from the Knox-Box in the truck to open up the Knox-Box

13 on the building.

14  Q.      Okay.

15  A.      And then we secure the key to our wrist until we secure

16 the Knox-Box.

17  Q.      And obviously the Knox-Box isn't accessible to the

18 general public.

19  A.      No one, no.

20          MR. LYNN:  No further.

21          THE COURT:  Cross-examination?

22                          - - -

23                  CROSS-EXAMINATION

24  By Mr. Stabenow:

25  Q.      Lieutenant Wasson, you said that when you went in,

1   first you went through the west side access; is that correct?

2   A.      Correct.

3   Q.      All right.  And then you -- I guess that would take you

4   up some stairs, you turn left, and then go towards the north

5   entrance?

6   A.      North, correct.

7   Q.      When you got up there, you said there was light smoke.

8   I don't think most of us have had much fire fighting

9   experience, so what does light smoke mean to you?

10  A.      Light smoke was -- excuse me, we got near Room 101, and

11  there was just a light smoke, it was -- it wasn't banking down.

12  It was just a little light smoke, you could see it; and as we

13  came in across where 101 is, behind the desk, the smoke got

14  more intense and started being a little heavier and lower.

15  Q.      You said you used fire extinguishers to put out the

16  fires in 101?

17  A.      Correct.

18  Q.      And then you said you noticed the sprinklers were

19  running.  Was that the sprinklers were running in 101 or the

20  sprinklers turned on in 101 while you were there or --

21  A.      The sprinklers were activated behind the room in 101.

22  You went behind a desk, and as we came around kind of like a

23  little corridor area, the smoke intensified, and we could hear

24  a sprinkler activation back in that room.

25  Q.      When you say you heard a sprinkler activation, does

1  that mean it was just turning on or you could tell it was on?

2  A.    I could tell it was on.  I do not know how long it had

3  been activated.

4  Q.    Okay.  I'm showing you here Defense Exhibit No. 1.  So

5  just to point out where it says circulation 101, those were the

6  fires that were easy to put out?

7  A.    Correct.

8  Q.    And the sprinklers were running back more towards this

9  101B, 102 area?

10 A.    I think -- 102 is where the sprinklers, where I noticed

11 the sprinklers were activated first.

12 Q.    Okay.  You said there were two small fires in the copy

13 area when you went back inside, that's the Room 115?

14 A.    Room 115, thank you.

15 Q.    Did I hear you say that they were paper fires?

16 A.    It looked like paper, maybe books, and they were up on

17 the desk areas.

18 Q.    Did you see any, I don't know, fuses, accelerant,

19 anything like that, or was it just some stuff burning?

20 A.    Just some stuff burning.

21 Q.    All right.  In your experience, if papers of that type

22 are lit, how fast do they start to burn?

23 A.    If they're dense books, they burn a little slower than

24 if you just crumble up some paper.  This was more -- I'm not

25 sure if it was books or crumbled-up paper.  It didn't appear

1  that it had been burning for a long time.

2  Q.    Okay.  So maybe it had been burning a minute or two,

3  not like 20 minutes or something like that.

4  A.    I would say probably not.

5  Q.    All right.  I know you said that you saw some cameras

6  damaged, some evidence of vandalism.  Did you see a broken

7  umbrella and a broken umbrella handle laying there, did you

8  happen to notice that when you went through?

9  A.    I did not write it in my report, so I do not recall.

10        MR. STABENOW:  Thank you.

11        THE COURT:  Any redirect?

12        MR. LYNN:  No redirect, Your Honor.

13        THE COURT:  Sir, you may step down.

14        MR. LYNN:  Debbie -- call Debbie Sorrell.

15        THE COURT:  If you could come to the center of the

16  room, and then come up to the front here by the witness stand.

17  Thank you.

18                          - - -

19                     DEBBIE SORRELL,

20  being first duly sworn by the courtroom deputy, testified as

21  follows:

22                          - - -

23                   DIRECT EXAMINATION

24  By Mr. Lynn:

25  Q.    Would you state your name and spell your name, please?

1    A.       My name is Debbie Sorrell; D-E-B-B-I-E, S-O-R-R-E-L-L.

2    Q.       And how are you employed?

3    A.       I'm an assistant fire marshal for the City of Columbia.

4    Q.       And how long have you been an assistant fire marshal

5    with the City of Columbia?

6    A.       I've been employed there for 16 years, and I've been

7    assistant fire marshal for nine.

8    Q.       And what are your duties as assistant fire marshal?

9    A.       I'm the senior fire investigator, but I also conduct

10   inspections of buildings.

11   Q.       With regard to your experience as a fire investigator,

12   how long have you worked as a fire investigator?

13   A.       Nine years.

14   Q.       And what training do you have to do that job?

15   A.       Various trainings, but most importantly you have to be

16   certified by the state of Missouri, and that's through Missouri

17   Department of Public Safety.

18   Q.       Now, are you, in fact, certified through the Department

19   of Public Safety?

20   A.       I am.

21   Q.       Now, did you have occasion to do certain fire

22   investigations related to this case?

23   A.       Yes.

24   Q.       Specifically, I want to take you to May 18th of 2011,

25   the early morning hours.  Were you called to the scene of a

1  fire?

2  A.     Yes.

3  Q.     And what time did you receive the call, if you

4  remember?

5  A.     May I refer to my report?

6  Q.     If it refreshes your recollection.

7  A.     I was dispatched at 4:22 in the a.m.

8  Q.     And to what location were you dispatched?

9  A.     The address was 1400 Windsor Street in Columbia,

10 Missouri, and that's the address of Audrey Webb Childcare

11 Center on the Stephens campus.

12 Q.     Okay.  Now, you were dispatched at 4:22.  How long did

13 it take you to get there?

14 A.     Usually about ten minutes.

15 Q.     All right.  And upon arriving there, did you meet with

16 anyone?

17 A.     Yes.  I met with Lisa Todd.  She was the officer on

18 Snozzle 1, and they had discovered and extinguished the fire.

19 Q.     Did she brief you as to what she had done?

20 A.     That a lot of smoke was inside and that they did have

21 to remove a small portion of the wall where the fire was to

22 check for extension of the fire.

23 Q.     Did you then proceed to conduct your fire

24 investigation?

25 A.     I did.

1  Q.      And what is the first thing you did?

2  A.      I conducted a 360 walk around the exterior of the

3  building; and as my method, I start from the smallest amount of

4  damage and work to the largest.  I started in the basement and

5  worked my way upstairs until I arrived in Classroom 108 on the

6  first floor.

7  Q.      Okay.  Now, as you arrived in Classroom 108, what did

8  you notice?  What did you notice?

9  A.      Immediately, a stronger smoke odor, smoke staining on

10  the walls and ceiling.  There was fire damage in the east,

11  southeast corner of that classroom.

12  Q.      And let me show you what's been received as

13  Government's Exhibit 8.  Do you recognize that?

14  A.      Yes.  That's the southeast corner of that classroom.

15  Q.      Now, let me back up a minute.  When you were down in

16  the basement, what was your purpose in going down there?

17  A.      There's mechanical areas in that basement.  There is a

18  sprinkler riser in that basement -- the building was

19  sprinkled -- and HVAC units.

20  Q.      And what did you observe with respect to those items?

21  A.      The sprinkler system wasn't monitored, it wasn't

22  installed correctly.  And all of the air conditioning, heating

23  ducts and stuff, there was no smoke staining or buildup inside

24  those ducts, and the fire did not originate in the basement.

25  Q.      Okay.  Were you in the basement?  Did you also look at

1  the electrical service panels?

2  A.      I did.  Nothing was tripped or in an altered position.

3  Q.      Okay.  So then you proceeded to Classroom 108; is that

4  correct?

5  A.      That's correct.

6  Q.      Now, I'll show you what's been received as Government's

7  Exhibit No. 9.  What does that photograph show?

8  A.      That is again the southeast corner.  On the lower -- at

9  floor level, there is an old electric type heater, baseboard

10 heater.  That's been removed, and that's actually the heating

11 duct now.  There's an area of the carpet in front of that that

12 is burned, maybe three-by-three.  There was a table sitting

13 there that firefighters had moved.

14 Q.      Now, I see -- I see an electrical panel there on the

15 wall.  Did you examine that?

16 A.      I did.  And that's actually a duplex -- it's a junction

17 box, duplex junction box.  Again, all of the electrical

18 components that were in this radiant type of heater have been

19 removed.  The duplex outlet, that is exposed with the plywood

20 wall behind it.  There was a splitter in there, so we have two

21 duplex outlets, six-slot splitter in there, and it was melted.

22 But as you take that off, the inside of the box was in good

23 condition.  The wiring was not melted or frayed or damaged in

24 any way.  It was radiant heat that damaged this.

25 Q.      Okay.  Indicating that the electricity wasn't the cause

1  of the fire?

2  A.      Nothing to do with it.  And those are my only two

3  ignition sources in that area.

4  Q.      Did you determine where the fire began?

5  A.      Yes, away from that wall approximately three feet there

6  was a table.

7  Q.      Okay.

8  A.      And on top of and below the table there were items

9  stored on it and, again, firefighters pulled that table away

10  from the wall.

11  Q.      Let me show you --

12  A.      And that is the table that was moved.

13  Q.      And for identification, that's Government's Exhibit 10?

14  A.      On the edges of the table, you can see some smoke and

15  soot.  You can also see a little bit of charring and deposits

16  on it.  Underneath the table was some kind of artwork or

17  prints, prints that were under glass, appeared to be stacks of

18  pictures that were in frame and the frame was just burned.

19  Q.      Let me show you what's been received as Government's

20  Exhibit 11.

21  A.      That is the underside of the same table.  At the top of

22  the picture, you can see that there's more charring than there

23  is at the bottom of the picture.  This was closer to the corner

24  of that southeast class -- the southeast corner of the

25  classroom.

1  Q.     Did you also notice the table containing computers

2  there?

3  A.     Yeah, against the west wall, there was maybe two or

4  three long, narrow tables that were positioned against the wall

5  that had several different work stations on them.

6  Q.     Let me show you Government's Exhibit No. 7.

7  A.     That's it.

8  Q.     And what do you notice with respect to that space in

9  between the computers?

10 A.     Something is missing from there, and if the, if it was

11 a better photo, you could see a clean space on there with

12 something -- where soot had already settled on that table and

13 something was removed.  Soot here, and no soot where the item

14 was removed.

15 Q.     Indicating the item was removed after the fire?

16 A.     Correct.

17 Q.     Now, based upon your examination, did you determine the

18 nature of the fire there at Stephens?

19 A.     The nature of the fire was intentional.

20 Q.     And the origin of the fire was where?

21 A.     In the southeast corner of the classroom.

22 Q.     And you couldn't identify any accidental ignition

23 sources; is that correct?

24 A.     There were no -- of the two possible accidental origins

25 of the fire, huh-uh.  So it was intentionally set, and the

1    cause of the fire was arson.

2     Q.      Next directing you to September 10th of 2011, the early

3    morning hours, did you respond to another fire to conduct an

4    investigation?

5     A.      I did.

6     Q.      And when were you notified of that fire?

7     A.      4:04 a.m.

8     Q.      And did you immediately respond?

9     A.      I did, to provide the origin and cause analysis.

10    Q.      And did you go to the Ellis Library on the MU campus?

11    A.      I did.

12    Q.      And upon arriving there, did you make contact with

13    other firefighters?

14    A.      I did.  I met with Marc Wright outside the north side

15    of the building on the Lowry Mall, and he explained that there

16    were several ignition source, several ignition places

17    throughout one of the upper floors, and that I couldn't go in

18    the building yet.

19    Q.      Now, so you had to wait outside for some time?

20    A.      I did.

21    Q.      Do you recall about how long you had to wait before you

22    were allowed into the building?

23    A.      Twenty minutes, thirty minutes.

24    Q.      Okay.  And upon entering the building, what did you see

25    generally?

1  A.      I entered the building with MUPD, University of

2  Missouri Police Department detectives, and there was smoke.

3  There was smoke throughout.  Again, through methods we worked

4  from the smallest damage to the worst damage in the fire, and

5  we went to the west.

6  Q.      Okay.  Let me show you what's been marked collectively

7  as Government's Exhibits 25 through 48.  Could you look through

8  those photos just to see whether you recognize them?

9  A.      This is the path that I took as I entered through the

10  north door in the security gates.

11  Q.      Just right now, do you recognize the photos?

12  A.      I do.

13  Q.      You took those photos?

14  A.      Yes.

15  Q.      Do they fairly and accurately depict the scene as you

16  encountered it?

17  A.      Yes.

18          MR. LYNN:  Your Honor, I would offer Government's 25

19  through 48.

20          MR. STABENOW:  No objection.

21          THE COURT:  Government's Exhibits 25 through 48 will

22  be admitted.

23          (Government's Exhibits 25-48 were admitted into

24  evidence.)

25  BY MR. LYNN:

1    Q.      Let me show you first Exhibit 25.  Do you recognize

2    that?

3    A.      I do.  That's the north entrance into the Ellis Library

4    on the MU campus.

5    Q.      Government's Exhibit No. 26, do you recognize that?

6    A.      Yes, sir.  That's right inside the doors, those north

7    doors.

8    Q.      So you're facing south?

9    A.      That's correct.  So I could go straight ahead down the

10   hallway, to the west or to the east.

11   Q.      Government's Exhibit 27, do you recognize that?

12   A.      That's just on the other side of those security gates.

13   If your book isn't checked out, they beep if you're bringing

14   anything in or out.  It is facing south, I believe.

15   Q.      Government's Exhibit 28?

16   A.      This is facing west, again, right inside those north

17   doors looking down the west hallway.

18   Q.      Did you look in office No. 115?

19   A.      Yes.

20   Q.      And were you able to locate any fire sources there?

21   A.      Yes.

22   Q.      Let me show you Government's Exhibit 29.  What does

23   that show?

24   A.      Copy service and book sale room, and that is office

25   labeled 115.

1  Q.      Showing you next Government's Exhibit No. 30.  Do you

2  recognize what that shows?

3  A.      That's right inside the room, the countertop showing

4  the reception desk, and I continued further to the north,

5  around that reception desk.

6  Q.      Government's Exhibit 31, what does that show?

7  A.      That's as I continued around that reception desk, and

8  there's two small fires in this area.  And you could see smoke

9  on the wall underneath a white tiger, but the next photo will

10  show the first one that I approached.

11  Q.      Showing you Exhibit 32, what does that show?

12  A.      This is a bookcase with hardly any items on it at all;

13  but on the top left of the photo, there is a corkboard.  The

14  corkboard has cloth on it, and the cloth has been burned.

15  There's some fall-down paper on the top shelf of the bookcase

16  of things that fell from the corkboard.

17  Q.      Can you touch that screen, if you would, where you're

18  talking about?  Just touch it and see --

19  A.      There's a red dot on it.

20  Q.      Okay.  And what did you notice there?

21  A.      This is a corkboard.  The second red dot is items that

22  fell down off the corkboard as they burned and decomposed.

23  There's no electricity in this area.  There are no candles in

24  this area, no cooking.  There's no ignition source in that

25  area.

1  Q.      Leading you to conclude what?

2  A.      That this was an intentionally set fire.

3  Q.      Now, could you tell what the fuel source was?

4  A.      The ignition, the fuel source was probably just paper.

5  Just very common paper that was hanging on the corkboard.

6  Q.      No evidence of accelerants or anything like that?

7  A.      None.

8  Q.      And No. 33, what does that show?

9  A.      That is the same, the same corkboard where you can see

10 items, paper items that burned on the cloth-covered corkboard

11 and fell down onto the bookcase.  But, again, there's no

12 electricity in the area.

13 Q.      Can you touch clear?  There you go.  Anything further

14 in that photo?

15 A.      No.

16 Q.      And Government's Exhibit 34, what does this show?  Is

17 this that same area?

18 A.      It is the same area.

19 Q.      Different perspective?

20 A.      Red dot on the fire we just spoke about.  There's

21 another fire right here.  And the green item resting on the

22 bookcase is a time clock, and it is plugged into the

23 electricity.  Behind it there was a poster, there's another

24 corkboard here, in this area is my burn area.

25 Q.      And, again, what did you find with respect to that fire

1  in terms of accidental ignition sources?

2  A.     Besides the time clock, there were no other ignition

3  sources in that area.  The time clock was virtually undamaged.

4  The cord was in good shape, it was still working.

5  Q.     Leading you to conclude what in terms of the cause of

6  the fire?

7  A.     Again, that this fire was intentionally set by an

8  outside source.

9  Q.     Showing you Government's Exhibit 35, do you recognize

10  what that depicts?

11  A.     I do.

12  Q.     What does that -- and clear your screen, if you would,

13  from -- there you go.

14  A.     This is a wooden rolling cart that is in the library

15  behind the -- let me look at the name, please, circulation

16  desk, and the reserve desk.  So on the east side of the north

17  entrance where I came into the library, this is another area

18  where you reserve your books, pretty much employees only back

19  here.  But this is a sign-out book for reserving and obtaining

20  materials.

21  Q.     And what do you see there?

22  A.     I see where somebody took a heat source and put it on

23  the corner of the pages.

24  Q.     Same question.  Any indication of accidental ignition

25  sources there?

1  A.    There's nothing in that area that would cause an

2  accidental fire.

3  Q.    Clear your screen, if you would.  Showing you next

4  Government's Exhibit 36.  Is that that same book you were

5  talking about?

6  A.    It's the same book, so you could see a light over here

7  on the left side, lights over here on the right side.  Nothing

8  would make that paper ignite by itself.

9  Q.    Clear your screen, if you would.  Showing Government's

10  Exhibit 37.  Do you recognize what that shows?

11  A.    This is the room, the office just behind the

12  circulation/reserve desk.  I don't believe it has a room

13  number.  It's a work station.  From the ceiling, you could see

14  a large yellow hose.  Actually, firefighters placed that there.

15  The sprinkler system was still in service.  We had not turned

16  the water off.  And to limit the water damage in the building,

17  we had hoses running out the window because we couldn't turn

18  off the sprinkler because fires were still occurring and we

19  wanted to limit the water damage, so that's why that's there

20  and the two ceiling tiles are gone.  That's actually right

21  underneath of a sprinkler head.

22  Q.    All right.  Clear your screen, if you would.

23  Government's Exhibit 38.

24  A.    Mr. Lynn, could we go back to that picture we just

25  looked at?

1   Q.      37?

2   A.      Thank you.  I wanted to make note, this area in through

3   here, there was fire there, and the next picture will show some

4   fall-down.  I wanted to make sure you knew that this is where

5   the fire was in that room that initiated that sprinkler

6   activation.

7   Q.      Very well.

8   A.      Thank you.

9   Q.      And the next photo shows the envelopes you were talking

10  about, 38?

11  A.      That's correct.  So these items are on the floor.  And

12  you can see there's water on the floor from that sprinkler

13  activation, and all of these combustibles have fallen down from

14  the shelves.  The edges, the edges of these envelopes are

15  burned.  They were on the shelf stored in an upright position.

16  Q.      Showing you next Government's Exhibit 39.  What does

17  that show?

18  A.      That is the top shelf.  This could have been one

19  ignition, it could have been one light, one lighter, or it

20  could have been more than one.

21  Q.      Okay.

22  A.      As far as proving that would be very difficult,

23  depending on which direction the HVAC was blowing, things of

24  that nature.  But certainly there's nothing in this area that

25  would cause an accidental fire of the top two shelves of

1    envelopes.

2    Q.      Leading you to conclude that it was intentional?

3    A.      Again, an arson.

4    Q.      Showing you next Government's Exhibit No. 40.  Do you

5    recognize what that shows?

6    A.      Yes, this office is just east of the reserve desk.

7    Office 102, circulation offices, this is looking in from the

8    hallway to the reception area of the office.  These two rooms

9    are also connected.

10   Q.      Okay.  Did you find fires in there?

11   A.      I did.

12   Q.      Showing you Government's 41.  Do you recognize that

13   photograph?

14   A.      This is just inside Office 102, the work area 102

15   looking north.

16   Q.      Now, was there water on the floor there?

17   A.      There is, we had a sprinkler activation in this room

18   also.

19   Q.      Next showing you Government's Exhibit 42.

20   A.      I'll point to the bottom right corner, and we have

21   cardboard boxes full of stored items on the other side of this

22   cubicle.  The reception desk is over here.  So this is on the

23   south wall, but there's old computer disks, paper, lesson

24   plans, many pieces of paper that were very wet and some

25   charred.

1    Q.       And does Exhibit 43 show that same scene?

2    A.       It does.

3    Q.       But a little closer?

4    A.       It does.  So you can see the drawers that held the old

5    disks, ceiling tiles that fell from the ceiling when the

6    sprinkler activated, and the floor is wet with the sprinkler

7    activation.

8    Q.       And, again, showing you Government's 44, is that that

9    same area?

10   A.       The same area.

11   Q.       What did you observe with respect to the metal on the

12   drawers there?

13   A.       Some of the paint from the metal was burned.  It had

14   kind of a rusted appearance, an oxide appearance usually caused

15   from direct flame contact.

16   Q.       And again, any accidental ignition source detected

17   there?

18   A.       There's no candles in the area, there's no outlets

19   behind the storage, there was just nothing.

20   Q.       Showing you Government's Exhibit 45.  What does that

21   show?

22   A.       This is a cubicle, approximately 18 feet from the boxes

23   with the computer disk that had burned.  In this cubicle, you

24   can see the vertical file folders had been set on fire.  There

25   is a computer -- everything was at a distance, but there was no

1   ignition source in this area.

2   Q.      Leaving you to conclude what?

3   A.      That this was an intentionally set fire.

4   Q.      Turning next to Government's Exhibit 46.  What does

5   that photograph show?

6   A.      I believe that's the same cubicle.

7   Q.      Showing debris on the floor there?

8   A.      That's correct.  The fall-down and stuff on the floor,

9   I can't tell if the fire is right there or if it's over here.

10  Q.      Okay.

11  A.      Perhaps another view.

12  Q.      Showing you Government's Exhibit 47.  Do you recognize

13  what that shows?

14  A.      I do.  This is room -- Room 102 was connected to Room

15  103 where this is.  There is also -- 103 can be accessed from

16  the hallway, as well.  Cardboard boxes that are on top of a

17  wooden rolling cart.  The sprinkler above did activate.  What

18  we found in here were cardboard boxes and just combustible

19  Class A items.

20  Q.      No evidence of accidental ignition sources?

21  A.      There was nothing in this area.

22  Q.      Next showing you Government's Exhibit 48.

23  A.      This is the corner of that same room, the boxes are

24  right down here?  And it just, the fire -- obviously heat

25  rises, we do have an outlet right here that could produce a

1  spark or an arc.  The wall plate is still in good shape.  I was

2  able to take the small bolts out of the wall plate, the

3  junction box cover, and examine the insides.  Everything was in

4  good shape.  There were no blisters on the insulation of the

5  wire or tapering or beading.

6  Q.     So no electrical cause of the fire?

7  A.     That's correct.

8  Q.     And your conclusion as to the cause of the fire?

9  A.     That it was intentionally set.

10 Q.     Let me show you a diagram marked Government's Exhibit

11 92.  Do you recognize this?  Does that appear to be an overview

12 of the library?

13 A.     Yes.

14 Q.     Does that fairly and accurately depict the library, at

15 least the rooms as they related to each other?

16 A.     It appears to be, yeah, a floor plan.

17         MR. LYNN:  Offer Government's 92, Your Honor.

18         THE COURT:  Any objection?

19         MR. STABENOW:  No objection.

20         THE COURT:  Government's 92 will be admitted.

21         (Government's Exhibit 92 was admitted into evidence.)

22 BY MR. LYNN:

23 Q.     I'm going to show you Government's 92.  And if you

24 would just go in -- as you've figured out the technology pretty

25 well.

1  A.      Uh-huh.

2  Q.      Just indicate on the diagram the sites where you

3  located fires.

4  A.      Okay.  Again, I came in through the north entrance.  I

5  had a fire in copy services, 115; I had one right -- let me

6  move it over a little bit.  Right there.  Can you see my arrow?

7  Q.      Uh-huh.

8  A.      And another one right here.

9  Q.      Okay.

10  A.      So two in Room 115.

11  Q.      Okay.

12  A.      To the right of the screen in Room 101, there's a

13  countertop out here.  That was the rolling cart.  That was fire

14  No. 3, the sign-out paperwork on the log on the binder.

15  Q.      Okay.

16  A.      Further to the north in reserve, 101B, we had storage

17  of envelopes on the shelf, and a lot of those had fallen down,

18  as well.  In access services next-door in 102 in the, near the

19  corner, we had cardboard boxes that were stored next to a

20  cubicle with the old-time computer disks and stuff, and then we

21  also had a vertical file folder in another cubicle that was on

22  fire.

23  Q.      Okay.

24  A.      Continuing further to the east in Room 103 in the

25  corner by the door was the cardboard on the rolly cart.

1  Q.    So seven fire sites in total?

2  A.    That's correct.

3  Q.    And as to all, you were able to eliminate any

4  accidental causes; is that correct?

5  A.    I was able to eliminate them.

6  Q.    And do they all appear to be available-material kind of

7  fires?

8  A.    Yes.

9         MR. STABENOW:  Before you clear that one, can you

10 have the courtroom deputy print it?

11        MR. LYNN:  Defense is requesting a printout.  And we

12 have no further questions, Your Honor.

13        THE COURT:  Mr. Stabenow, if you could hold off just

14 for a second so we could get it printed.

15        MR. STABENOW:  It's too late now.

16        THE COURT:  You can go through and ask her to redo

17 that testimony if you want it preserved.  I think you need a

18 couple of advanced degrees in order to be able to operate this.

19        MR. LYNN:  I'm still figuring this part out.

20        COURTROOM DEPUTY:  Now I find it.  Sorry.

21        MR. STABENOW:  It's all right.

22        THE COURT:  I'm sorry.  You may proceed.  I'm still

23 trying to figure this out.

24        MR. STABENOW:  I need the AV system back up in order

25 to ask my questions.

1                                    - - -

2                             CROSS-EXAMINATION

3    By Mr. Stabenow:

4    Q.      Okay.  Going back to the fire at the Audrey Webb

5    building.

6    A.      Okay.

7    Q.      I'm going to put on prosecution Exhibit No. 8 here,

8    zoom out of it.  And you said that was -- I guess here in the

9    picture, the brown table is the table that you said the fire

10   was underneath.  It had been pulled back from the wall prior to

11   your arrival by the firefighters, and that that damaged area

12   back there in the corner is where the table had been sitting;

13   is that correct?

14   A.      Close to it, yes.

15   Q.      Okay.  Now, the actual -- the walls are ripped out, and

16   that was done by your firefighters trying to make sure there

17   wasn't an electrical fire going on behind the walls.

18   A.      That's correct.

19   Q.      Why didn't we see similar stuff in the Ellis Library

20   fires?  Why weren't those walls pulled out or ripped out like

21   this was?

22   A.      They weren't damaged like this one was.

23   Q.      So just there was not as much damage?

24   A.      That's correct.

25   Q.      Okay.  I'm going to put now prosecution Exhibit No. 7

1 on. This is that picture of the computer equipment. Now,

2 Mr. Coleman is the person who actually took this picture,

3 correct?

4 A.    He is.

5 Q.    All right. And you said that this was, that the

6 computer would have been taken after the fire because of the

7 clean imprint on the tables?

8 A.    Correct.

9 Q.    How do you know that isn't like a layer of dust? I

10 mean, I think many of us might have offices where if we moved

11 our computer equipment there would be a similar pattern of dust

12 and clean.

13 A.    And my office gets dusty, as well, but soot is black.

14 Q.    Okay.

15 A.    And this was a paper that had burned, so it puts off a

16 lot of soot.

17 Q.    So how long would the fire have had to be -- how long

18 would there have had to be smoke in the air and everything else

19 in order to put down this amount of soot before somebody takes

20 it away and leaves an imprint?

21 A.    Not very much at all because it was paper that was

22 burning. A lot of the items were paper and cardboard that put

23 off a lot more ash.

24 Q.    Now, you didn't mention any of this in your report, did

25 you?

1  A.      In --

2  Q.      In the fire report that you issued, you didn't mention

3  anything about a computer or soot being on the table or that

4  being an indicator that the computer was taken after the fire

5  or anything like that?

6  A.      No.  The only thing that I put in my report was when I

7  met with security the next morning, they said that a computer

8  was missing and that their IT department was able to find out

9  what time the computer was unplugged from the wall.

10 Q.      I'm not asking about that.  Just did you mention in

11 your report that this computer, that the soot here shows that

12 the computer was taken after a fire?

13 A.      I did not.  Just what I just told you about the

14 computer being unplugged at a certain time.

15 Q.      Returning to Prosecution 32, it shows the two fires in

16 the copy room.

17 A.      Uh-huh.

18 Q.      And up here in the upper right-hand corner, there's a

19 green square object.  That's the clock that I'm pointing at.

20 A.      The time clock.

21 Q.      You said it was still working fine?

22 A.      That's correct.

23 Q.      Are you able to tell how long that fire had been

24 burning?

25 A.      No.  I know that the items that did burn burned

1  quickly, you know, pieces of paper with lots of oxygen around

2  them.

3  Q.    Is this something that would take 20 minutes to burn or

4  just --

5  A.    Usually quicker than that.

6  Q.    You light it, and you want to back up pretty quickly.

7  A.    It's not going to poof, it's a piece of paper, but it

8  doesn't take very long.

9  Q.    Okay.  Here is Defense Exhibit No. 1.  This is kind of

10  a zoomed-in section of that map that you talked about with Mr.

11  Lynn.

12  A.    Yes.

13  Q.    Do you recognize it as the layout?

14  A.    Yes.

15  Q.    All right.  Now, we talked about some fires in work

16  area 102 and this -- it's hard to read, but ILL Office 103.

17  ILL Off, I think it stands for interlibrary loan office 103.

18  Do you see that section?

19  A.    I do.

20  Q.    And going now to -- going to go back and forth here

21  real quick.  Government's Exhibit 40, do you see that?

22  A.    Okay.

23  Q.    And then we go back to Defense Exhibit No. 1.  That

24  picture was taken right here at the bottom of work area 102

25  where this little green door is indicated; is that correct?

1   A.      Yes.

2   Q.      And Government's Exhibit 48, this fire with the light

3   switch, and we see a door through a window, that was taken, on

4   Defense Exhibit No. 1, at this doorway at the bottom of the

5   interlibrary loan office that leads out into the hallway; is

6   that correct?  Not -- standing inside the door looking back --

7   A.      Almost.  The direction is kind of like this.  You can

8   kind of see the door from 103.  I'm sorry, 102.

9   Q.      So put them next to each other.  There on the left,

10  you're seeing the door that I'm pointing at here that's at the

11  bottom of --

12  A.      I believe that's a real good depiction, yes.

13          MR. STABENOW:  Okay.  Just a moment.

14  Q.      Are you able to -- were you able to tell which fire was

15  in this 101, 102, 103 area, what order the fires were set in?

16  A.      No, they were all extinguished by the time I arrived.

17  I know what the firefighters told me, but they were all

18  extinguished by the time I arrived.

19          MR. STABENOW:  Thank you.  Nothing further at this

20  time.

21          THE COURT:  Any redirect, Mr. Lynn?

22          MR. LYNN:  No redirect.

23          THE COURT:  Ma'am, you may step down.

24          THE WITNESS:  Thank you.

25          MR. LYNN:  Julie Rogers.

1                              - - -

2                          JULIE ROGERS,

3   being first duly sworn by the courtroom deputy, testified as

4   follows:

5                              - - -

6                        DIRECT EXAMINATION

7   By Mr. Lynn:

8   Q.      Ma'am, would you state your name and spell your name,

9   please?

10  A.      Julie Rogers; J-U-L-I-E, R-O-G-E-R-S.

11  Q.      Miss Rogers, what is your employment?

12  A.      I am assistant head of security at Ellis Library,

13  University of Missouri.

14  Q.      And as assistant head of security, what are your

15  responsibilities there?

16  A.      I run the daily operations of the security department,

17  direct report of all of the security officers, full and

18  part-time.

19  Q.      Now, is Ellis Library equipped with surveillance

20  cameras?

21  A.      Yes, it is.

22  Q.      Do you have responsibilities related to that?

23  A.      I do, I'm accountable for training all officers.

24  Q.      Okay.  And are you familiar with equipment?

25  A.      Yes, I am.

1  Q.      Surveillance equipment?  And back on September 10th of

2  2011, the morning hours, were you called into the library?

3  A.      Yes, I was.

4  Q.      And do you recall what time you arrived at the library?

5  A.      4 -- about 4:05 a.m.

6  Q.      Upon your arrival, what were you requested to do?

7  A.      I was requested to look on our surveillance system at

8  all of our cameras and see if we could see anybody that was in

9  the building.

10 Q.      And did you have a particular time frame that you were

11 reviewing, that you were looking at?

12 A.      Initially, yes.  It was between 3 a.m. and 3:45 a.m.

13 Q.      Okay.  So your initial focus was a little more limited;

14 is that correct?

15 A.      Yes, it was.

16 Q.      Then ultimately, did you review the time frame from the

17 previous evening to the early morning hours?

18 A.      Yes, I did.  From 8:15 p.m. on 9/9/11, throughout that

19 entire evening until 9/10/11 at 4:15 a.m.

20 Q.      Okay.  So I suspect that took a little bit of time.

21 A.      Yes, it does.

22 Q.      And how many cameras did you have to review?

23 A.      I reviewed -- give me a second here.  I reviewed ten

24 cameras.

25 Q.      Now, let me show you what's been received as

1  Government's Exhibit 92.  Do you recognize that diagram?

2  A.      Yes, I do.

3  Q.      What does that diagram show?

4  A.      It's the first floor of Ellis Library.

5  Q.      I want you to indicate for us with a stylus where those

6  cameras were positioned on that day.

7  A.      The cameras on this floor, there's a camera right

8  there, there is a camera right here, there's a camera right

9  here.

10  Q.      Backing you up --

11  A.      I'm sorry.

12  Q.      On the first camera you indicated, is that camera

13  designated a certain number or name?

14  A.      Yes, this is camera No. 7.  It's also called the

15  birdcage.

16  Q.      Okay.  And what perspective does that camera give you?

17  A.      It shoots from the hanging point north, so it would

18  show this area.

19  Q.      All right.  The second camera that you designated --

20  the second camera you've designated, did it have a particular

21  name and number?

22  A.      This is camera No. 9, the north door.

23  Q.      Okay.  And what perspective does that --

24  A.      It --

25  Q.      -- survey?

1  A.      It's pointed here, and it points out the north door, so

2  it shows our north door entrance out into the foyer.

3  Q.      The next camera you've designated?

4  A.      This is camera No. 16, and it shows, from this vantage

5  point it covers this whole area here.

6  Q.      Okay.

7  A.      And it comes back through here.

8  Q.      And what is the next camera?

9  A.      This is -- we have two cameras in our circulation area.

10 We have camera No. 5, and it's actually indicated as north desk

11 camera because it points from the circulation wall and it

12 shoots out this way.

13 Q.      Okay.

14 A.      And this is the next camera, it's camera No. 6, and

15 it's called east circ for east circulation, and its vantage

16 point goes through here.

17 Q.      Now, is that all of the cameras or -- are those all the

18 cameras that were operational, operating back on September 10th

19 of 2011?

20 A.      Yes, these are all of the cameras on the first floor.

21 Q.      On that floor.  Other floors were also equipped with

22 cameras?

23 A.      Yes, they were.

24 Q.      Where were other cameras located?

25 A.      On -- there were other cameras on the first floor and

1    it's not, it's not on this map, but there are four cameras on

2    the first floor on the south side, and there is a camera on the

3    second floor outside of Room 213, that's the name of that

4    camera.  And there are several cameras on our ground level.

5    Q.      Okay.  Now, are there cameras situated near or by exits

6    or entrances?

7    A.      Yes, there are.  Our -- I can't show you on this map.

8    Q.      Just describe.

9    A.      Yes.  At our west entrance of the library, there are

10   two cameras.  Also when you enter our west entrance, it goes

11   onto the ground level.  There are three cameras on that floor

12   outside of our security office.  There's a camera at our

13   loading dock entrance and the hallway leading from that loading

14   dock entrance.  There is a camera out the east entrance.  And

15   that would be about the 16 cameras.

16   Q.      Sixteen cameras total throughout --

17   A.      Yes.

18   Q.      Did you have occasion to review all of the

19   surveillance?

20   A.      Yes, I did.

21   Q.      To the best of your knowledge, were those cameras

22   operating properly that evening?

23   A.      They were.

24   Q.      Were the surveillance cameras operating properly?

25   A.      Yes, they were operating properly.

1    Q.      Okay.  Now, did you have occasion to make or preserve

2    copies of certain surveillance?

3    A.      Yes, I did.

4    Q.      Let me show you what's been marked as Government's

5    Exhibit No. 99.  Do you recognize that disk?

6    A.      Yes, I do.

7    Q.      You've had occasion to review that disk?

8    A.      Yes, I did.

9    Q.      Does that disk contain certain surveillance video that

10   you preserved?

11   A.      Yes, it contains all the surveillance video that I just

12   explained.

13   Q.      Okay.  Now, was there a particular time frame that is

14   preserved on this disk?

15   A.      Yes, from 8:15 p.m. on 9/9, 2011, to 9/10, 2011, at

16   3:25 a.m.

17   Q.      Now, why did you terminate your preservation at 3:25?

18   A.      It was actually 3:24 and 28 seconds when the suspect

19   left, was leaving the building, and we got him on camera

20   leaving the building.

21   Q.      But did you have occasion personally to review all of

22   the surveillance?

23   A.      Yes, I reviewed all of the surveillance until 4:15 a.m.

24   Q.      Did you see yourself arrive on video?

25   A.      Yes, I did.

1    Q.      Did you see other library personnel arrive?

2    A.      I saw -- I saw members of the fire department, I saw

3    members of MUPD, university police; I saw myself and several

4    other library employees enter the building.

5    Q.      Did you see Officer Brayer arrive?

6    A.      Yes, I did.

7    Q.      Do you recall about what time he arrived?

8    A.      He arrived through the west entrance, and that was at

9    3:29, and he was on camera again at the north entrance at 3:30

10   a.m. -- excuse me.  3:30 a.m.

11           MR. LYNN:  Your Honor, I'm going to offer

12   Government's Exhibit 99.

13           THE COURT:  Any objection?

14           MR. STABENOW:  No, Your Honor.

15           THE COURT:  Government's Exhibit 99 will be

16   admitted.

17       (Government's Exhibit 99 was admitted into evidence.)

18           MR. LYNN:  Do you want a copy of that?

19           MR. STABENOW:  No.

20           THE COURT:  Could you clear that?

21           THE WITNESS:  Undo?

22       (So done.)

23           MR. LYNN:  That doesn't sound good.

24   BY MR. LYNN:

25   Q.      All right.  Now, do you see on the display in front of

1  you, does that appear to be my desktop?

2   A.     Yes, it is.

3   Q.     And does that appear to -- have I opened the disk

4  there?

5   A.     Yes, Drive E, fire video.

6   Q.     Okay.  Now, the first folder designated fire

7  surveillance, what is that file?

8   A.     That file contains five different sets of video on

9  different cameras that I spoke about earlier, camera 7.

10  Q.     Spanning what time frame?

11  A.     Spanning from 8:15 p.m. on 9/9/11 to 3:25 a.m. on

12 9/10/11.

13  Q.     How about the second file called fire suspect video

14 footage?

15  A.     That's different segments of time when the suspect's

16 caught on camera.

17  Q.     Okay.  I'm going to open that folder, and what do I see

18 there?

19  A.     The GE Navigator is the system that we play our

20 surveillance from, and the other videos, the other files are

21 segments of video from different cameras.

22          MR. LYNN:  Your Honor, I'm going to request leave to

23 play portions of the video at this time.

24          THE COURT:  Any objection?

25          MR. STABENOW:  No objection, Your Honor.

1    THE COURT:  You may proceed.

2    BY MR. LYNN:

3    Q.    All right.  I've activated the player, hopefully it

4    will work.

5    A.    Yes.

6    Q.    Enlarge that window so we have presented to us a play

7    list; is that correct?

8    A.    Yes, it's a play list of two videos at camera 16,

9    camera 9, camera 6, and camera 5.

10   Q.    I'm going to select the first item on the play list.

11   It's designated 20110910-030653 from camera 16.  And, again,

12   refresh our memory, what is camera 16?

13   A.    Camera 16 is on our north entrance from -- viewing

14   inside the north entrance, so you'll see the book detectors

15   leaving the north entrance of Ellis Library.

16   Q.    All right.

17         (Playing video.)

18   Q.    That video commences approximately what time?

19   A.    When does it finish or when does it start?

20   Q.    3:06, when it commenced, when it began.

21   A.    3:06:53.

22         (Playing video.)

23   Q.    What do we see there?

24   A.    That's the suspect walking in front of camera 16 with a

25   pipe.

1  Q.      Did you catch anything of significance from there on?

2  A.      It will catch the suspect exiting in front of the book

3  detectors and trying to exit the north doors at 3:24.

4  Q.      I mean this particular -- okay.  That will be the next

5  segment, though?

6  A.      Yes.

7  Q.      Okay.  All right.  I'm going to stop the video just

8  one -- I'm going to show you Government's Exhibits 49, 50, and

9  51.  Do you recognize these?

10  A.      Yes.  They are still shots from the video that we just

11  saw.

12          MR. LYNN:  Okay.  Your Honor, I'm going to offer

13  those three exhibits, again, 49, 50, and 51.

14          MR. STABENOW:  No objection, Your Honor.

15          THE COURT:  Exhibits 49, 50, and 51 will be

16  admitted.

17          (Government's Exhibits 49, 50, and 51 were admitted

18  into evidence.)

19  BY MR. LYNN:

20  Q.      Showing you Government's Exhibit 49.  Again, what does

21  that show?

22  A.      The suspect with a pipe walking in front of camera 16.

23  Q.      And what does the time stamp reflect?

24  A.      9/10/11 at 3:07 and 11 seconds, a.m.

25  Q.      And Government's 50, what does that show?

1  A.      It shows him continuing through camera 16 viewing at, I

2  can't quite see the time.  Camera is -- on 9/10/11 at 3:07 a.m.

3  and 12 seconds.  And, again, it's camera 16, the north exit.

4  Q.      Does he appear to have an item in his hand?

5  A.      Yes, he has a pipe.

6  Q.      Do you recognize that pipe?

7  A.      Yes, I do.  It's part of a quiet sign that was up in

8  Room 202 on the second level that was ripped apart.

9  Q.      Okay.  And showing you Government's Exhibit 51.

10  A.      That picture shows the suspect Kelley leaving, about to

11  leave the viewing of camera 16 at, on 9/10/11 at 3:07 and 13

12  seconds, a.m.

13  Q.      Can you tell which direction he's headed?

14  A.      Yeah, he's actually heading east towards the

15  circulation area, which would be the two other cameras I spoke

16  of, camera 5 and camera 6.

17  Q.      Okay.  I'm going to deselect that, and I'm going to

18  select the next one, and that shows 20110910-030719 from camera

19  5; is that correct?

20  A.      Yes.

21  Q.      And what does that, what is that clip?

22  A.      It's a, the first camera in our circulation area, it's

23  actually the north desk camera that points out from

24  circulation, viewing south.

25  Q.      Okay.  I'm going to play that.

1              (Playing video.)

2    A.        That was the suspect.

3                 (Playing video.)

4    Q.        All right.  We've reached the end of that segment; is

5    that correct?

6    A.        Yes, that's correct.

7    Q.        That was pretty quick.  So let me show you Government's

8    Exhibits 52, 53, and 54.  Do you recognize those?

9    A.        Yes, I do.  They are still shots from camera 5 that we

10   just watched video on.

11              MR. LYNN:  Offer Exhibits 52, 53, and 54, Your

12   Honor.

13              MR. STABENOW:  No objection.

14              THE COURT:  Exhibit 52, 53, and 54 will be admitted.

15              (Government's Exhibits 52, 53, and 54 were admitted

16   into evidence.)

17   BY MR. LYNN:

18   Q.        Showing you Government's Exhibit 52.

19   A.        That is camera 5, the north desk camera.  It's from

20   9/10/11 at 3:07:14 a.m., and it shows suspect Kelley with a

21   pipe in his hand heading towards the circulation desk.

22   Q.        Okay.  Exhibit 53?

23   A.        That is camera 6, which is an east circulation camera.

24   And it's on 9/10/11 at 3:07 and 14 seconds a.m. and it shows,

25   can I use -- it shows the suspect --

1  Q.     Feel free to point.

2  A.     It shows the suspect going around the bin here.  Our

3  camera 5 is the previous picture that was seen, this is from

4  camera 6.

5  Q.     And finally Government's Exhibit 54.

6  A.     That shows suspect Kelley at 3:07:15 a.m. entering the

7  circulation area on 9/10/11, and that's from camera 5.

8             THE COURT:  Mr. Lynn, we've been going for about an

9  hour and 15 minutes.  Is this a good stopping point to take a

10 break?

11            MR. LYNN:  It would be a good time.

12            THE COURT:  Okay.  Why don't we go ahead and take a

13 15-minute recess.

14            (The following proceedings were had in the courtroom

15 out of the presence of the jury:)

16            THE COURT:  My thought is to take a 15-minute

17 recess, reconvene at about ten till 11:00, and go for another

18 hour and 15 minutes, and then break for lunch around noon,

19 whenever it's a good breaking point with the witnesses.

20 Anything else to take up at this point?

21            MR. STABENOW:  No.

22            MR. LYNN:  No.

23            THE COURT:  Okay.  I'll see you in 15 minutes.

24            (A recess was taken from 10:36 a.m. to 10:51 a.m.)

25            THE COURT:  Ready to call the jury in?

1    MR. STABENOW:  Yes.

2    THE COURT:  Mr. Lynn?

3    MR. LYNN:  Yes.  Judge, should she resume the

4  witness stand?

5    THE COURT:  Yes, please.

6    (The following proceedings were had in the courtroom

7  in the presence of the jury:)

8    THE COURT:  Mr. Lynn, you may resume.

9    MR. LYNN:  Thank you, Your Honor.

10                          - - -

11                      JULIE ROGERS,

12   having been previously duly sworn by the courtroom deputy,

13  testified further as follows:

14                          - - -

15              RESUMED DIRECT EXAMINATION

16  By Mr. Lynn:

17  Q.    Miss Rogers, I'm selecting the third item on the play

18  list.  Attempting to select it.  And it is, for the record,

19  20110910-030727 from camera 6.  Are you familiar with that

20  video excerpt?

21  A.    Yes, I am.

22  Q.    And to what camera does that relate?

23  A.    Camera 6 is also the east circulation camera, east circ

24  camera.

25  Q.    Hit play.

1              (Playing video.)

2    Q.      Is that the end of that excerpt?

3    A.      Yes, it is.

4    Q.      That went pretty fast, so let me show you some stills.

5    Show you Government's 56 -- or 55, 56, and 57.  Do you

6    recognize those items?

7    A.      Yes, I do.  They're still shots from the east

8    circulation camera No. 6.

9    Q.      Based upon the excerpts that we just observed, correct?

10   A.      Yes, based on the video.

11              MR. LYNN:  Offer 55, 56, and 57, Your Honor.

12              MR. STABENOW:  No objection.

13              THE COURT:  Exhibit 55, 56, and 57 will be admitted.

14              (Government's Exhibits 55, 56 and 57 were admitted

15   into evidence.)

16   BY MR. LYNN:

17   Q.      Show you Government's Exhibit 55.  What does that

18   photograph show?

19   A.      It shows suspect Kelley on 9/10/11 at 3:07 and 15

20   seconds a.m., camera 6, east circulation.

21   Q.      Can you ascertain where he's headed?

22   A.      He's headed behind the circulation desk.

23   Q.      Does he appear to have an object in his hand?

24   A.      He still has the pipe in his hand.

25   Q.      Exhibit 56?

1    A.      It is, again, east circ camera No. 6 on 9/10/11 at

2    3:07:16 seconds a.m., shows suspect Kelley entering the

3    circulation desk.

4    Q.      Government's Exhibit 57?

5    A.      Again, east circ camera, camera No. 6, on 9/10/11 at

6    3:07:29 seconds a.m.  It shows suspect Kelley in the bottom

7    corner.

8    Q.      Now, did the video depict anything at 3:09:37?

9    A.      3:09?

10   Q.      You don't have any?

11   A.      I don't have any time at 3:09.  I'm sorry.

12   Q.      Okay.  Go back to video.  Now, I'm deselecting camera

13   6, going down to the next one on the play list, which is

14   20110910-032359 from camera 9.  What does that excerpt depict?

15   A.      That is camera No. 9, points from inside the library

16   out the north door.  It's the north door camera, as well.  And

17   it shows suspect Kelley trying to exit the building.

18           (Playing video.)

19   Q.      Is that the end of that video excerpt?

20   A.      Yes, it is.

21   Q.      Approaching, show you Government's Exhibit 66 and 67.

22   Do you recognize those?

23   A.      Yes, they're still shots from camera No. 9, also known

24   as the north door camera, on 9/10/11 showing suspect exiting --

25   or trying to exit, excuse me.

1    MR. LYNN:  Offer Government's Exhibit 66 and 67,

2 Your Honor.

3    MR. STABENOW:  No objection.

4    THE COURT:  Exhibits 66 and 67 will be admitted.

5    (Government's Exhibits 66 and 67 were admitted into

6 evidence.)

7 BY MR. LYNN:

8 Q.    Showing you Government's Exhibit 66.  Do you recognize

9 that?

10 A.    Yeah, it's the still shot of camera No. 9, the north

11 door camera on 9/10/11 at 3:24 and 16 seconds a.m.  It shows

12 suspect Kelley trying to leave the north door.

13 Q.    Show you Government's Exhibit 67.

14 A.    Snapshot from camera No. 9, north door, on 9/10/11 at

15 3:24:18 seconds a.m.  Trying to exit the door, and it is

16 locked, so he turns away.

17 Q.    The door was locked?

18 A.    Yeah, the door is locked.

19 Q.    Okay.  I've selected the camera 16, which is

20 20110910-032413 from camera 16.  Is that a video excerpt you

21 prepared?

22 A.    Yes, it is.

23 Q.    And what does it depict?

24 A.    It is -- it shows suspect Kelley leaving the

25 circulation desk area heading to the north doors.  You have to

1    switch the monitor.

2  Q.      Oh, okay.

3            (Video playing.)

4  Q.      Okay.  That concludes that excerpt; is that correct?

5  A.      Yes, it does.

6  Q.      Show you Government's 64, 65, and 66.  What do those

7    photos show?

8  A.      They're snapshots of the north exit door, camera 16,

9    and it shows him trying to exit the building.

10  Q.      Was he able to exit the building?

11  A.      No.  It's a locked door.  You have to have key card

12    access.

13  Q.      Show you 64.

14  A.      Camera 16, north exit at 9/10/11 at 3:24:12.

15          THE COURT:  Excuse me, Mr. Lynn, my records show

16    that that's not been admitted, 64 and 65 have not been

17    admitted.

18          MR. LYNN:  I'm sorry.

19          MR. STABENOW:  I have no objection if he offers

20    them.

21          MR. LYNN:  64, 65, and 66, sorry.

22          THE COURT:  Okay.  Those are admitted.

23        (Government's Exhibits 64 and 65 were admitted into

24    evidence.)

25  BY MR. LYNN:

1  Q.      Now that those are admitted, let me show you 64.

2  A.      Camera 16, north exit, 9/10/11 at 3:24:12 a.m., and it

3  shows suspect Kelley running towards the north door.

4  Q.      Government's Exhibit 65?

5  A.      That's another still shot on camera 16, north exit, on

6  9/10/11 at 3:24:14 a.m.  It shows him running to the north

7  doors.

8  Q.      Government's Exhibit 68?

9  A.      Camera 16, north exit, 9/10/11 at 3:24:21 a.m., shows

10 suspect Kelley heading towards the front service area, copy

11 services, as well.

12 Q.      Okay.  Now, I'm going to the last -- let me get back to

13 my place here.  I'm going to the last file on the disk labeled

14 video of damage to camera 5.  What does that contain?

15 A.      It's actually video of damage to cameras 5 and 6.

16 Q.      Five and six.

17 A.      It contains footage from when suspect Kelley comes on

18 the camera until when they're broken.

19 Q.      I've activated the recorder.  I'm going to select the

20 first item on the play list, which is 20110910-030714 from

21 camera 6.

22             (Video playing.)

23 Q.      I'm going to fast forward.

24 A.      Do you need the time?

25 Q.      I'm going to stop it.  Anything visible thereafter?

1  A.      It comes back into focus at 3:14 for about four

2  seconds.

3  Q.      Is that the totality of that?

4  A.      That is, yes.

5  Q.      And show you Government's Exhibit 60.  What does that

6  depict?

7  A.      That is camera No. 6, east circulation at 3:12 when it

8  starts to go out, when it's been hit.

9          MR. LYNN:  Your Honor, offer Government's Exhibit

10  60.

11          MR. STABENOW:  No objection.

12          THE COURT:  Exhibit 60 will be admitted.

13          (Government's Exhibit 60 was admitted into evidence.)

14  BY MR. LYNN:

15  Q.      Going to switch back.  And show you Government's 60.

16  Is that the photo you described?

17  A.      Yes, camera 6, east circ, 9/10/11, 3:12:29 a.m.

18  Q.      Was that one knocked off the wall, or did it still

19  hang?

20  A.      That one still hung.  That was camera 6.

21  Q.      Okay.  Deselect that and select the next item on the

22  play list.

23  A.      You need to switch the monitor.

24  Q.      I'll switch the monitor.  And I've selected item

25  20110910-030743 from camera 5.  What does that depict?

1    A.      That's camera 5, which is the north desk camera.  It

2    shows the damage of the camera when it starts to go out and is

3    hit.

4              (Video playing.)

5    Q.      Okay.  Is that the totality of the video from camera 5?

6    A.      Yes, it is.

7    Q.      Show you Government's Exhibits 61, 62, and 63.  Do you

8    recognize those?

9    A.      Yes, I do.  They're snapshots of camera No. 5, north

10   desk.

11   Q.      Depicting what?

12   A.      The camera being hit and taken out of service.

13             MR. LYNN:  Offer 61, 62, and 63, Your Honor.

14             MR. STABENOW:  No objection.

15             THE COURT:  Exhibit 61, 62, and 63 will be admitted.

16             (Government's Exhibits 61, 62, and 63 were admitted

17   into evidence.)

18   BY MR. LYNN:

19   Q.      Showing you Government's 61.  What does that photo

20   show?

21   A.      It shows north desk camera 5, and it is showing the

22   ceiling.  It's being knocked out of service on 9/10/11 at

23   3:12:43 a.m.

24   Q.      Next showing you Government's Exhibit 62.  What does

25   that show?

1  A.      That is from camera 5, north desk camera, 9/10/11 at

2  3:12:45 a.m., and this right here is a mirror that the camera

3  is hitting, reflecting off of, and this right here is the

4  suspect.

5  Q.      Okay.  And do we have -- let me show you Government's

6  Exhibit 63.  Is that a still photo of --

7  A.      That's a snapshot of the north desk camera 5 on 9/10/11

8  at 3:12:46 a.m., and this is the mirror I was speaking of.

9  Q.      Now, the video you originally viewed in its raw form,

10  was it any clearer than this photo that we see?

11  A.      Oh, yeah, it's a lot clearer.  I have a smaller picture

12  that I'm looking at.  So it's a lot clearer than it shows now,

13  but if you look, you can see the suspect right here, and the

14  camera would be right up there being hit.

15  Q.      When did the defendant first appear on camera, on the

16  video surveillance?

17  A.      On 9/10/11 at 2:12 a.m.

18  Q.      Okay.  Did he appear on multiple cameras at that time?

19  A.      Yes, he did.  He appeared on camera 7, 16, 5, 6, and 9.

20  Q.      And what was he doing?

21  A.      He was walking across the entranceway, the north

22  entranceway from our copy service area.  So he was going from

23  west to east.

24  Q.      Let me show you what's been marked Government's Exhibit

25  70, 71, and 72.  What do these photos show?

1  A.     These are photos from the camera outside of Room 213 on

2  the second floor.

3          MR. LYNN:  Your Honor, I would offer 70, 71, and 72.

4          MR. STABENOW:  No objections.

5          THE COURT:  Exhibits 70, 71, and 72 will be

6  admitted.

7          (Government's Exhibits 71 and 72 were admitted into

8  evidence.)

9  BY MR. LYNN:

10  Q.     Showing you Government's 70.  What does that photograph

11  depict?

12  A.     This is a camera up on the second floor, which is

13  outside of Room 213, and it goes -- there's a stairwell right

14  here, and it goes from the first floor up to the third floor,

15  and this is suspect Kelley.

16          MR. STABENOW:  Objection, Your Honor.  The witness

17  keeps testifying that some of these photos are, quote, suspect

18  Kelley, like in the mirror.  I think it's up to the jury to

19  determine if it's Mr. Kelley.  She can say this is the image we

20  captured on the video.

21          THE COURT:  I do think it's a conclusion.  I think

22  she can point out that it's an individual.

23          MR. LYNN:  Very well.

24  BY MR. LYNN:

25  Q.     Government's Exhibit 71.  What does that show?

1  A.     That is the camera outside of Room 213, and that is the

2  suspect we were, had been videotaping all day.

3  Q.     Okay.  Government's 72?

4  A.     That's the same camera, outside of 213.  It's the

5  suspect that we had had on video all day heading up to the

6  third floor.

7  Q.     Show you Government's 69.  What does that show?

8  A.     That is camera 7, the birdcage camera.  It shows the

9  suspect trying to exit the building.

10            MR. LYNN:  Offer 69.

11            MR. STABENOW:  No objections.

12            THE COURT:  Exhibit 69 will be admitted.

13        (Government's Exhibit 69 was admitted into evidence.)

14 BY MR. LYNN:

15 Q.     Showing you government's 69.  What does that show?

16 A.     That's camera 7, the birdcage camera that shows the

17 suspect after he tries to exit the north doors on 9/10/11 at

18 3:24:22 a.m.

19            MR. LYNN:  Your Honor, could I have just a moment?

20            THE COURT:  Sure.

21        (So done.)

22            MR. LYNN:  Your Honor, the next excerpt that we

23 intend to play is going to take a little time to queue up.

24 This system is proprietary, it's not very user friendly.  So if

25 we could have five minutes just to queue it up, it would save

1 everybody just from waiting.

2          THE COURT:  Sure.  Why don't we go ahead and take a

3 five-minute recess, kind of get up and move around a little

4 bit.  But we will be back from recess pretty quickly at --

5 let's see.  At about 11:36.

6          (A recess was taken from 11:32 a.m. to 11:37 a.m.

7 when the following proceedings were had in the courtroom out of

8 the presence of the jury:)

9          MR. LYNN:  Your Honor, Ms. Rogers has a doctor's

10 appointment at 2 o'clock, if there's any way we could get

11 through her.

12          THE COURT:  Sure.  We've taken enough breaks this

13 morning that I won't feel bad if we go to 12:30 or so for

14 lunch.  So we can definitely stay here until your direct and

15 cross is completed and then take a lunch break at that point.

16          MR. LYNN:  Very well.

17          THE COURT:  Are there any thoughts yet on the IT

18 expert and your IT expert?

19          MR. STABENOW:  I sent a text message to Troy Schnack

20 asking that as soon as he's out of the prison that he contact

21 me.  That's what I was doing on my phone there.  I asked him

22 that he contact me as soon as he's out of the prison by text

23 message so that we can coordinate that.

24          THE COURT:  We're just trying to get the

25 instructions done.  I'm sorry?

1          THE WITNESS:  I was asking if I had time to go to

2     the restroom.

3          THE COURT:  Sure.  So much for my

4     got-to-be-back-in-at-11:36.  We're just trying to coordinate

5     the instructions and get the instructions done.  If we have

6     tomorrow, we've got more time to finish the instructions; but

7     obviously if we could finish today, I would prefer to finish

8     today, instructions notwithstanding.

9               (The following proceedings were had in the courtroom

10    in the presence of the jury:)

11         THE COURT:  Well, the break was a little longer than

12    I said.  We ran into an IT problem and had to have someone with

13    IT come up to address the issue, but I think the issue has been

14    addressed and we're ready to proceed.

15              Given the fact that we've taken a number of breaks

16    and we have a witness on the stand, we're probably going to go

17    a little bit later for lunch today.  Nothing like yesterday,

18    but maybe a little closer to 12:30 or so, 12:45 until we take a

19    break for lunch.  Mr. Lynn?

20         MR. LYNN:  Thank you, Your Honor.

21                             - - -

22                        JULIE ROGERS,

23     having been previously duly sworn by the courtroom deputy,

24    testified further as follows:

25                             - - -

1        RESUMED DIRECT EXAMINATION

2   By Mr. Lynn:

3   Q.      Miss Rogers, I have queued up a video.  It's on the

4   play list.  It's the first item selected, 20110909-201001 from

5   camera 7.  Can you tell us what we're about to observe here?

6   A.      Yeah, it's going to show suspect Kelley entering the --

7   Q.      Ma'am, just --

8   A.      I'm sorry, suspect.

9   Q.      Just individual.

10  A.      Individual.  It's going to show the male individual

11  entering here, crossing across here to, this is the north door,

12  to the circulation area, and it's going to show an individual

13  knocking down two cameras.

14  Q.      Now, can you clear that?

15  A.      Yes.

16  Q.      Can you give us the times we should look for?  When

17  does the individual first appear?

18  A.      The individual appears right here at about 3:07.

19  Tampering with camera 5 right here about 3:12, and tampering

20  with camera 6 right there at 3:13.

21  Q.      Very well.  If you could clear it, I'll play the video.

22          (Video playing.)

23  Q.      Okay.  I'm going to stop it there.  Stopping at

24  3:15:31.  Miss Rogers, just a few more questions.

25  A.      Okay.

1  Q.      Now, are you familiar with fires that occurred back in

2  Ellis Library back on September 10th of 2011?

3  A.      Yes, I am.

4  Q.      Are you familiar with their locations?

5  A.      Yes.

6  Q.      Okay.  Now, given your experience with the surveillance

7  system, given the position of the surveillance cameras, was

8  there any way an individual could have entered those areas

9  where the fire took place without being captured on video

10 surveillance or activating an alarm there at the library?

11 A.      There's no way possible.

12         MR. LYNN:  No further.

13                           - - -

14                    CROSS-EXAMINATION

15 By Mr. Stabenow:

16 Q.      Officer Rogers, I'm going to show you Defense Exhibit

17 1.  Do you recognize that as being a partial map of the main

18 floor of the Ellis Library?

19 A.      That is a partial map of the first floor of the

20 library.

21 Q.      Okay.  And you'll see some numbers there.  There's a 7

22 with a blue arrow pointing up, a 9, a 16, a 5 and a 6.

23 A.      Yes.

24 Q.      Do those show the approximate position of those cameras

25 with the blue arrows showing their general angle of view?

1   A.      Yes.

2   Q.      Now, this is prosecution Exhibit No. 69.  That's that

3   view from the birdcage, correct?

4   A.      Yes.

5   Q.      And if we look -- if you look in the upper right-hand

6   corner right here, I'm going to circle it in blue.

7   A.      Uh-huh.

8   Q.      We have a desk.  That's the desk that the student guard

9   sits at during the day to monitor the front door, correct?

10  A.      That's where the student desk sits, yes.

11  Q.      And right behind it, I'll draw with a blue arrow,

12  that's the location of the circulation desk area where cameras

13  5 and 6 were.

14  A.      Correct.

15  Q.      And right up here in the upper right-hand corner,

16  again, you know this doesn't show quite as well on this blowup,

17  but right here up at the very right-hand corner that I'm going

18  to fill in with a half circle, that's where the clock is on the

19  wall, right?  Or where the clock was on the wall, on the

20  circulation desk wall.

21  A.      I can't say.

22  Q.      Okay.  You agree that right where I'm going to put a 1,

23  this is where camera 5 was, and right off frame where I'm going

24  to put a 2 is where camera 6 is.

25  A.      Yes.

1    MR. STABENOW:  Okay.  Can you print that?

2   Q.    All right.  So going back to Defense Exhibit No. 1,

3   that means that since the security desk is right where I'm

4   going to draw some blue junk, 7 is actually mounted just a

5   little bit back down here by the 7 where I put a blue dot.  So

6   its field of view as it comes up terminates right where I have

7   the blue line connecting to 101, correct?

8   A.    Actually, no.  It comes halfway down past like right

9   through here is where it goes to, so you can see cameras 5 and

10  camera 6.

11  Q.    So like that?

12  A.    Uh-huh.

13  Q.    Okay.  But it doesn't come all the way over to this

14  access way that I'm drawing as a blue arrow with arrows up and

15  down.

16  A.    Camera 7 does not.

17  Q.    It does not --

18  A.    Huh-uh.

19  Q.    -- capture that in its field of view, does it?

20  A.    No, it does not.

21  Q.    That's why when we look at Prosecution Exhibit 69,

22  that's why we can't see all the way over to the end of the

23  circulation desk up there in the upper right-hand corner,

24  correct?

25  A.    Correct.

1  Q.      And cameras 9, 16, 5, and 6, likewise, do not give us

2  any insight into this spot right here that I'm indicating with

3  the blue line.

4  A.      No, it does not.

5  Q.      All right.  As a matter of fact, they do a very good

6  job of capturing the area where Mr. Kelley came like this and

7  going back, but they don't capture the stairwell over on the

8  left, they don't capture the stairwell here on the right, and

9  they don't capture the elevators here on the right, correct?

10 A.      Correct.

11 Q.      Nor do they capture any part of the length of this hall

12 off to the right.

13 A.      No, they do not.

14 Q.      Now, you said that -- a couple of times you said the

15 person we were watching all day.  I assume what you mean is

16 that you saw -- you had somebody on film between about 2 a.m.

17 and about 3:24 a.m. in different spots, and that's what you

18 mean by all day; is that correct?

19 A.      No, it's not.  I was watching video from 8:15 on 9/9

20 throughout that whole span of time until 4:15 a.m.

21 Q.      So was he on video any other time other than between

22 2:00 and 3:24?

23 A.      The suspect was not on video between that time.

24 Q.      So when you say the person you were watching all day,

25 you just mean what you had between 2 a.m. and --

1    A.      Correct.

2    Q.      And you had a couple of pictures up on the second floor

3    of somebody rounding the stairwell.

4    A.      Yes.

5    Q.      Okay.  Only one time?

6    A.      Yes.

7    Q.      All right.  So for some reason the camera didn't

8    capture them -- assuming they were going up, it didn't capture

9    them coming down; or assuming they were coming down, it had

10   never captured them going up?

11   A.      That picture shows a person going up, and there's

12   several ways to come down besides that stairs.

13   Q.      But those ways to come down were not under

14   surveillance.

15   A.      The other ways are not under surveillance, but they are

16   under alarm at a certain spot.

17   Q.      Explain that.  So if I was, say, on the third floor and

18   I took the elevator down to the main floor where the

19   circulation desk is, the first floor, that would trigger an

20   alarm?

21   A.      No, it would not.  I said stairs.

22   Q.      So alarms would be like if I broke into some rooms,

23   that would set off an alarm.

24   A.      No, trying to exit the building would set off an alarm.

25   Q.      Okay.  So as long as I wasn't exiting the building, if

1  I was just going up and down elevators or stairs, that would

2  not trigger an alarm?

3   A.     Correct.

4   Q.     I'm going to show you Defense Exhibit 3, and that's a

5  view standing in the hallway looking back towards that main

6  area with the circulation desk on our right, correct?

7   A.     Correct.

8   Q.     All right.  And you see up here in the field of view,

9  at the time there was a camera here where I've placed with an

10  X, and a camera here where I've placed with an X, correct?

11  Those would have been cameras 5 and 6?

12   A.     Correct.

13   Q.     So it would have been possible for somebody to walk

14  from the elevators back into that room or from the stairs back

15  into that room without it being on any of the video

16  surveillance.

17   A.     On any of the surveillance on camera 7, 9, 16, 5, and

18  6.

19   Q.     Okay.  Well, did you have any other video cameras

20  surveilling this spot right here between those elevators and

21  those stairs and that circulation area?

22   A.     No.

23   Q.     Okay.  And this is the view looking back from that main

24  area back towards that hallway where I had shown the other

25  photo from, correct?

1  A.      Correct.

2  Q.      And over here on the right-hand side, that's that

3  little student desk that we had talked about?

4  A.      Correct.

5  Q.      And right off frame, that's where those little like

6  book detectors are that are shown in the field of view of

7  cameras 9 and 16.

8  A.      Camera 16.

9  Q.      Where you're -- if you're coming in and out of the

10 entrance, that would be where the entrance is?

11 A.      Correct.

12 Q.      All right.  Defense Exhibit 4.  This is over by the

13 circulation -- or sorry, by the copy services area?

14 A.      Correct.

15 Q.      And again, up here in the upper left-hand corner,

16 that's the birdcage camera, correct --

17 A.      Correct.

18 Q.      -- that I'm circling?  But that camera's field of view

19 ends about where I'm drawing the line.  It doesn't -- it did

20 not have a field of view of the staircase, the actual copy

21 services room, or this hallway back in here; is that correct?

22 A.      Camera 7 does not.

23 Q.      And you didn't have any other cameras that had a field

24 of view of that exact spot either, did you?

25 A.      Yes, I did.

1  Q.     Then where is the camera footage going back to --

2  A.     It only shows this right here.

3  Q.     Okay.  So you had a camera that was viewing those, that

4  staircase?

5  A.     This is in the shot of one of our views.

6  Q.     I'm going to hand you Government's Exhibit 49.  Is that

7  the shot you're referring to?

8  A.     Yeah, right here.

9  Q.     Okay.  So putting Government's Exhibit 49 back on here,

10 what you're referring to is the upper right-hand side, you can

11 see kind of right off the side?

12 A.     Yeah, into the door.  It doesn't show inside the

13 stairs.

14 Q.     Okay.  What it shows, going back to Defense Exhibit 4,

15 is you can see the pillar and kind of part of --

16 A.     Yes.

17 Q.     -- the upper part of the side pillar?

18 A.     Correct.

19 Q.     Okay.  I think you and I had talked last fall about the

20 fact that it was kind of a long night for you that night, that

21 you were woken up at a very early hour and you had not had a

22 lot of sleep the night before; is that correct?

23 A.     I was woken up by a call shortly before 4 a.m.

24 Q.     All right.  And how much sleep had you gotten the night

25 before?

1   A.      To my recollection, I probably went to bed like normal,
2   between 8 and 9 p.m.

3   Q.      Let me ask you, you said there were ten cameras that
4   you looked at, but that may seem a little confusing to some
5   people because we have a camera 16.  Why do we have a camera 16
6   if there were only ten cameras at the time?

7   A.      There were different numbers on cameras that pretty
8   much varies by when the camera comes about.  So camera 1 might
9   have been bought at a certain year, and then by the time we got
10  the last camera, camera 16, it was put in that area down the
11  road, years down the road, so the numbers aren't going to be in
12  sequence.

13  Q.      How long, how many days did it take you to watch all of
14  these different ten cameras for the -- let's see, 8 p.m. to 4
15  a.m., say, the eight hours -- ten cameras, eight hours each,
16  how long did it take you to watch all of that footage?

17  A.      I watched starting at 4:15 a.m., 4:30 a.m. on the 10th
18  throughout almost two and a half to three weeks.

19  Q.      But you didn't -- you didn't find any -- you didn't
20  find anybody, not even Mr. Kelley, on any of the video cameras,
21  right?  What we have heard about today is all the times that
22  you found somebody who didn't belong to the library on the
23  video cameras.

24  A.      Yes, sir.

25  Q.      All right.  The only other people you saw was about

1  8:15 the previous night, somebody locking up and --

2  A.    Yeah, a security officer locking the doors up and

3  making sure it was secured.

4  Q.    And when did you provide this footage to law

5  enforcement?

6  A.    When you say this footage --

7  Q.    The video footage.  I mean, correct me if I'm wrong, I

8  assume your system doesn't automatically go to law enforcement,

9  that if they want something, you have to kind of dub it over or

10 sync it over.

11 A.    Yes.

12 Q.    And we already heard, and we've already seen it's kind

13 of a -- this viewing system is kind of proprietary and,

14 although it does a nice job for you in security, it's not

15 necessarily the most user friendly for jumping back and forth

16 to different spots.

17 A.    Yeah, it is user friendly when it's in a certain time

18 period, yes.

19 Q.    Okay.  So you basically had to copy stuff over to a

20 thumb drive or a disk or something and give it to --

21 A.    I copied footage over to a thumb drive and gave it to

22 officers.

23 Q.    And you gave them the part that you thought was

24 relevant?

25 A.    I gave them the part that I was asked to --

1  Q.    To provide?

2  A.    To provide, yes.

3  Q.    Prior to you dubbing it over, did you show any of it to

4  law enforcement in its native format?  Like did a detective

5  like Laughlin or somebody come in and say, hey, here on the

6  screen I've got somebody who shouldn't be in the library here

7  at this time on these videos?

8  A.    There was -- when I was watching video, there was

9  different officers in the room at different times.  Most of the

10 footage, after I got the suspect on camera and then it was sent

11 to them for a further report, that's basically when it was

12 pretty much myself, when they were gone and taking care of that

13 situation.

14 Q.    What I'm asking is, did you choose what footage to give

15 them, or did you consult with them as to what footage to give

16 them?

17 A.    I chose the footage that the suspect was on, and I also

18 chose the footage from making sure my, that the library was

19 secure until when I walked in the building.

20 Q.    What happened to the rest of the footage after -- when

21 the footage you said ended at like 3:25, almost 3:26, the

22 footage ends.

23 A.    Uh-huh.

24 Q.    And at that point, you would agree there's no smoke, no

25 haze, none of those things are yet observable on any of the

1  video camera footage.

2  A.      Correct, at 3:24.

3  Q.      What happened to the footage after that?

4  A.      It saves on the DVR for a period of time, which is

5  anywhere between 30 and 42 days.

6  Q.      And then it was gone.

7  A.      And then it's gone.

8  Q.      Okay.  And law enforcement never requested any of that

9  other -- Columbia Police never requested any of that remaining

10  footage.

11  A.      Not at that point.

12          MR. STABENOW:  Just a moment.

13  Q.      Two questions.  Going back to Defense Exhibit No. 1,

14  first is, we saw footage that clearly is Mr. Kelley attempting

15  to exit the door right here in the middle of the picture.

16  A.      Yes.

17  Q.      All right.  But we haven't heard any testimony that

18  that set off an alarm when he tried to push that door.

19  A.      That's because it would not set off an alarm.

20  Q.      It would only if -- you said earlier if somebody tried

21  to like exit the main doors, that would set off an alarm, so --

22  A.      No, I said if somebody tried to exit some of our

23  emergency doors, it would set off an alarm.

24  Q.      Okay.  The second thing, the final thing is you do

25  agree, then, that it was possible for somebody to walk from the

1    elevator lobby into the back circulation area or from the

2    stairs here into the back circulation area, and they would not

3    have been caught on any of your surveillance equipment at that

4    time.

5    A.     It would not be caught on any surveillance at that

6    time, the person coming up that, no.  But getting to that area,

7    yes.

8    Q.     So you're drawing a conclusion that you think somebody,

9    that you would have gotten footage if somebody was moving, else

10   was moving around the library, that's a conclusion you're

11   drawing.

12   A.     Correct.

13   Q.     But the fact is that it is possible to walk from those

14   stairs, from that elevator lobby back to the circulation area

15   without being on any of your surveillance equipment.

16   A.     Correct.

17           MR. STABENOW:  Thank you.

18           THE COURT:  Mr. Lynn, do you have any redirect?

19           MR. LYNN:  Yes.

20                        - - -

21                  REDIRECT EXAMINATION

22   By Mr. Lynn:

23   Q.     But if that individual had moved anywhere else, would

24   that have been caught on surveillance?

25   A.     To get to that area, yes, they would be caught on

1    surveillance.

2    Q.      Okay.  Now, Mr. Stabenow asked you about the video that

3    you preserved.  Did you say that you were requested to preserve

4    certain video and that's what you did?

5    A.      Correct.

6    Q.      But did you have an opportunity to personally review

7    all of the video?

8    A.      Yes, sir.

9    Q.      And in all of the video that you reviewed, did you ever

10   see anybody, other than the one individual whom you've

11   identified?

12   A.      I saw no one on that video, but the individual that

13   I --

14          MR. LYNN:  Thank you.

15          MR. STABENOW:  Your Honor, might I have a brief

16   recross?

17          THE COURT:  Sure.

18                          - - -

19                   RECROSS-EXAMINATION

20   By Mr. Stabenow:

21   Q.      Officer, you're aware that there was a window that was

22   broken into on the fourth floor, correct?

23   A.      Correct.

24   Q.      All right.  And so it is theoretically possible

25   somebody could have broken in on the fourth floor and gone to

1   the elevators and taken the elevators down to the first floor,

2   and they would not have been on the surveillance cameras.

3  A.      I would have to say no.

4  Q.      Why do you have to say no?

5  A.      I couldn't fit through that window. So -- it's like --

6   the window that was broken is about eight inches wide.

7  Q.      Could it have been used to open the window?

8  A.      Not to my understanding, no.

9          MR. STABENOW: Nothing further, thank you.

10         MR. LYNN: Nothing further.

11         THE COURT: You may step down. Why don't we go

12   ahead and take a break for lunch now. I'm going to again

13   remind you for the first time today that it's very important

14   that you not discuss this case with anyone, that you not do any

15   type of research whatsoever, internet, going to Ellis Library,

16   Stephens College, anything of that sort, and not draw any

17   conclusions or come to any conclusions regarding the evidence

18   in this case until I've directed you to do so.

19         We will be in recess until -- we'll do another

20   hour-and-15-minute lunch, unless anyone thinks they need more

21   time. If you think you need more time, raise your hand. Okay.

22   I see no hands, so we'll be in recess until 1:30.

23         (The following proceedings were had in the courtroom

24   out of the presence of the jury:)

25         THE COURT: Any issues any of the attorneys wish to

1  raise?

2          MR. LYNN:  No, Your Honor.

3          MR. STABENOW:  I would just let the judge know

4  Mr. Schnack is available, so I'll take my cell phone out and

5  have the two experts talk to each other.

6          THE COURT:  Let me know after lunch if we have any

7  better indication as to when we're going to close.

8          (A recess was taken from 12:14 p.m. to 1:34 p.m.)

9          THE COURT:  So are there any issues that need to be

10  taken up before the jury comes?

11          MR. LYNN:  Your Honor, we would next intend to call

12  the witness from Stephens, Christopher Herbold, that we

13  disclosed earlier this morning.  I think --

14          MR. STABENOW:  My IT expert had a chance to talk to

15  their IT expert, and apparently Stephens College has their own

16  proprietary software that most people don't use that is

17  specifically designed to test when things are on or off the

18  network.

19          THE COURT:  Okay.  So you won't have any additional

20  witnesses on that issue.

21          MR. STABENOW:  I don't think so.

22          THE COURT:  Okay.  Does that give us any ideas as to

23  when we're going to close?

24          MR. STABENOW:  Your Honor, I would guess -- it's

25  1:30.  I would guess this is -- correct me if I'm wrong.  I

1 would guess the government's case might be done by 3:30 or

2 4:00, and then I would personally recommend that we discuss

3 jury instruction and stuff.  I think my case would probably

4 take an hour or so.  But if we just started with -- if we

5 finished with the government's case this afternoon and talked

6 jury instructions, and then tomorrow morning I could briefly do

7 my case and then we could go right to closing arguments.

8           THE COURT:  Let's see what time it is.  I would

9 probably prefer to finish all of the evidence today if we can

10 and do closings tomorrow.  Why don't we go ahead, though, while

11 we're thinking of it.  I have a copy of the instructions.

12 Darin, will you give each of them a copy of the instructions?

13           You'll notice there's one area that's highlighted,

14 two paragraphs in instruction 3.04, that will be determined by

15 whether or not the defendant takes the stand, which obviously I

16 don't know if that's going to occur or not.  So these are the

17 first copy of the instructions.  Some changes I know will be

18 made, and we'll weigh any objections or suggestions that you

19 all have at the time.

20           So let's go ahead and move forward, and we can make

21 a decision regarding the defendant's case as the evidence comes

22 in.  So if you could get the jury, that would be great.

23           You know, one thing that we may, I would like for

24 you to think about, as we were watching those videos, it

25 occurred to me, I would not be surprised if the jury is

1  interested in watching those videos again during deliberations.

2  What I would propose and what I've done in the past when I was

3  in your roles, not in this one, obviously, is to bring the jury

4  in with the attorneys present, not say anything, but then play

5  the videos for them then.  It's my understanding based -- or my

6  assumption, I guess, based on the software that you can't send

7  the software back to the jury to have them watch it without

8  sending a computer or something along those lines.

9          MR. LYNN:  I can send a disk back, and the software

10  is encrypted in the disk.  They could play it if they had a

11  computer.

12          THE COURT:  But we would have to give them a

13  computer.  I'll determine whether or not there are any

14  computers in the courthouse that we are confident are clean.  I

15  doubt that exists.

16          MR. LYNN:  I think we've used them before.  I think

17  we've had them before, but whatever.

18          MR. STABENOW:  I'm comfortable either way, Your

19  Honor.  Certainly I think a practical solution might be to

20  indicate if they want to watch a particular couple seconds or

21  whatever that we can quickly pull it up here in the courtroom

22  for them without anybody commenting; but if they're wanting to

23  watch the whole seven hours or something, we'll make special

24  arrangements for them to have that capability because the

25  actual disk does have the seven hours of videos if they want to

1  watch them.

2          THE COURT:  The problem is sending the computer back

3  that has the program and no access to any internet.

4          (The following proceedings were had in the courtroom

5  in the presence of the jury:)

6          THE COURT:  I think we're ready to begin the

7  afternoon session.  Mr. Lynn, are you ready to proceed?

8          MR. LYNN:  Ready to proceed, Your Honor, call

9  Christopher Herbold.

10                          - - -

11                  CHRISTOPHER HERBOLD,

12  being first duly sworn by the courtroom deputy, testified as

13  follows:

14                          - - -

15                  DIRECT EXAMINATION

16  By Mr. Lynn:

17  Q.      Would you state your name, please?

18  A.      Chris Herbold.

19  Q.      And Mr. Herbold, how are you employed?

20  A.      I'm employed with Stephens College as a network

21  manager.

22  Q.      Okay.  And as network manager, what are your

23  responsibilities?

24  A.      I oversee the build-out of networks across our campus.

25  One of my side responsibilities are also making sure all of the

1  labs are connected and updated.

2   Q.      Okay.  When you say connected, what do you mean?

3   A.      Make sure there's fiber optics either to the building

4  or to the labs and that they're all hard-wired in.

5   Q.      Now, are you aware of certain computers that were kept

6  at the Audrey Webb Children's School Center?

7   A.      I am.

8   Q.      And directing you back to May 18th of 2011, did it come

9  to your attention that one of the computers may have been found

10 missing?

11  A.      Yes.

12  Q.      And was that a computer within your purview, within

13 your responsibilities?

14  A.      It is.

15  Q.      What sort of computer was that?

16  A.      It was a Mac Mini.

17  Q.      And was that computer connected to any sort of system

18 network?

19  A.      It was connected to our main campus network, yes.

20  Q.      Okay.  And is there any way that the main campus

21 network kept track of that computer in terms of interfacing

22 with it?

23  A.      We have software that interfaces with all of our Apple

24 computers, allows us to install software and do updates at

25 random; so, yes, we are able to see it.

1  Q.      So you're able to see if the computer is there and

2  still on the network?

3  A.      Yes.

4  Q.      Now, with respect to the computer that was determined

5  to be missing, did you determine when it last had contact with

6  the network?

7  A.      Yes, we did.

8  Q.      What did you determine?

9  A.      We determined that the morning -- can I look at my

10  notes?

11 Q.      Sure.

12 A.      On May 18, 2011, we saw that it last contacted the

13 machine that did all of the management at 3:46 a.m.

14 Q.      Indicating to you what?

15 A.      Indicated that that was the last time that it was

16 talking to the network.

17 Q.      Any further contact thereafter with that computer?

18 A.      No, sir.

19         MR. LYNN:  No further.

20         THE COURT:  Any cross, Mr. Stabenow?

21         MR. STABENOW:  Nothing, no questions, Your Honor.

22         THE COURT:  Sir, you may step down.

23         THE WITNESS:  Thank you.

24         MR. LYNN:  Call Michael Laughlin.

25                        - - -

1        MICHAEL LAUGHLIN,

2   being first duly sworn by the courtroom deputy, testified as

3   follows:

4                        - - -

5                  DIRECT EXAMINATION

6   By Mr. Lynn:

7   Q.      Sir, would you state your name and spell your name,

8   please?

9   A.      My name is Michael Laughlin; M-I-C-H-A-E-L,

10  L-A-U-G-H-L-I-N.

11  Q.      How are you employed, sir?

12  A.      I'm currently a police officer with the University of

13  Missouri Police Department.

14  Q.      And I want to direct you back to September 10, 2011,

15  the early morning hours.  Were you working for MUPD on that

16  date?

17  A.      I was working on that date.

18  Q.      And what was your position?

19  A.      I was a detective.

20  Q.      All right.  In the early morning hours, were you called

21  to assist in an investigation?

22  A.      I was.  I received a phone call from my supervisor, and

23  I was advised that there was a fire at Ellis Library, and arson

24  was suspected.

25  Q.      Did you respond to that call, then?

1    A.      I did respond.

2    Q.      What time did you arrive at Ellis Library?

3    A.      I arrived at Ellis Library at about 4:30 a.m.

4    Q.      Okay.  Did you then participate in an investigation?

5    A.      I did.  When I arrived on scene, there was MUPD patrol

6    officers, police officers, and MUPD security officers

7    positioned around the library so that they could see every

8    entrance and exit.  There was also fire personnel on scene when

9    I arrived at that time, and I was advised by fire personnel

10   that I had to wait until they made the scene secure.

11   Q.      And ultimately was the scene secured and were you

12   allowed entry into the library?

13   A.      Yes, I was advised by Assistant Fire Marshal Debbie

14   Sorrell that the scene was secure, and at that time Assistant

15   Fire Marshal Sorrell and I entered the library.

16   Q.      Did you work in conjunction with Officer -- Fire

17   Marshal Sorrell?

18   A.      I did.  We worked at different paces because I was

19   photographing both the fire damage and the property damage, and

20   she was focusing primarily on the fire damage, but we would

21   make contact with each other and note different fire sites and

22   property damage as we worked throughout the scene.

23   Q.      Officer Laughlin, I'm showing you what's a group of

24   exhibits collectively marked 73 through 91.  And I want you to

25   take a look at those exhibits and tell us just if you recognize

1  them as photographs that you took of the scene.

2  A.      Yes, these are all photographs that I took.

3          MR. LYNN:  Your Honor, I would offer --

4          MR. STABENOW:  73 to 91.

5          MR. LYNN:  73 to 91, thank you.

6          MR. STABENOW:  No objection.

7          THE COURT:  Exhibits 73 to 91 will be admitted.

8          (Government's Exhibits 73 - 91 were admitted into

9  evidence.)

10  BY MR. LYNN:

11  Q.      So the focus of your investigation was on identifying

12  and documenting property damage; is that correct?

13  A.      That's correct.

14  Q.      And was your, did you go throughout the Ellis Library?

15  A.      I --

16  Q.      Did you go on all floors?

17  A.      No, I did not.

18  Q.      Let's just go through the photographs.  Let me show you

19  what's been admitted as Exhibit 73 and ask you, do you

20  recognize what's depicted in that photograph?

21  A.      This is inside access services.  On the left side is a

22  monitor that was damaged from blunt force impact.  In other

23  words, a hard object was used to strike the monitor to damage

24  it.  On the right side of the screen on the cubicle you can see

25  fire damage at the same site.  Additionally, there's a printer

1    in between these that the -- that there was a note located on.

2    Q.     You might be able to just circle the things you're

3    indicating.  So what you circled there is the --

4    A.     That's where the object impacted the monitor.

5    Q.     Okay.

6    A.     That is the fire site, and there is the printer.

7    Q.     Very well.  Do you want to clear that?  Show you next

8    Exhibit 74.  Do you recognize what's depicted there?

9    A.     This is a damaged monitor.  I think it's pretty clear,

10   but --

11   Q.     Okay.  Showing you next 75.

12   A.     Another damaged monitor.  The impact point on this one

13   is right there.

14   Q.     Government's 76, I'm showing you that.

15   A.     Damaged monitor, impact point is right inside that

16   circle.

17   Q.     Those last monitors we've seen, where were those

18   located?

19   A.     All five of those were located inside access services.

20   Q.     Okay.  I've got one more to show you.  What does that

21   show?

22   A.     That's another damaged monitor.  The impact point is

23   right there.

24   Q.     You indicated all of those monitors were in access

25   services?

1    A.      Yes.

2    Q.      Showing you next Exhibit 78.  Do you recognize that

3    photograph?

4    A.      Yes.  This office is, this door for the office is

5    located behind the circulation desk; and if you were to walk

6    behind the circulation desk and head north towards the reserve

7    area, you would walk past this, and this is, again, an impact

8    point right there from --

9    Q.      Showing you Government's Exhibit 79.  What does that

10   photograph depict?

11   A.      There was two cameras behind the circulation desk that

12   were damaged and were both removed from where they had been

13   fixed previously.  This one was removed and was laying on the

14   ground, and I collected it.

15   Q.      Show you Government's 106.  Do you recognize that?

16   A.      I do.  This is the camera that I collected.

17          MR. LYNN:  Your Honor, offer 106.

18          MR. STABENOW:  I would like to see it just a second.

19   I haven't had a chance to see that one.

20          THE COURT:  Any objection?

21          MR. STABENOW:  No objection, Your Honor, sorry.

22          THE COURT:  Exhibit 106 will be admitted.

23          (Government's Exhibit 106 was admitted into evidence.)

24   BY MR. LYNN:

25   Q.      All right.  Exhibit No. 80, Government's Exhibit No.

1  80, what does that photograph show?

2  A.      This is the camera that you just showed to me, and it's

3  lying on the ground, and that's where I collected it from.

4  Q.      And Government's 81, is that just a close-up shot of

5  that same camera?

6  A.      It is a close-up shot of that camera and, again, it's

7  behind the circulation desk before you reach the reserve area.

8  Q.      Show you Government's Exhibit 82.  Do you recognize

9  that?

10  A.      That's a picture of the circulation desk.  The things

11  to note in this picture is you can see both spots next to the

12  doors where the two cameras were previously located.  One

13  camera is still hanging attached to the wires, the other camera

14  is no longer attached.  You can also see there's no monitors

15  sitting upright on the circulation desk.  They had all been,

16  previously they'd been knocked over.

17  Q.      And Government's 83.  What does that show?

18  A.      That's a close-up of the second camera behind the

19  circulation desk that was still attached to one wire.

20  Q.      Government's Exhibit 84, what does that show?

21  A.      That is a monitor on the circulation desk, and that's a

22  picture of another -- the impact point on that one is right in

23  the middle of that circle.

24  Q.      Government's Exhibit 85.  What does that show?

25  A.      That's two additional monitors on the circulation desk.

1 You can see the impact point on this one.  On the other one, I

2 don't think the impact point is visible.

3 Q.     Government's 86.  What does this depict?

4 A.     That's a monitor on the circulation desk, and the

5 impact point is right there.

6 Q.     Showing you Government's 87.  Do you recognize this

7 room?

8 A.     That is the microforms office.  It's located on the

9 fourth floor.  It is just to the west of the west stairwell,

10 which starts on the first floor by copy services.  Room 403.

11 Q.     Show you Exhibit No. 94.  Is that a diagram that you

12 prepared?

13 A.     Yes, it is.

14 Q.     Does it depict the general layout of the fourth floor

15 there?

16 A.     Yes, it does.

17        MR. LYNN:  Your Honor, I would offer Exhibit 94 as a

18 demonstrative exhibit.

19        MR. STABENOW:  No objections, Your Honor.

20        THE COURT:  Exhibit 94 will be admitted.

21        (Government's Exhibit 94 was admitted into evidence.)

22 BY MR. LYNN:

23 Q.     And let me next show you Exhibit 88.

24 A.     That is a window that was broken inside Room 403 of

25 that microforms office that we just showed the outside picture

1  of.  You can see the shattered glass down here below the

2  window.

3  Q.    Now, showing you Exhibit 94, the diagram of the fourth

4  floor, can you indicate to us where that window was found, was

5  located?

6  A.    Inside that office.  That's --

7  Q.    Show you Government's Exhibit 89.  Do you recognize

8  what that is?

9  A.    I do.  It's a quiet area sign that is located inside a

10 study room on the second floor.  That, again, is just off --

11 it's just to the west of the west stairwell.

12 Q.    On second floor, you say?

13 A.    That's correct.  This particular quiet sign was

14 damaged.  There was a pipe missing from this quiet sign.

15 Q.    Was that pipe recovered?

16 A.    That pipe was recovered.

17 Q.    Did you recover that?

18 A.    I did recover it.

19 Q.    Let me show you Government's Exhibit No. 90.  Do you

20 recognize what's depicted in that photograph?

21 A.    I do.  This is the pipe from the quiet area sign laying

22 right there.  To give you sort of a, an idea of where we are,

23 I'm standing in the doorway from the reserve area to the access

24 services area.  On the right side here is a desk that had a

25 damaged monitor on it and a fire origin, and on the left side

1  is an additional desk that had a damaged monitor on it and a

2  fire site.

3  Q.    Now, how long approximately did you remain there at the

4  Ellis site conducting your investigation?

5  A.    I don't know the exact time frame, but I was there --

6  Q.    Just give me a rough, rough time.

7  A.    It was more than a couple of hours.

8  Q.    Okay.  Well, my question is, later that same day, did

9  you make contact with anyone regarding this investigation, any

10  subject?

11  A.    I did.  At approximately 12:40 hours, or 12:30 hours, I

12  was advised that a subject had reported, had shown up in the

13  MUPD lobby and stated that he was the person that was in the

14  Clery release.

15  Q.    Tell us about the Clery release.  What was that?

16  A.    A Clery release, it's based upon the Jeanne Clery Act,

17  and it's in an effort to make the campuses safer.  Whenever

18  there's a major crime that could affect public safety on the

19  campus, we're required to release Clery releases that notify

20  people of what the incident was so that students on the campus,

21  everyone in the area of that campus, will know that there is

22  something dangerous that has happened that could affect their

23  safety, and they could make decisions as needed based upon that

24  previous incident.

25  Q.    Was a Clery release released in connection with this

1  incident?

2   A.      That's correct.  We made a Clery release advising the

3  campus community that there had been a fire in the Ellis

4  Library and that arson was suspected, and we released two

5  pictures of a subject that was later identified by Kelley as

6  himself, stating that we were attempting to locate the subject

7  and identify him.

8   Q.      Okay.  So you released this press release, essentially.

9  To whom does it go?

10  A.      It goes to the entire campus community, so that's

11  staff, all the students, all the faculty.  Additionally, I

12  think if there are retirees and former students who want to pay

13  a fee to continue using their university e-mail, they would

14  also get that.

15          THE COURT:  Detective Laughlin, you talk really

16  fast, and so I would ask that you slow down just a little bit

17  so the court reporter can get everything that you're saying.

18          THE WITNESS:  I apologize.

19  BY MR. LYNN:

20  Q.      Okay.  So you were indicating that about 12:30 you were

21  advised of Mr. Kelley's presence?

22  A.      I was advised at 12:30, and I actually got to the

23  department more around 12:40, I believe.

24  Q.      Did you make contact with anyone?

25  A.      At 12:40 I made contact with suspect Kelley in our

1    prisoner processing area.

2    Q.      Is the individual you've identified as suspect Kelley,

3    do you see him present in court today?

4    A.      He's sitting over there in the green sweater.

5              MR. LYNN:  Your Honor, may the record reflect that

6    the witness has identified the defendant?

7              THE COURT:  The record will so reflect.

8    BY MR. LYNN:

9    Q.      Upon making contact with Mr. Kelley, did you advise him

10   of any rights?

11   A.      I did.  I read him his Miranda rights.  I also provided

12   him with a MUPD Miranda rights waiver form, which I read

13   through for him and I gave to him, advising him that if he

14   signed on the first line, that would indicate that he

15   understood the Miranda rights waiver; if he signed on the

16   second line, that would indicate he was willing to answer

17   questions at that time.

18   Q.      Did you ask him any questions?

19   A.      I did.  I began by asking him what brought him in

20   today.  He advised me that he had seen the Clery release, and

21   there was a picture of him in the Clery release, and that was

22   why he came in.

23              I then asked him if he could tell me about what he

24   had done the last, the day of the September 9th, the day before

25   the fire and the early morning hours of September 10th.  He

1  told me that on September 9th at about 10:30 in the morning he

2  went to a doctor's appointment.  He also --

3          MR. STABENOW:  Objection, Your Honor, may I

4  approach?

5          THE COURT:  Sure.

6          (Counsel approached the bench and the following

7  proceedings were had:)

8          MR. STABENOW:  He's starting a narrative that begins

9  the previous day, and this narrative included a description of

10  a fire that's not coming into this case.  So I want to object

11  just as to hearsay now, but I'm going to make an objection of

12  relevance when I go back to my table, and my concern is this

13  narrative would necessarily involve the material that we had a

14  ruling on.

15          MR. LYNN:  But he's not admitting he started any

16  fire, all he said was I was at a party and I saw a fire at a

17  duplex.

18          MR. STABENOW:  But that's still getting into that

19  fire.  I don't think there's any doubt that he's on the video

20  camera at Ellis Library, so why are we --

21          THE COURT:  I don't see the relevance of him

22  discussing the other fire.

23          MR. LYNN:  Very well, understood.

24          (The following proceedings were had in open court:)

25   BY MR. LYNN:

1    Q.    Detective, let me push you forward in your narrative to
2    a point.  Did Mr. Kelley tell you that at some point he began
3    to walk around campus in the early morning hours?
4    A.    Yes, he told me that he was first walking around the
5    student center, and then he decided to walk around Lowry Mall,
6    which, for those of you who aren't familiar, Lowry Mall is
7    located directly to the north of Ellis Library.
8          I then asked him if -- I asked him what he did
9    around Lowry Mall, and he advised me that he did not set the
10   fires, and then the interview was concluded shortly after that.
11   Q.    Okay.  Now, what was done with respect to Mr. Kelley's
12   clothing?
13   A.    When he was transported to the Boone County Jail, I
14   requested that Officer Kingsbury collect his clothing because I
15   felt that the clothing was the same as the clothing that he was
16   wearing the night -- or during the fire.
17   Q.    Had you had an opportunity to review any video
18   surveillance of Ellis Library?
19   A.    I have.
20   Q.    Okay.  Had you at that time?
21   A.    I had at that time.
22   Q.    Okay.  Let me show you what's been marked as
23   Government's Exhibit 107.  Do you recognize this?
24   A.    I do.
25   Q.    What is that?

1  A.     When I was in the prisoner processing area, suspect

2  Kelley requested a, something to write with and a piece of

3  paper.  I gave him a Sharpie marker and a piece of paper

4  because at that time I had already seen a note that was

5  collected from the library in a Sharpie marker.

6  Q.     So you wanted a handwriting sample?

7  A.     That's right.

8           MR. LYNN:  Offer 107.

9           MR. STABENOW:  No objection.

10          THE COURT:  107 is admitted.

11        (Government's Exhibit 107 was admitted into evidence.)

12 BY MR. LYNN:

13 Q.     And I neglected to ask you about this earlier.  Let me

14 show you what's been marked as Government's Exhibit 100.  Do

15 you recognize that?

16 A.     That is the pole I collected in the access services

17 area that was from the quiet sign on level 2.

18          MR. LYNN:  Offer Exhibit 100, Your Honor.

19          MR. STABENOW:  No objection.

20          THE COURT:  Exhibit 100 will be admitted.

21        (Government's Exhibit 100 was admitted into evidence.)

22 BY MR. LYNN:

23 Q.     Now, during your investigation, Detective, were you

24 able to identify any apparent point of entry there into Ellis?

25 A.     There was a window that was pointed out to me.

1  Q.    Okay.  What did you see around the window?

2  A.    There was numerous objects next to the window that were

3  laying in a manner that would suggest that someone -- that they

4  had been knocked in from the outside.

5  Q.    And where was that window located?

6  A.    It was located in copy services about ten feet from one

7  of the fire sites.

8        MR. LYNN:  No further.

9        THE COURT:  Cross-examination?

10                   - - -

11              CROSS-EXAMINATION

12  By Mr. Stabenow:

13  Q.    So it was your opinion that the clothes Mr. Kelley came

14  in -- when he came into the station, the clothes he was wearing

15  were the clothes you had observed in the videos from five or

16  six hours earlier?

17  A.    They looked the same.

18  Q.    Okay.  And when you went to the scene, were you the one

19  who found the pole and collected it?

20  A.    I'm the one that collected the pole, yeah.

21  Q.    Did you also see underneath the camera that was

22  dangling from the wall a broken umbrella, like a broken

23  umbrella handle and shards of an umbrella?

24  A.    I saw a curved wooden object that could have been part

25  of an umbrella or cane or something like that.

1  Q.      And wooden fragments?

2  A.      Yes.

3  Q.      Did you identify who it belonged to?

4  A.      No, I did not.

5  Q.      Did you check with the librarian and say, is this

6  yours, or do you know where it came from?

7  A.      I did, and no one claimed it.

8           MR. STABENOW:  Nothing further at this time, Your

9  Honor.

10          THE COURT:  Mr. Lynn, any redirect?

11          MR. LYNN:  No redirect, Your Honor.

12          THE COURT:  Detective, you can step down.

13                           - - -

14                      APRIL COLVIN,

15  being first duly sworn by the courtroom deputy, testified as

16  follows:

17                           - - -

18                   DIRECT EXAMINATION

19  By Mr. Lynn:

20  Q.      Would you state your name and spell your name, please?

21  A.      April Colvin, spelled A-P-R-I-L, C-O-L-V-I-N.

22  Q.      And how are you employed?

23  A.      I'm employed as a lieutenant with the University Police

24  Department.

25  Q.      And how long have you been so employed?

1    A.    A little over 14 years.

2    Q.    And did you say, what's your position there?

3    A.    I'm a lieutenant.

4    Q.    Lieutenant.  You used to be a sergeant back --

5    A.    I did, until about two days ago.

6    Q.    Lieutenant Colvin, back on September 10 of 2011, did

7    you work that day?

8    A.    I did.

9    Q.    What time did your shift start, approximately?

10   A.    It started at 7 a.m.

11   Q.    Okay.  Now, did you become aware after you came in that

12   there was an incident at the Ellis Library?

13   A.    Yes.

14   Q.    And at some point, were you called to go and retrieve

15   certain items from Ellis Library?

16   A.    I was.

17   Q.    All right.  What is the first item you were requested

18   to retrieve?

19   A.    The first item was feces left on a desk on the fourth

20   floor.

21   Q.    Okay.  And did you package the feces?

22   A.    I actually did not package it.  Officer Brayer packaged

23   it.  I photographed it.

24   Q.    Okay.  And was that item collected, was it preserved?

25   A.    It was collected.  However, it was not preserved.

1    Q.      And why not?

2    A.      I contacted Sergeant Spalding to determine if he needed

3    us to keep it and how to go about preserving it, if he did.

4    And he stated that it was not necessary.

5    Q.      Okay.  Were you then called back to the library to

6    retrieve additional items?

7    A.      I was.

8    Q.      An additional item?

9    A.      I was.

10   Q.      Let me show you -- show counsel first -- Government's

11   Exhibits 95 and 96.  Do you recognize those photos?

12   A.      Yes, I do.

13   Q.      And did you take those photos or are you aware --

14   A.      I took the photos, yes.

15   Q.      Okay.

16           MR. LYNN:  Offer, Your Honor, 95 and 96.

17           MR. STABENOW:  No objection.

18           THE COURT:  Exhibits 95 and 96 will be admitted.

19           (Government's Exhibits 95 and 96 were admitted into

20   evidence.)

21   BY MR. LYNN:

22   Q.      Showing you photo Exhibit No. 95, do you recognize

23   what's depicted there?

24   A.      Yes, I do.

25   Q.      And what does that show?

1   A.      That shows a cubicle -- I'd almost have to show you on

2   the map, but it shows a cubicle that I responded to.  On the

3   printer in that corner is a note.

4   Q.      Point to that and touch the screen.

5   A.      Right here.

6   Q.      Okay.  And did you, in fact, retrieve that note?

7   A.      I did.

8   Q.      Let me show you Government's Exhibit 96.  Can you clear

9   that, hit that corner where it says clear, and that should take

10  it off of that.  Right, the screen, it's a little tricky.

11  A.      High tech.

12  Q.      Yeah.  Okay.  96, is that the note that you encountered

13  there?

14  A.      It is.

15  Q.      And show you 97.  Is that the note?

16  A.      It is.

17          MR. LYNN:  Offer Exhibit 97, Your Honor.

18          MR. STABENOW:  Just a second.  No objection, Your

19  Honor.

20          THE COURT:  Exhibit 97 will be admitted into

21  evidence.

22          (Government's Exhibit 97 was admitted into evidence.)

23  BY MR. LYNN:

24  Q.      And did you take that, and you turned it over to

25  Detective Laughlin; is that correct?

1  A.      I did.

2          MR. LYNN:  No further questions.

3          THE COURT:  Any cross-examination, Mr. Stabenow?

4                      - - -

5                      CROSS-EXAMINATION

6  By Mr. Stabenow:

7  Q.      Lieutenant Colvin, congratulations on your recent

8  promotion.

9  A.      Thank you.

10 Q.      To your knowledge, that note was fingerprinted, and Mr.

11 Kelley's fingerprints were not found on it, were they?

12 A.      I did not get that report.  That is what I heard.

13         MR. STABENOW:  Okay.  Thank you.  Nothing further.

14         THE COURT:  Any redirect?

15         MR. LYNN:  No.

16         THE COURT:  Lieutenant, you may step down.

17         THE WITNESS:  Thank you.

18         MR. LYNN:  Joe Kingsbury.

19                      - - -

20                      JOSEPH KINGSBURY,

21 being first duly sworn by the courtroom deputy, testified as

22 follows:

23                      - - -

24

25

1                    DIRECT EXAMINATION

2   By Mr. Lynn:

3   Q.      Sir, would you state your name and spell your name, if

4   you would?

5   A.      Joseph, J-O-S-E-P-H, Scott, S-C-O-T-T, Kingsbury,

6   K-I-N-G-S-B-U-R-Y.

7   Q.      And are you a detective with MUPD?

8   A.      I am.

9   Q.      And I want to take you back to September 10th of 2011.

10  Were you working that day?

11  A.      I was.

12  Q.      And did you assist Detective Laughlin in processing an

13  individual?

14  A.      Yes.

15  Q.      Who did you process?

16  A.      Christopher Curtis Kelley.

17  Q.      Okay.  Do you see Mr. Kelley present in court today?

18  A.      I do.

19  Q.      Can you point him out and just indicate what he's

20  wearing?

21  A.      Yes, he's the gentleman with the dark beard and the

22  green shirt.

23              MR. LYNN:  May the record reflect that he's

24  identified the defendant, Your Honor?

25              THE COURT:  The record will so reflect.

BY MR. LYNN:

Q.      Did you have occasion to transport Mr. Kelley to any
locations?

A.      Yes, I did.

Q.      And where did you transport him to?

A.      To the Boone County Jail facility.

Q.      Now, upon transporting him, did you maintain any items
of his possessions?

A.      Yes.  I did.

Q.      What did you retrieve from him?

A.      From him, I retrieved his clothing upon delivery to the
jail, and I packaged them in a brown paper bag and brought them
back to the station.

Q.      Let me show you what's been marked as Government's
Exhibit No. 104.  Do you recognize that as the brown paper bag
containing Mr. Kelley's clothing?  And you may look at your --

A.      Sure.  Yes, I do.

Q.      How are you able to recognize it?

A.      It was filled out in my handwriting on the front here.
And then also it was sealed and labeled by myself, as well, and
dated.

Q.      And when you packaged it, did you seal it with evidence
tape?

A.      I did.

Q.      Okay.

1          MR. LYNN:  Offer Exhibit No. 104, Your Honor.

2          MR. STABENOW:  No objection.

3          THE COURT:  Exhibit 104 will be admitted.

4          (Government's Exhibit 104 was admitted into evidence.)

5    BY MR. LYNN:

6    Q.     What specific items -- and you can take those out and

7    show them to the jury, if you would.  What specific items did

8    you retrieve?

9    A.     I retrieved Mr. Kelley's shirt that he was wearing at

10   the time he arrived at the MUPD, a gray V-neck T-shirt; I also

11   retrieved a pair of khaki shorts Mr. Kelley was wearing at the

12   time he arrived at MUPD; and I also retrieved a pair of shoes,

13   brown in color, Mr. Kelley was wearing at the time he arrived

14   at MUPD, as well.

15   Q.     Okay.  You can place those back in the bag, if you

16   would.

17   A.     Certainly.

18          MR. LYNN:  No further.

19          THE COURT:  Cross-examination?

20          MR. STABENOW:  Yes.

21                         - - -

22                   CROSS-EXAMINATION

23   By Mr. Stabenow:

24   Q.     So when you collected that clothing, were you

25   anticipating that there might be evidentiary testing of that

1  clothing?

2  A.    I was simply instructed by Detective Laughlin to

3  collect his clothing and place it into evidence.

4  Q.    Did you do anything that would have prevented -- I

5  mean, did you handle it in a way that it could be tested if

6  somebody wanted to do testing of it?

7  A.    I did.  I handled it with protective gloves and

8  packaged it according to our policy.

9         MR. STABENOW:  Thank you.  Nothing further.

10        MR. LYNN:  Nothing.

11        THE COURT:  All right.  You may step down.

12        THE WITNESS:  Thank you, Your Honor.

13                        - - -

14                   KEVIN RODGERS,

15  being first duly sworn by the courtroom deputy, testified as

16  follows:

17                        - - -

18                 DIRECT EXAMINATION

19  By Mr. Lynn:

20  Q.    Would you state your name and spell your name, please?

21  A.    Kevin Rodgers; K-E-V-I-N, R-O-D-G-E-R-S.

22  Q.    How are you employed, sir?

23  A.    University of Missouri Police Department.

24  Q.    What is your position there?

25  A.    I'm a lieutenant there.

1  Q.     Lieutenant Rodgers, I want to take you back to

2  September 10th of 2011.  Shortly before noon, were you on duty

3  at that time?

4  A.     I was.

5  Q.     And did you make contact with an individual around that

6  time?

7  A.     Yes.

8  Q.     How did you become aware of an individual?

9  A.     I was advised by the communications officer that there

10 was an individual in the lobby who said he was in the Clery

11 release that we had earlier released that day.

12 Q.     Okay.  So what did you do?

13 A.     I responded to the lobby, where I made contact with

14 Christopher Kelley.

15 Q.     And Christopher Kelley, do you see him in court today?

16 A.     Yes, yes, that's him.

17        MR. LYNN:  May the record reflect, Your Honor, that

18 he's identified the defendant.

19        THE COURT:  The record will so reflect.

20 BY MR. LYNN:

21 Q.     And did you know who he was at that point when you

22 initially contacted him?

23 A.     Only through the picture of the Clery release.

24 Q.     Okay.  So did you approach Mr. Kelley?

25 A.     Yes.

1    Q.    Did you have an exchange with him?

2    A.    Yes, I asked him if I could help him, to which he

3    responded that he was in the Clery release.

4    Q.    So what did you ask him?

5    A.    I said, "So you were in the library?"  And he

6    responded, "I was in the library."

7              MR. LYNN:  No further.

8              THE COURT:  Cross-examination?

9              MR. STABENOW:  No, Your Honor.

10             THE COURT:  Lieutenant, you may step down.

11                            - - -

12                       BRITTANY CARNEY,

13   being first duly sworn by the courtroom deputy, testified as

14   follows:

15                            - - -

16                     DIRECT EXAMINATION

17   By Mr. Lynn:

18   Q.    Ma'am, would you state your name and spell your name,

19   if you would?

20   A.    Brittany Carney; B-R-I-T-T-A-N-Y, C-A-R-N-E-Y.

21   Q.    Miss Carney, where do you live?

22   A.    Portland, Oregon.

23   Q.    Did you previously live in Columbia, Missouri?

24   A.    Uh-huh.

25   Q.    And did you become familiar with Christopher Kelley?

1    A.      Yes.

2    Q.      Just for the record, is Mr. Kelley the gentleman back

3    here to my left --

4    A.      Yeah.

5    Q.      -- in the green?  Did you have a relationship with Mr.

6    Kelley at one time?

7    A.      Yes.

8    Q.      And by that I mean you were dating; is that fair to

9    say?

10   A.      Yes.  Yes.

11   Q.      Okay.  What was the time frame in which you were

12   dating?

13   A.      Maybe February 2009 until about February or January

14   2011.

15   Q.      Okay.  So you stopped dating him in January or February

16   of 2011; is that what you indicated?

17   A.      I believe so.

18   Q.      Now, directing you to May of 2011, were you still

19   having -- where were you living at that time?

20   A.      I was still in Portland.

21   Q.      Still in Portland?

22   A.      Uh-huh.

23   Q.      And where was Mr. Kelley located?

24   A.      He was in Columbia.

25   Q.      All right.  Were you still having contact with him?

1    A.      Yes.

2    Q.      What was your relationship at that time?

3    A.      Just pretty frequent communication.

4    Q.      You were still on friendly terms with him?

5    A.      I don't talk to him now.

6    Q.      At that time you were on friendly terms?

7    A.      At that time, yes, yeah.

8    Q.      And did you talk with him frequently during that time

9    period?

10   A.      Yes.

11   Q.      Now, directing you to around May of 2011, that time

12   frame, give or take, did you have a conversation with him about

13   an incident at Stephens College?

14   A.      Yes.

15   Q.      What did Mr. Kelley tell you?

16   A.      He just told me that he went in through a window in the

17   classroom and then took a computer, and then he went back to

18   his house, and then -- he lived like close-by or something like

19   that.  And so he thought -- he thought he might have started a

20   fire because he pulled the wires out of the wall.

21   Q.      Why did he think he started a fire?

22   A.      Because the fire trucks -- he saw a fire truck or cops

23   or something pull up.

24   Q.      Did he tell you what kind of computer he took from

25   Stephens?

1  A.      I believe he said it was a Mac.

2  Q.      A Mac?

3  A.      A Mac, like a monitor, something.

4          MR. LYNN:  No further.

5          THE COURT:  Mr. Stabenow, any cross-examination?

6                           - - -

7                    CROSS-EXAMINATION

8  By Mr. Stabenow:

9  Q.      So, ma'am, just to make sure I understand this right,

10 what he told you was that he went in through a window, took a

11 computer, left, and then later on he got nervous wondering if

12 maybe him pulling the cords out started a fire because later on

13 he saw emergency vehicles or heard emergency vehicles over in

14 the direction of that building; is that correct?

15 A.      Yes.

16         MR. STABENOW:  Just a moment.

17 Q.      Miss Carney, in your experience with Mr. Kelley, it

18 would not have been unusual for him to, when he had some

19 alcohol, go around and go in through windows and wander around

20 buildings and then leave, would it?

21 A.      No.

22 Q.      And is it fair to say it might not have been that

23 unusual for him to maybe take something?

24 A.      Yeah, it would be like a sign or something.

25 Q.      But it would have been very much out of character in

1 your experience for him to go around and set fires?

2 A.    He likes fireworks, but I never seen him like start

3 fires or that much, no.

4         MR. STABENOW:  Thank you.  Nothing further.

5                     - - -

6              REDIRECT EXAMINATION

7 By Mr. Lynn:

8 Q.    So to your knowledge, he did like to go into places at

9 night that were open?

10 A.    I mean, yeah, if he had a couple of drinks or

11 something, you know, just wander around.

12 Q.    Was that a frequent kind of occurrence?

13 A.    Yeah.  Yeah.  I think so.

14 Q.    Okay.  And you indicated he liked to take things

15 sometimes?

16 A.    Sometimes.

17         MR. LYNN:  No further.

18         THE COURT:  Any recross?

19         MR. STABENOW:  No, Your Honor.

20         THE COURT:  Ma'am, you may step down.

21         MR. LYNN:  Matt Cavanah, Matthew Cavanah.

22                     - - -

23              MATTHEW CAVANAH,

24  being first duly sworn by the courtroom deputy, testified as

25  follows:

1                        - - -

2                  DIRECT EXAMINATION

3    By Mr. Lynn:

4    Q.      Sir, would you state your name and spell your name, if

5    you would?

6    A.      Matthew Cavanah, C-A-V-A-N-A-H.

7    Q.      And Mr. Cavanah, how are you employed?

8    A.      I'm the Web Editor at the Columbia Daily Tribune.

9    Q.      Are you familiar with the defendant in this matter,

10   Christopher Kelley?

11   A.      Yes.

12   Q.      How did you come to know Mr. Kelley?

13   A.      I lived with him for a few months.

14   Q.      Okay.  And during what time frame did you reside with

15   him?

16   A.      It would have been from August 2011 until about March

17   2012.

18   Q.      So during September 10 of 2011, you were residing with

19   him?

20   A.      Yes.

21   Q.      Were there others that lived there at the residence

22   with you, as well?

23   A.      Yes.

24   Q.      Who else?

25   A.      Casey Gray, Brooke Butler, and Tara Ballenger.

1    Q.      Okay.  I want to direct you to the morning of September

2    10th of 2011.  Did anything unusual come to your attention?

3    A.      Early in the morning, Casey came upstairs and showed me

4    that there was an e-mail on his laptop that was the Clery

5    release from MU Police, and there were photos that we saw of

6    Chris relating to a fire.

7    Q.      Can you speak up a little bit?

8    A.      Sure.  Sorry.  Casey came up and showed me an e-mail on

9    his laptop that was the Clery release.

10   Q.      What sort of information did the Clery release have in

11   it?

12   A.      It mentioned that there had been a fire at the Ellis

13   Library on the MU campus.

14   Q.      Did it have any photographs depicting any persons?

15   A.      Yes.

16   Q.      When you saw that Clery release, did you recognize

17   anybody in those photographs?

18   A.      Yes.

19   Q.      Who was depicted in those photographs?

20   A.      Chris Kelley.

21   Q.      So what did you do?

22   A.      We decided that we needed to tell Chris and urge him to

23   turn himself in.

24   Q.      Okay.  And where was Chris at that time?

25   A.      Upstairs in his room.

1  Q.      And so did you proceed upstairs?

2  A.      Yes.

3  Q.      And what did you do?

4  A.      We asked him to come downstairs.  Tara was in the room,

5  as well, and we just kind of pulled him aside and showed him

6  the e-mail and encouraged him that he should go down to the

7  police station.

8  Q.      Did he, in fact, go to the police station, to your

9  knowledge?

10  A.      Yes.

11  Q.      Now, at some point later, did you ever have an

12  opportunity to speak with Mr. Kelley about his activities at

13  Ellis Library?

14  A.      Yes.  It was sometime the next day, I believe.

15  Q.      And what did he tell you?

16  A.      He said that he had gone in to the library through an

17  open window on the ground floor, but he told us all he did was

18  walk around, look around, and he heard somebody else in the

19  building and left.

20  Q.      Did you ask him about any metal bars that he possessed?

21  A.      Yes.  One of the photos that was in the e-mail showed

22  him holding a sign post, and we asked him what he was doing

23  with that, and he mentioned that he grabbed it in self-defense

24  if he needed to --

25  Q.      All right.  Now, on February 1 of 2012, were you still

1  living there?

2  A.      Yes.

3  Q.      Do you recall officers showing up at the residence?

4  A.      Yes.

5  Q.      Do you recall them coming in and retrieving certain

6  property?

7  A.      Yes.

8  Q.      Are you familiar with Apple computer equipment?

9  A.      Very much so.

10  Q.      Are you familiar with an Apple Mac Mini computer?

11  A.      Yes.

12  Q.      Do you know whether Mr. Kelley possessed such a system

13  back at that time?

14  A.      There was one in the upstairs room, yes.

15  Q.      Was that one of the items being carted out by officers?

16  A.      Yes.

17  Q.      Did you ever see Mr. Kelley using that Mac Mini or in

18  his possession?

19  A.      Just I saw it upstairs in the room, and I don't ever

20  remember anyone actually being there anytime I was up there.

21          MR. LYNN:  Understood.  No further.

22          THE COURT:  Any cross-examination?

23                          - - -

24

25

1          CROSS-EXAMINATION

2     By Mr. Stabenow:

3     Q.      So you guys were roommates or housemates for about six

4     or seven months?

5     A.      Correct.

6     Q.      And so who all lived in the house at that time?

7     A.      Myself, Brooke Butler, Casey Gray, Chris Kelley, and

8     Tara Ballenger.

9     Q.      And during the course of your all's conversations

10    together, did you learn that Chris -- I mean, this was, that

11    Ellis Library situation was not the only situation where he

12    would go into buildings and wander around in the night and then

13    leave, correct?

14    A.      Correct.

15    Q.      As a matter of fact, he and Ms. Ballenger referred to

16    that as urban exploring, and that was something they had done a

17    lot of.

18    A.      Yes.

19    Q.      And you had even heard of another incident in which he

20    had had a pole another time he had gone into a building and

21    thought he heard voices or somebody else in the building.

22    A.      Nothing about a pole, no.

23    Q.      There wasn't a discussion one time with he and Tara

24    about a time when they were in Oregon and they thought they had

25    heard somebody in the building and he had grabbed a pole in

1  case they ran into whoever that was?

2  A.    The way I recall the story was that they were

3  attempting to climb to the roof of a building, and along the

4  way they found an open window and went in.  They didn't mention

5  anything about anyone else being in the building or grabbing a

6  pole for defense.

7          MR. STABENOW:  Just a moment.

8  Q.    I'm sorry.  Maybe you might have heard it as them

9  grabbing a microphone stand.

10          MR. STABENOW:  No further questions, Your Honor,

11  thank you.

12          THE COURT:  Any redirect?

13          MR. LYNN:  No redirect.

14          THE COURT:  Sir, you may step down.

15          THE WITNESS:  Thank you.

16          MR. LYNN:  Casey Gray.

17                  - - -

18                  CASEY GRAY,

19   being first duly sworn by the courtroom deputy, testified as

20  follows:

21                  - - -

22              DIRECT EXAMINATION

23   By Mr. Lynn:

24  Q.    Sir, would you state your name and spell your name for

25  the court reporter?

1    A.      Casey Sean Gray; C-A-S-E-Y, S-E-A-N, G-R-A-Y.

2    Q.      Mr. Gray, are you employed?

3    A.      Yes.

4    Q.      Where are you employed?

5    A.      I'm employed at two locations.  I'm a bar manager at

6    the Bread Basket Cafe, and then I also wait tables at

7    Houlihan's, both in Columbia.

8    Q.      Are you a student, as well?

9    A.      Yes, at Columbia College.

10   Q.      I want to take you back to September 10th of 2011, fall

11   semester of 2011.  Where were you living?

12   A.      At 108 East Hubbell.

13   Q.      Did you have roommates?

14   A.      I did, I had four roommates:  Chris, Tara, Matt, and

15   Brooke.

16   Q.      Now, do you remember an incident on September 10th of

17   2011 that came to your attention?

18   A.      Yes, I do.

19   Q.      And on that date, how did you become aware of anything

20   going on?

21   A.      I was actually in bed, and my little brother called me.

22   At the time I was a student at University of Missouri, and he

23   called me and told me to check my webmail.

24   Q.      So did you check your webmail?

25   A.      I did, yes.

1  Q.    What did you see?

2  A.    There was a Clery release sent to everybody with a

3  .Missouri.edu address about the fire at Ellis, and it had a

4  picture.

5  Q.    It had photographs?

6  A.    Yes.

7  Q.    Photographs depicting an individual?

8  A.    Yes.

9  Q.    Did you recognize that individual?

10 A.    I did.

11 Q.    Who was it?

12 A.    It looked like my roommate Chris.

13 Q.    So when you saw that, what did you do?

14 A.    I went upstairs.  I told my roommate Matt what I had

15 seen, and then we went upstairs to wake Chris up and tell him

16 he should probably turn himself in.

17 Q.    Did you, in fact, go and make contact with Chris?

18 A.    Yes.

19 Q.    And what did you tell him?

20 A.    I showed him the e-mail, and I pretty much told him

21 that I would strongly recommend he should go turn himself in

22 because he's wanted for some pretty serious crimes.

23 Q.    Did he have any response?

24 A.    He claimed he didn't know anything about a fire.

25 Q.    Okay.  Describe Mr. Kelley's appearance when you

1    encountered him there.

2    A.      Well, we had just woken him up, so he looked a little

3    dazed.

4    Q.      Okay.  Now, did he, in fact, go and turn himself in to

5    the police?

6    A.      I believe so, yes.

7    Q.      Did you later have an opportunity to talk with him

8    about the events at the Ellis Library?

9    A.      I did.

10   Q.      And what did he tell you about what had happened?

11   A.      He told us, or me, at least, that he had been in the

12   library that night, had heard some suspicious sounds and then

13   left, but had not started any fires.

14   Q.      Did he talk about grabbing some sort of rod or pole?

15   A.      Yeah, some sort of pole, I think, that was used to hold

16   up a sign in the library.

17   Q.      Did he say why he grabbed that?

18   A.      I guess as defense from whatever was causing those

19   mysterious sounds.

20   Q.      Okay.  Now, you recall in February of 2012 officers

21   arriving at your residence?

22   A.      Yes.

23   Q.      Were you present when they seized certain items from

24   the residence?

25   A.      I was.

1  Q.     And where was -- do you recall the police officers

2  arriving?

3  A.     Yes, I recall them arriving.  They kind of surrounded

4  our house for some hours.  At first they'd asked to come

5  upstairs and search Chris's area, and they were told not unless

6  they had a warrant.  So they proceeded to surround the house

7  and essentially wait for a judge's warrant.

8  Q.     So did they return several hours later, the officers?

9  A.     Yes.

10  Q.     Now, in the interim after the officers had left, what

11  did Chris do, where did he go?

12  A.     He pretty much stayed upstairs.

13         MR. LYNN:  No further.

14         THE COURT:  Cross-examination?

15         MR. STABENOW:  Just briefly.

16                        - - -

17                  CROSS-EXAMINATION

18  By Mr. Stabenow:

19  Q.     You said -- did you show him the Clery release or tell

20  him about the Clery release?

21  A.     As I recall, I had my laptop in my hand and just turned

22  it around and showed him the webmail and the picture in the

23  webmail.

24  Q.     And he seemed surprised by the accusation that he had

25  set a fire or confused by the accusation, correct?

1  A.      Yes.   Yes.

2            MR. STABENOW:  Thank you.  Nothing further.

3            THE COURT:  Any redirect?

4            MR. LYNN:  No redirect.

5            THE COURT:  Sir, you may step down.

6            MR. LYNN:  Philip Thunhorst.

7                         - - -

8                   PHILIP THUNHORST,

9  being first duly sworn by the courtroom deputy, testified as

10  follows:

11                         - - -

12                   DIRECT EXAMINATION

13  By Mr. Lynn:

14  Q.      Sir, would you state your name and spell your name, if

15  you would?

16  A.      Yes, it's Philip Michael Thunhorst; it's P-H-I-L-I-P,

17  M-I-C-H-A-E-L, T-H-U-N-H-O-R-S-T.

18  Q.      Mr. Thunhorst, how are you employed?

19  A.      I'm employed as a fire protection equipment technician

20  with the University of Missouri-Columbia.

21  Q.      How long have you been so employed?

22  A.      Over 12 years.

23  Q.      What are your responsibilities there as a technician,

24  fire protection and equipment technician?

25  A.      I inspect, test, maintain, and program -- I inspect,

1  test, maintain, program, and troubleshoot fire alarm and

2  sprinkler systems at the university.

3  Q.    Is Ellis Library equipped with a fire alarm system?

4  A.    Yes.

5  Q.    And are you responsible for that system?

6  A.    Yes.

7  Q.    Now, tell us about that system.  Does it have -- is it

8  designed to detect smoke, fire, and heat?

9  A.    Yes, it is.

10  Q.    And what sorts of detectors does it have?

11  A.    It has a fire alarm system that's set up to have smoke

12  detectors, heat detectors, duct detectors, sprinkler flow

13  switches.

14  Q.    What about water flow detectors?

15  A.    Yes, that's the water flows.

16  Q.    Now, we'll come to the water flow detector, but how is

17  the Ellis fire alarm system connected to the university system?

18  A.    The fire alarm goes through what we call a Metasys

19  system over at the energy management building on campus, and

20  then from there it's transmitted to the University Police

21  Department.

22  Q.    Okay.  So it's relayed ultimately to the university

23  police or campus police?

24  A.    That's correct.

25  Q.    Was there any time lag there back at that time?

1  A.      Yes.  Some of the issues that we run into is that the

2  fire alarm actually responds to energy management.  From energy

3  management, the system would pull that time and then actually

4  has up to a minute to send it to the University Police

5  Department.

6  Q.      Okay.  So when the alarm went, there was a delay up to

7  a minute to send it to the University Police Department?

8  A.      That's possible.

9  Q.      Now, I want to take you back to September 10th of 2011.

10  Were you asked to retrieve information from the Ellis Library

11  fire panel?

12  A.      Yes, I was.

13  Q.      And did you, in fact, retrieve that information?

14  A.      Yes, I printed a history and turned it over to the

15  detectives.

16  Q.      Let me show you what's been marked as Government's

17  Exhibit 105.  Do you recognize that?

18  A.      Yes, sir, that's the history I printed for the

19  detectives.

20  Q.      Okay.

21          MR. LYNN:  Offer Government's Exhibit No. 105, Your

22  Honor.

23          MR. STABENOW:  No objection, but we would request

24  that Mr. Thunhorst pull the microphone a little closer.  I'm

25  struggling to hear.

1          THE COURT:  If you would slow down a little bit

2  because you naturally talk fast, that would be helpful too.

3  Exhibit 105 will be admitted.

4          (Government's Exhibit 105 was admitted into evidence.)

5  BY MR. LYNN:

6  Q.     Mr. Thunhorst, I'm going to show you a portion of this

7  report.  Do you see a section that's highlighted there?

8  A.     Yes, I do.

9  Q.     And tell the jury, if you would, what that indicates.

10  A.     That is the alarm from the water flow system that

11  responded to the fire panel.

12  Q.     Okay.  What has to happen in order to activate the

13  water flow alarm?

14  A.     A sprinkler would have to activate, causing the water

15  to flow through the system, which in turn would activate that

16  flow switch.

17  Q.     Okay.  Once the water starts flowing, does the alarm

18  immediately go or activate?

19  A.     No.  We have set those up, we're allowed up to 90

20  seconds.  At the university we have ours set between 30 and 60

21  seconds.  In the case of this one, we've tested that one, it

22  comes in between 40 and 50 seconds.

23  Q.     So the alarm wouldn't have actually activated until 40

24  or 50 seconds after the water was flowing toward the sprinkler

25  system; is that correct?

1    A.      Correct, after we start the flow.

2    Q.      Now, are you familiar with the rooms in which the water

3    flow alarm indicated?

4    A.      Yes, I am.

5    Q.      In what rooms were they?

6    A.      101, 102.

7    Q.      Okay.  Now, were the water flow alarms, the sprinkler

8    alarms equipped with sprinkler heads?

9    A.      Yes.

10   Q.      And what has to happen in order to activate those

11   alarms?

12   A.      In this case, the sprinklers in those rooms are on what

13   we call a fusible link.  The temperature in the room would have

14   to heat those up to approximately 160 degrees or it also could

15   have mechanical damage that would also cause those to activate.

16   Q.      So the fire gets the head up to 160 degrees; is that

17   correct?

18   A.      Correct.

19   Q.      Causing what to happen?

20   A.      The fusible link would release, the sprinkler head

21   would open up.  Because there's water in that system, they

22   would start to flow water.

23   Q.      Okay.  And then 40 to 50 seconds later --

24   A.      The fire alarm would activate, yes.

25   Q.      -- the fire alarm would activate.  Okay.  Are you

1  familiar with the dimensions of those rooms?

2   A.      Somewhat.

3   Q.      Okay.  Are they large rooms or small rooms, or how

4  would you characterize them?

5   A.      102 was actually a room that's about 50 by 50 with

6  11-foot ceilings, so approximately 2500 square feet.  101 is

7  probably about half that size.

8   Q.      Now, assuming a fire occurs in a room such as you

9  described, would it immediately cause the water flow alarm to

10  go off?

11  A.      No.  You're going to have to heat up the air space

12  around that sprinkler head to 160 degrees, so it's going to

13  take some time.

14  Q.      Would that depend upon the load?

15  A.      The fire load and, yes, what was used as far as the

16  fuel, yes.

17  Q.      What about paper and cardboard if that was the fuel

18  load?

19  A.      It would take some time because there's not a lot of

20  density.

21          MR. LYNN:  No further.

22          THE COURT:  Any cross-examination?

23          MR. STABENOW:  Just a moment, Your Honor.  Nothing,

24  Your Honor, thank you.

25          THE COURT:  Sir, you may step down.  Mr. Lynn, I'd

1 like to take a break sometime between now and 3 o'clock.  If

2 this is a good time, or if you have another couple of

3 witnesses, whichever you would prefer.

4             MR. LYNN:  I have two more witnesses.

5             THE COURT:  And they're short?

6             MR. LYNN:  I think they're relatively short.

7             THE COURT:  Then why don't we go ahead and go

8 forward.

9             MR. LYNN:  Ann Riley.

10                         - - -

11                     ANN RILEY,

12  being first duly sworn by the courtroom deputy, testified as

13 follows:

14                         - - -

15                 DIRECT EXAMINATION

16  By Mr. Lynn:

17  Q.     Ma'am, would you state your name and spell your name,

18 if you would?

19  A.     My name is Ann, A-N-N; Campion, C-A-M-P-I-O-N; Riley,

20 R-I-L-E-Y.

21  Q.     And what is your occupation?

22  A.     I'm a librarian.

23  Q.     What is your title?

24  A.     I'm Associate Director for Access Collections and

25 Technical Services at the University of Missouri library.

1  Q.      And you work at Ellis Library there; is that correct?

2  A.      Yes.

3  Q.      Directing your attention back to September 10th of

4  2011, were you familiar with certain fires that occurred there?

5  A.      Yes.

6  Q.      Did those fires occur in areas for which you had

7  responsibility?

8  A.      Yes.

9  Q.      Where did they occur, some of the areas that they

10 occurred?

11 A.      They occurred in the access services area, at

12 circulation, interlibrary lending and borrowing, and reserves.

13 Q.      How were those areas affected by those fires?

14 A.      Well, there was damage, and they were shut down for

15 several days, three days.

16 Q.      Now, are you familiar with the total amount of damage

17 that Ellis Library sustained as a result of those fires?

18 A.      Yes.

19         MR. STABENOW:  Objection, Your Honor, relevance.

20         THE COURT:  Could the attorneys please approach?

21         (Counsel approached the bench and the following

22 proceedings were had:)

23         THE COURT:  I'm inclined to sustain the objection

24 unless you can explain how this is going to --

25         MR. LYNN:  That's the only question I'm going to ask

her.  He's charged with maliciously starting fire, and our
theory is it was an act of malice, that he just simply wanted
to cause property damage, and I think it goes to the malicious
nature of his act.

THE COURT:  I just don't see that it's relevant.
The prejudicial value outweighs the relevance.

(The following proceedings were had in open court:)
BY MR. LYNN:

Q.     Moving on, Ms. Riley, let me ask you, are you familiar
with the interlibrary loan program there at the Ellis Library?

A.     Yes, it's under my supervision.

Q.     Would you tell the jury about that program, how that
program operates?

A.     We borrow books for our students, faculty, and staff
who need them.  Books we don't have, we borrow from other
libraries that do have them.  We share information through a
computer system, and we then also lend to those libraries books
that their students and researchers want that we have that they
don't, and we do this with libraries all over the country and
all over the world.

Q.     So this is just an exchange of information, books and
journals and other such items; is that correct?

A.     Yes.

Q.     Now, is this commercial in nature?  Are there fees
associated with this program?

1  A.     Yes.  There are fees associated with some of the

2  interlibrary loans.  Some within the state we don't charge for,

3  but others we do charge for.

4  Q.     Does the University of Missouri expend moneys to

5  acquire materials?

6  A.     Yes.

7  Q.     Do they have a budget?

8  A.     Yes.

9  Q.     Do you know what that is about per year?

10  A.     For interlibrary loan materials or for all materials?

11  Q.     For all materials.

12  A.     For all materials?

13  Q.     For interlibrary loan.

14  A.     For interlibrary loan, about $70,000.

15  Q.     Do other libraries spend money at Ellis to acquire

16  materials?

17  A.     Yes.

18  Q.     Are there other costs associated with this program?

19  A.     Yes.  There are also shipping costs, copying costs

20  sometimes.

21  Q.     Are you familiar with the Digi Center there at the

22  Ellis Library?

23  A.     Yes.

24  Q.     What is that?

25  A.     It's a place that offers services to patrons who come

1  in, students, faculty, staff, or others, to make digital copies

2  or xerox copies of materials that they need.

3  Q.    And they charge a fee for that service?

4  A.    Yes.

5  Q.    Are you familiar with the Bookmark Cafe?

6  A.    Yes.

7  Q.    Is that located at Ellis Library?

8  A.    Yes, it is.

9  Q.    What sort of facility is that?

10 A.    It's a cafe.  It has food and beverages, mostly

11 coffees, Starbucks kind of like place.

12 Q.    Do you know who provides the coffee?

13 A.    I believe it's -- it comes from the University Food

14 Service, but I believe they purchase it from Kaldi.

15 Q.    Kaldi?  That's a commercial establishment there in

16 Columbia; is that correct?

17 A.    Yes, yes.

18 Q.    Obviously, University of Missouri is an educational

19 institution; is that correct?

20 A.    Yes.

21 Q.    Do students who attend there pay tuition?

22 A.    Oh, yes.

23 Q.    Obviously.  And to your knowledge, do out-of-state

24 students come and attend at the university?

25 A.    Oh, yes, many.

1  Q.     And do they come from other countries, as well?

2  A.     Oh, yes.

3  Q.     And do these students use the Ellis Library?

4  A.     Yes, they do.

5          MR. LYNN:  No further, Your Honor.

6          THE COURT:  Any cross-examination?

7          MR. STABENOW:  No, Your Honor, thank you.

8          THE COURT:  Ma'am, you may step down.

9                        - - -

10                   MICHAEL BAKER,

11  being first duly sworn by the courtroom deputy, testified as

12  follows:

13                        - - -

14                  DIRECT EXAMINATION

15  By Mr. Lynn:

16  Q.     Sir, would you state your name, please?

17  A.     Michael Baker.

18  Q.     And how are you employed, sir?

19  A.     I'm a criminalist supervisor with the Missouri State

20  Highway Patrol Crime Lab in Springfield, Missouri.

21  Q.     And what are your responsibilities with the crime lab?

22  A.     I work in the trace evidence section.

23  Q.     And what is your educational background?

24  A.     I have a Bachelor of Science Degree in forensic science

25  from Michigan State University.

1   Q.      Okay.  And how long have you been with the patrol, the

2   highway patrol lab?

3   A.      About 16 years.

4   Q.      Okay.  So what are your duties generally?

5   A.      In trace evidence, I look at a variety of different

6   types of evidence, including hairs, fibers, paint, glass,

7   flammables, and just general unknown substances.

8   Q.      So you examine items to determine whether any trace

9   evidence exists on them?

10  A.      Yes.

11  Q.      Did you have occasion to do an examination in

12  connection with this case?

13  A.      Yes, I did.

14  Q.      Let me show you what's been received in evidence as

15  Government's Exhibit No. 104.  Do you recognize this as an item

16  received by you at the lab?

17  A.      Yes, I do.

18  Q.      And how are you able to determine that?

19  A.      There's a sticker on here that has a lab number, and

20  then there's also my initials.

21  Q.      Okay.  Now, when you received Government's Exhibit No.

22  104, was it in a sealed, untampered condition?

23  A.      Yes.

24  Q.      And upon receiving it, what did you then do with its

25  contents?

1   A.      On that, I examined the clothing, looking for glass

2 particles.

3   Q.      Were you able to find any glass particles?

4   A.      Yes, I did.

5   Q.      Were you able to characterize those particles further

6 as to their source?

7   A.      I did look at them, and they had a similar elemental

8 composition of a sheet glass, which would be like a window or a

9 mirror or a windshield.

10  Q.      Show you Government's Exhibit No. 100, I believe it is.

11 Do you recognize that as an item you received there at the lab?

12  A.      Yes.  Again, it has our lab number and my initials on

13 the paper bag.

14  Q.      When you received that, was it in a sealed, untampered

15 condition?

16  A.      Yes.

17  Q.      Did you perform a similar test as you did with the

18 other exhibit --

19  A.      Yes.

20  Q.      -- for the presence of glass?

21  A.      Yes, there was glass on the pole, and I did further

22 characterize it as having elemental composition of a sheet

23 glass.

24  Q.      Was it different than the glass you found on the

25 clothing?

1    A.       Yes.  I compared the clothing with the glass on the --

2    the glass on the clothing I compared to the glass on the pole.

3    They had different optical properties, meaning they came from a

4    different source from each other.

5              MR. LYNN:  Very well.  No further.

6              THE COURT:  Any cross-examination?

7                          - - -

8                    CROSS-EXAMINATION

9    By Mr. Stabenow:

10   Q.       Was there any evidence on any of the clothing that you

11   received of soot, smoke, ignitable fluids, anything like that?

12   A.       I did not see any soot or anything visibly on the

13   clothing, no.

14   Q.       So glass fragments, but nothing you would associate

15   with a fire?

16   A.       I did not see anything, no.

17             MR. STABENOW:  Thank you.

18             THE COURT:  Any redirect?

19                          - - -

20                  REDIRECT EXAMINATION

21   By Mr. Lynn:

22   Q.       Did you test for that?

23   A.       I didn't look specifically for any flammable material

24   or soot, but I would have noted anything black on there, I

25   would think.

1    MR. LYNN:  Got you.  No further.

2    THE COURT:  Any recross?

3    MR. STABENOW:  No, Your Honor, thank you.

4    THE COURT:  Sir, you may step down.  Why don't we go

5    ahead and take our afternoon break and be in recess until about

6    10 after 3:00.

7    (The following proceedings were had in the courtroom

8    out of the presence of the jury:)

9    THE COURT:  Mr. Lynn, where do we stand with respect

10   to the government's case?

11   MR. LYNN:  Your Honor, I think we're ready to rest.

12   I want to make sure my exhibits -- just do a final inventory,

13   but --

14   THE COURT:  Okay.

15   MR. STABENOW:  I'll be ready to proceed.  I'm going

16   to talk to my witnesses briefly.  It might take a couple of

17   minutes past 3:10.

18   THE COURT:  If you need more than 15 minutes, just

19   let me know.  Do you need 15 or 30?

20   MR. STABENOW:  I think 30 would be a heck of a lot

21   more comfortable to talk to my client and my witnesses.

22   THE COURT:  Why don't we do that.  Kelly, would you

23   tell the jury we're going to take a 30-minute break instead of

24   a 15-minute break?

25   MR. STABENOW:  Judge, I have a motion for judgment

1  of acquittal at the close of the government's evidence.

2          THE COURT:  I'm going to overrule the motion, but it

3  will be noted for the record that you submitted the motion.

4          Why don't we take a recess; and then when you're

5  ready to start, just let Kelly know, and I'll come back out.

6          MR. STABENOW:  I will.  Thank you, Your Honor.

7          (A recess was taken from 2:58 p.m. to 3:33 p.m.)

8          THE COURT:  Ready to proceed?

9          MR. STABENOW:  We are.

10         THE COURT:  Any issues that we need to take up?

11         MR. STABENOW:  I don't think so.

12         MR. LYNN:  Not by the government.

13         THE COURT:  Are you ready to rest?

14         MR. LYNN:  I am ready to rest.

15         THE COURT:  Okay.  If you could grab the jury.

16         MR. LYNN:  I know there are a few exhibits that I

17 didn't admit, but I intentionally did not admit them.

18         THE COURT:  Okay.

19         (The following proceedings were had in the courtroom

20 in the presence of the jury:)

21         THE COURT:  I think we're ready to proceed.  Mr.

22 Lynn?

23         MR. LYNN:  Your Honor, the government rests.

24         THE COURT:  Thank you.  Mr. Stabenow, is the

25 defendant ready to proceed?

1          MR. STABENOW:  Yes, Your Honor, we would recall
2   Mr. Cavanah to the stand.  Sir, if you could come in and retake
3   the stand briefly.
4          And while you're doing that, once -- I'll remind you
5   that once you retake the stand, you're still under oath.
6          THE WITNESS:  Okay.
7                         - - -
8                    MATTHEW CAVANAH,
9    having been previously sworn by the courtroom deputy,
10  testified as follows:
11                        - - -
12                 DIRECT EXAMINATION
13   By Mr. Stabenow:
14   Q.     Mr. Cavanah, I do want to take you back briefly to the
15  morning where the Clery release came out.  You had worked a
16  late shift the night before; is that correct?
17   A.     Yes.
18   Q.     And about what time had you gotten home from that late
19  shift?
20   A.     It would have been between 2:00 and 2:30.
21   Q.     And sometime between 3:00 and 3:30, did you hear
22  anything from upstairs where Chris lived?
23   A.     I heard some footsteps.
24   Q.     The next morning, the Clery release came out, and you
25  and your other housemate went up to talk to Chris about it,

1  correct?

2  A.      Correct.

3  Q.      All right.  And do you remember if he had a visible

4  reaction to when you guys told him, hey, you're suspected of

5  starting these fires in the Ellis Library last night?

6  A.      He looked a little surprised.

7  Q.      Maybe surprised and confused?

8  A.      Surprised would be the way I would describe it.

9          MR. STABENOW:  Just a moment.  No further questions,

10 Your Honor.

11         THE COURT:  Any cross?

12                         - - -

13                   CROSS-EXAMINATION

14 By Mr. Lynn:

15 Q.      So you confronted him with a picture of him in the

16 Ellis Library; is that correct?

17 A.      Yes.

18 Q.      And he looked surprised?

19 A.      Yes.

20         THE COURT:  Any redirect?

21         MR. STABENOW:  No, Your Honor, thank you.

22         THE COURT:  Sir, you may step down.

23         MR. STABENOW:  The government (sic) will call

24 Investigator Greg Wills to the stand.

25                         - - -

1          GREGORY WILLS,

2    being first duly sworn by the courtroom deputy, testified as

3    follows:

4                          - - -

5                    DIRECT EXAMINATION

6    By Mr. Stabenow:

7    Q.      Investigator Wills, can you please tell us your full

8    name and where you work?

9    A.      My name is Gregory Parker Wills.  I'm an investigator

10   with the Federal Public Defender's Office for the Western

11   District of Missouri.

12   Q.      So you are basically Craig Holloway's counterpart for

13   our office?

14   A.      That would be correct, I guess.

15   Q.      And are you familiar, sir, with certain tests and

16   requests for discovery in this case?

17   A.      Yes.

18   Q.      All right.  And in this case are you familiar with

19   whether Mr. Kelley had sought video camera footage out in the

20   surrounding area around the Ellis Library or testing that would

21   associate him with fire evidence with soot and et cetera?

22   A.      Yes, I'm familiar with that.

23   Q.      Did he make those sort of requests to the government?

24   A.      He had made those sort of requests, that's correct.

25   Q.      And it's your understanding that it just turned out

1 that there was no camera footage preserved or available of the
2 surrounding area, and there was no testing that came back with
3 any sort of fire trace evidence linked to his clothing; is that
4 correct?

5  A.     That's correct.

6         MR. STABENOW:  No further questions.

7         THE COURT:  Cross-examination?

8         MR. LYNN:  No cross-examination.

9         MR. STABENOW:  Just one second.

10         THE COURT:  Hold on just one second.

11 BY MR. STABENOW:

12  Q.     Mr. Wills, one other thing.  We did hear some evidence
13 there was some feces found on the fourth floor.  Mr. Kelley had
14 also requested DNA testing of the feces; is that correct?

15  A.     Yes, he did.

16  Q.     And that's when all of us, the defense side and the
17 government's side, found out that it had not been preserved for
18 testing?

19  A.     That's correct.

20         MR. STABENOW:  Thank you.  Nothing -- hold on.
21 Nothing further.

22         THE COURT:  Any cross?

23         MR. LYNN:  No cross.

24         THE COURT:  You may step down.

25         THE WITNESS:  Thank you.

1          MR. STABENOW:  The defense would call Ms. Tara

2    Ballenger to the stand.  Miss Ballenger, come right over to the

3    back by the monitor and stop to be sworn.

4                              - - -

5                          TARA BALLENGER,

6     being first duly sworn by the courtroom deputy, testified as

7    follows:

8                              - - -

9                        DIRECT EXAMINATION

10   By Mr. Stabenow:

11   Q.     Miss Ballenger, how do you know Chris Kelley?

12   A.     He's my boyfriend.

13   Q.     And were you living with him in September of 2011 when

14   this whole Ellis incident took place?

15   A.     Yes.

16   Q.     Were you two the only people living on the top floor of

17   the home where you lived?

18   A.     Yes.

19   Q.     And the night that the Ellis Library fires occurred,

20   what time did you go to bed?

21   A.     About maybe 1 a.m.

22   Q.     Did you get up and walk around anywhere the rest of the

23   night?

24   A.     No.

25   Q.     The next morning, was it brought to your attention that

1  Chris was in a Clery release?

2   A.    Yes.

3   Q.    And were you there to see his reaction when he was told

4  that he was accused of setting fires in the library?

5   A.    I saw his reaction right after he came upstairs, so

6  within minutes.

7   Q.    What was his reaction to the accusation he had set

8  fires in the Ellis Library?

9   A.    Stunned.  Disbelief, but also the real worry hadn't set

10  in.

11          MR. LYNN:  Your Honor, I'm going to object to

12  hearsay.

13          THE COURT:  Could counsel please approach?

14          (Counsel approached the bench and the following

15  proceedings were had:)

16          MR. LYNN:  I think she's about to express

17  self-serving hearsay, his statements.

18          THE COURT:  I don't think she's entitled to get in

19  self-serving hearsay.

20          MR. STABENOW:  I could ask her physically what she

21  observed.

22          (The following proceedings were had in open court:)

23   BY MR. STABENOW:

24   Q.    Miss Ballenger, I understand you drew certain

25  conclusions from his physical reactions.  What we need to do is

1    just describe what you actually observed without the

2    conclusions.  So what did you observe about his demeanor or

3    about his behavior when he was told he had been accused of

4    setting fires in the Ellis Library?

5    A.    Can I say what he told me, or is that hearsay?

6    Q.    You can't say what he told you, just what his reaction,

7    what his physical demeanor and reaction was.

8    A.    His body language seemed like he was very surprised

9    that a fire was mentioned.  Now I feel like I don't know

10   exactly what to say without it being --

11   Q.    Imagine, if you will -- for just a second imagine that

12   we're watching a video of what's happening but the sound is

13   turned off.

14   A.    Yes.

15   Q.    So what are we seeing about Chris's demeanor as he's

16   hearing that he's been accused of setting these fires?

17   A.    Questioning like this.

18   Q.    By this, you mean like shrugging your shoulders, kind

19   of?

20   A.    In disbelief, but I don't -- he seemed --

21   Q.    Well, let me ask, then, from your observations of his

22   demeanor and not based upon what he said --

23   A.    Right.

24   Q.    -- you concluded that he was shocked or surprised by

25   that accusation; is that correct?

1  A.      Yes, I can --

2          MR. LYNN:  I object to her conclusion or opinion.

3          MR. STABENOW:  Present sense impression.

4          THE COURT:  I think we're getting a sense of what

5  she's trying to describe, so she can go ahead and testify to

6  this.

7  A.      He seemed to have no idea of any kind of fire and was

8  in complete disbelief.

9  BY MR. STABENOW:

10  Q.      Okay.

11  A.      I'm so sorry.

12          MR. STABENOW:  I'll move on, Your Honor.

13  Q.      Miss Ballenger, has Chris talked to you about the fact

14  that, frankly, on many occasions he's gone into buildings and

15  wandered around at night?

16  A.      Yeah.

17  Q.      And has he even talked to you about the idea that

18  sometimes he has armed himself if he thought he heard noises,

19  et cetera?

20  A.      Right, yeah.

21          MR. STABENOW:  Just a moment.  Nothing further, Your

22  Honor.

23          THE COURT:  Any cross-examination?

24                          - - -

25

1                    CROSS-EXAMINATION

2   By Mr. Lynn:

3   Q.      So he tells you he goes into places and wanders around;

4   is that correct?

5   A.      Right.

6   Q.      He trespasses into places and wanders around; is that

7   what you're saying?

8   A.      He sneaks in after hours.

9   Q.      Well, that's trespass, isn't it?

10  A.      Yeah, right.

11  Q.      So he trespasses unlawfully and arms himself; is that

12  what you said?

13  A.      Doesn't arm himself; but if he thought he heard a

14  noise, he'll have something there.

15  Q.      While he's there trespassing?

16  A.      Right.

17          MR. LYNN:  No further.

18          THE COURT:  Any redirect?

19          MR. STABENOW:  No, Your Honor.

20          THE COURT:  You may step down.

21          THE WITNESS:  Thank you.

22          MR. STABENOW:  The defense will call Command

23  Sergeant Major Kelley to the stand.

24                       - - -

25

1          WAYNE CURTIS KELLEY,

2  being first duly sworn by the courtroom deputy, testified as

3  follows:

4                          - - -

5                  DIRECT EXAMINATION

6  By Mr. Stabenow:

7  Q.      Can you please state your name for the record?

8  A.      Wayne Curtis Kelley.

9  Q.      And you are a retired sergeant major for the United

10 States Army; is that correct?

11 A.      Command sergeant major, yes, sir.

12 Q.      How do you know Chris Kelley?

13 A.      Well, he came into my life about 1985 when stationed in

14 Italy, so I've known him from birth.

15 Q.      So he's your son?

16 A.      Yes, he is.  I'm proud as hell.

17 Q.      Now, briefly, you obviously were aware that Chris

18 attended the University of Missouri and got a degree there and

19 then chose to live there, correct?

20 A.      Absolutely, yes.

21 Q.      How did he feel about the University of Missouri in his

22 time there?

23 A.      Well, from the very beginning when he was accepted he

24 was very excited.  I know my wife and I, Colleen, were very

25 excited.  And the whole four years he was there, he was

1   excited.  The fact is, he hung around a little longer so he

2   could get a second degree.  He loved Missouri, you know.

3   Q.      How did he feel about books and libraries?  Is there

4   anything in his life that's allowed you to draw a conclusion as

5   to learning and libraries?

6   A.      When it comes to books, I'll tell you, I've never seen

7   a guy so in love with books.  From the very beginning, Chris --

8   he was an early reader, he loved books.  If you wanted to make

9   him happy, you would buy him a book about words.  He loved the

10  written print -- excuse me, the written word.  He just loved

11  books.  If you just go into his apartment right now, you see

12  shelf after shelf, row after row of books.  If you go into my

13  storage shed, you see tub after tub full of books.  The idea

14  that he would do anything to a library in a negative sort of

15  way is just not believable.

16          MR. LYNN:  Your Honor, I'm going to object to a

17  nonresponsive question.

18          THE COURT:  I do think you need to focus your

19  question a little bit.  And Mr. Kelley, you're speaking very

20  fast, and I think that's probably just your manner.  But if you

21  would slow down just a little bit, it would make the court

22  reporter's job a lot easier.

23          THE WITNESS:  Thank you, I will.

24  BY MR. STABENOW:

25  Q.      Sergeant Major Kelley, have you been able to form an

1  opinion as to Chris Kelley's general character and whether he

2  would be the sort of person that would set fire to a library?

3  A.      There's no way, I can say without hesitation.

4          MR. LYNN:  Your Honor, I'm going to object as

5  nonresponsive.

6          THE COURT:  Sustained.

7  BY MR. STABENOW:

8  Q.      The first thing you have to do, Mr. Kelley, is tell me

9  whether you have formed an opinion as to --

10 A.      I have formed an opinion.

11 Q.      And briefly, without going into any specifics, can you

12 give us the gist of that opinion as to whether he would be a

13 person to set a library on fire?

14 A.      My opinion is that he would never do such a thing.

15         MR. STABENOW:  Thank you, nothing further.

16         MR. LYNN:  No cross-examination.

17         THE COURT:  Thank you, sir, you may step down.

18         MR. STABENOW:  The defense would call Nick Brown to

19 the stand.

20                        - - -

21                   NICHOLAS BROWN,

22  being first duly sworn by the courtroom deputy, testified as

23  follows:

24                        - - -

25

1    DIRECT EXAMINATION

2  By Mr. Stabenow:

3  Q.    Mr. Brown, could you please spell your first name for

4  the court reporter?

5  A.    N-I-C-H-O-L-A-S.

6  Q.    Do you know Chris Kelley?

7  A.    Yes, I do.

8  Q.    How long have you known him?

9  A.    Thirteen and a half years.

10  Q.    How well do you know him?

11  A.    Better than anybody.

12  Q.    And when you say better than anybody, how much time

13  have you spent with him?

14  A.    Just a tremendous amount of time.  As an aggregate, I

15  would say at least five years.

16  Q.    Have you ever seen anything from -- have you ever heard

17  him say anything or express anything that would express any

18  sort of hostility towards the University of Missouri?

19  A.    No.

20  Q.    Do you know how he felt about having attended the

21  University of Missouri and being located there with the

22  University of Missouri?

23  A.    Oh, he adored it.  That was the best time of his life

24  that I've known him.

25  Q.    What's his attitude towards books and libraries?

1  A.      He loves them.  You should see -- we currently live in

2  an apartment together.  You should see the amount of books he

3  currently owns.

4  Q.      I'm going to ask you some questions, a little bit

5  frank.  Would it surprise you if you heard that Chris had

6  stolen some stuff?

7  A.      No.

8  Q.      In fact, have you known him over the time that you've

9  known him to sometimes engage in some small thefts?

10  A.      Yes.

11  Q.      Would it surprise you to hear that he had snuck into a

12  building and wandered around at night?

13  A.      No.

14  Q.      Would it surprise you to hear that he had been accused

15  of setting fire to a library?

16  A.      Yes, absolutely.

17  Q.      Very specifically, yes, no, in the time that you've

18  known him, have you been able to form an opinion as to whether

19  he would have the character of somebody who would set fire to a

20  library?

21  A.      No.

22  Q.      Yes or no is the question, have you been able to form

23  an opinion?

24  A.      Yes.  Yes.

25  Q.      And what is your opinion as to whether he would be the

1   sort of person to do that?

2   A.      No, he is not the type of person to do that.

3           MR. STABENOW:  Thank you.  Nothing further.

4                           - - -

5                     CROSS-EXAMINATION

6   By Mr. Lynn:

7   Q.      Mr. Brown, you're the best of friends with Mr. Kelley;

8   is that the way you describe it?

9   A.      Absolutely.

10  Q.      You have a long relationship with him; is that correct?

11  A.      Extremely long, yes.

12  Q.      You said you know he steals stuff?

13  A.      Yes.

14  Q.      What kind of stuff does he steal?

15  A.      Off the top of my head, he stole a human resources

16  sign, I believe from the science building, I think a placard of

17  some type.

18  Q.      What about computer?

19  A.      Not to my knowledge, but I can't say it would surprise

20  me.

21  Q.      Well, that's -- you know that's unlawful, don't you?

22  To steal stuff?

23  A.      Yes.

24  Q.      Now, you said you were aware that he snuck into

25  buildings; is that correct?

1   A.      Yes, it is.

2   Q.      And you know that's trespassing?

3   A.      Yes.

4   Q.      That's unlawful, as well?

5   A.      Yes.

6           MR. LYNN:  No further.

7           THE COURT:  Any redirect?

8           MR. STABENOW:  No redirect, Your Honor.

9           THE COURT:  Sir, you may step down.

10          MR. STABENOW:  Your Honor, may I approach?

11          THE COURT:  Yes.

12          (Counsel approached the bench and the following

13  proceedings were had:)

14          MR. STABENOW:  Those are all the witnesses I have,

15  except that Mr. Kelley was still indicating five minutes ago

16  that he wasn't sure if he was going to testify, so I thought we

17  should probably do a brief break.  If he decides he's going to

18  testify, he'll testify; if not, we might want to make a record.

19          THE COURT:  Are you going to rest if he chooses not

20  to testify?

21          MR. STABENOW:  Yes.

22          THE COURT:  If he chooses not to testify, do you

23  want to state that in front of the jury on the record here

24  today?

25          MR. STABENOW:  No, I don't want to state that on the

1 record, and I won't request an instruction that addresses that
2 either. He and I have talked about that.
3       THE COURT: Okay. What I'll probably do is -- well,
4 let me take a ten-minute break, and I'll have them come in
5 because I want to read them the instruction about not talking
6 before I dismiss them. So we'll take a ten-minute break.
7       (The following proceedings were had in open court:)
8       THE COURT: We are going to -- I don't know why I
9 stood up. We're going to take a ten-minute break. And I
10 realize we've taken a number of breaks today. Trust me, we've
11 been doing work that has moved this case forward while we've
12 been on these breaks, and that's what we'll do during this
13 ten-minute break. So if we could be in recess until five after
14 4:00.
15       (The following proceedings were had in the courtroom
16 out of the presence of the jury:)
17       THE COURT: Mr. Stabenow, I'm going to want to have
18 a colloquy, regardless of whether or not he testifies. If he
19 chooses not to testify, we can do it after we dismiss the jury;
20 but if he chooses to testify, obviously I'll want to do that
21 before. So if you all could chat, and I'll be back at about
22 ten after so we can do the colloquy if we need to.
23       MR. STABENOW: Thank you.
24       (A recess was taken from 3:56 p.m. to 4:09 p.m.)
25       THE COURT: Ready to proceed?

1         MR. STABENOW:  My client is absent, but he's made

2 his election, and we can do it after the jury is released.

3         THE COURT:  He's not going to testify?

4         MR. STABENOW:  That's correct.

5         THE COURT:  Has anyone had a chance to look at the

6 instructions?

7         MR. STABENOW:  I have not.

8         MR. LYNN:  I have not.

9         MR. STABENOW:  But I would say, Jim and I talked

10 about this last night, not having seen your instructions, and

11 we both thought that our, both thought our proposed

12 instructions were so similar, it wouldn't take more than a

13 couple of minutes to resolve any issues.

14         THE COURT:  I made a couple of changes to them.  I

15 don't know that there are any substantive changes, but I

16 thought a few technical changes needed to be made.  Do you want

17 to go ahead and get the jury back so we can excuse them for the

18 night and we can take this issue up?

19         So my thought is, again, have them come back at

20 8:30, but I would like you here right at 8:30 tomorrow to

21 discuss the instructions, so if either of you notice any

22 typographical or if you can convince me that any substantive

23 changes need to be made, we have time to make those changes and

24 bring the jury in at 9:00.

25         MR. STABENOW:  That's of course acceptable to us,

1  Your Honor, but I would also think I could review them within

2  five or ten minutes if you wanted to take them up tonight, and

3  then have it comfortably done and then --

4         THE COURT:  I would prefer to take them up tonight.

5         MR. LYNN:  Sure.

6         MR. STABENOW:  Absolutely.

7         THE COURT:  If you're willing to do that, that would

8  be my preference.  Why don't we dismiss them, we can take a

9  15-minute recess, you can look at them, and we can take the

10 issue up after that.  Great.  That's perfect.  And I'll still

11 have them come back at 9:00 tomorrow.

12        MR. STABENOW:  Of course, I have this that I'll

13 file, as well.

14        THE COURT:  Sure.  Sure.  So you're not going to

15 rest on the record?

16        MR. STABENOW:  I'm going to go ahead and rest.

17        THE COURT:  Okay.

18        (The following proceedings were had in the courtroom

19 in the presence of the jury:)

20        THE COURT:  Please be seated.  Mr. Stabenow, are you

21 ready to proceed?

22        MR. STABENOW:  The defense rests, Your Honor.

23        THE COURT:  Thank you.  Ladies and gentlemen, that

24 concludes the evidence in this case.  The attorneys and I do

25 have to spend some time discussing the instructions that I've

1  made reference to and that we will give you after the closing

2  arguments in this case, and that's going to take us a few

3  minutes.

4          So we're going to go ahead and break for the day.  I

5  would ask that you be back tomorrow morning at 9 a.m.; and at 9

6  a.m., we will move directly into closing arguments, so I would

7  expect to have the case submitted to you tomorrow morning for

8  you to begin your deliberations.

9          Now, before you take your recess, I do want to read

10 you this instruction to again remind you that during these,

11 this recess and every other recess, do not discuss this case

12 among yourselves or with anyone else, including your family and

13 friends.  Do not allow anyone to discuss the case with you or

14 within your hearing.  Do not discuss also means do not e-mail,

15 send text messages, blog, or engage in any other form of

16 written, oral, or electronic communication.  As I instructed

17 you before, do not read any newspaper or other written account,

18 watch any televised account or listen to any radio program

19 about the trial.  Do not conduct any internet research or

20 consult with any other sources about this case, the people

21 involved in this case, or its general subject matter.  You must

22 keep your mind free and open, open and free of outside

23 information.  Only in this way will you be able to decide the

24 case fairly, based solely on the evidence and my instructions

25 on the law.  If you decide this case on anything else, you will

1  have done an injustice.

2          It is very important that you follow these

3  instructions.  So, again, as I said before, that means do not

4  go to the library, do not go to Stephens College, do not do any

5  type of research whatsoever or conversations or talking with

6  anyone about this case.  Tomorrow the deliberations will begin,

7  and then you guys can talk until your heart's content about it.

8  So with that, we'll be in recess.

9          (The following proceedings were had in the courtroom

10 out of the presence of the jury:)

11         THE COURT:  I first want to have a conversation with

12 Mr. Kelley about the decision not to testify.  I trust that

13 you've spoken with your attorney, Mr. Stabenow, about the fact

14 that you do have a right to testify?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  And you understand that you also have a

17 right to not testify?

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  And it's my understanding that you have

20 chosen to not testify in this case; is that correct?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Have you had ample time to talk with Mr.

23 Stabenow regarding your decision?

24         THE DEFENDANT:  I would have liked more, but under

25 the circumstances, I'll say yes.

1      THE COURT:  Have you also spoken with your family

2  regarding your decision to not testify?

3      THE DEFENDANT:  Just now, yes.

4      THE COURT:  Okay.  You've been aware, however, of

5  the fact that you had a right to testify for quite some time,

6  correct?

7      THE DEFENDANT:  Yes, I did.

8      THE COURT:  And so during your conversations -- and

9  I know from the previous conversation you and I have had that

10  you've had a number of conversations with Mr. Stabenow

11  regarding trial strategy, correct?

12      THE DEFENDANT:  A few, yes.

13      THE COURT:  And during those conversations, you had

14  the opportunity to discuss with Mr. Stabenow the right to not

15  testify, correct?

16      THE DEFENDANT:  Correct.  I do have -- one thing I

17  didn't know -- I could testify, but obstruction, what is --

18  obstructionism is bad and frowned upon?

19      THE COURT:  It's more than frowned upon, let me tell

20  you that.

21      MR. STABENOW:  Your Honor, I briefly -- to

22  summarize, we had talked previously in trial strategy that if a

23  defendant takes the stand and testifies as to something that

24  the court concludes is contrary, that is a material issue and

25  is contrary to the verdict, an obstruction enhancement might

1  apply.  And we have talked -- we've talked about that
2  previously, but we talked about it in more detail today.
3           THE COURT:  Yes, that is correct.  Your attorney has
4  properly summarized the factors that go into a sentencing
5  calculation with respect to enhancements for what's called an
6  obstruction of justice.
7           THE DEFENDANT:  I didn't know that was part of it;
8  otherwise, I might have had something prepared possibly, but
9  seems how I didn't learn about the obstruction aspect of it --
10 I thought it was just if I talked, that was another score up.
11 It may have been my misunderstanding; but from the git-go, he's
12 made a recommendation one way or the other, and I just didn't
13 know about that distinction, I figured I could talk around it
14 but --
15          THE COURT:  You also understand that if you talk
16 around it, Mr. Stabenow has explained to you that talking
17 around it carries some risks in and of itself; is that fair to
18 say?
19          THE DEFENDANT:  Yeah, it's tricky, yes.
20          THE COURT:  So considering all of the information
21 that Mr. Stabenow has given you and pondering it, is it your
22 decision to not testify in this case?
23          THE DEFENDANT:  Yes.
24          THE COURT:  Okay.  With that, why don't we take --
25 do you think 15 minutes is enough to go through the

1  instructions?

2          MR. LYNN:  I think so.

3          MR. STABENOW:  Your Honor, if I could just ask --

4  you said you made several changes.

5          THE COURT:  I didn't say several.  Well, I did --

6  I'm looking at my law clerk here because he may be better at

7  this than I.  I will tell you that the reasonable doubt

8  instruction is the 2011 edition of the reasonable doubt

9  instruction, 3.11.  The other instructions -- I took out, for

10  example, the instruction both of you had submitted with respect

11  to stipulations because it doesn't appear as if any

12  stipulations have been entered in this case.  With the

13  exception of those two, I believe --

14          LAW CLERK:  Defendant's statement.

15          THE COURT:  Right.  And we'll take out --

16          LAW CLERK:  2.07.

17          THE COURT:  2.07.  Or I think you submitted 2.07

18  maybe, and we took it out.

19          MR. LYNN:  The spillover?

20          THE COURT:  The spillover instruction, yes, that's

21  exactly correct.  I looked at that and feel as though the

22  issues that were addressed in your proposed instruction are

23  also addressed in other areas in the model instruction, and so

24  I've declined to give that instruction.

25          MR. STABENOW:  Your Honor, I respectfully object to

1  that, and I would just note that on Instruction 3.04, I talked

2  to Mr. Kelley.  Of course, that shouldn't apply, that very last

3  clause that we talked about, and we're not going to request any

4  instruction about the defendant's failure to testify as we are

5  making the determination that even to provide such an

6  instruction simply highlights his decision not to testify.

7           THE COURT:  Okay.  That -- the last sentence in 3.04

8  will be taken out.  Do you need additional time to look at the

9  instructions?

10          MR. STABENOW:  If those were the only things, I

11 really don't think we do.  Of course, I would prefer the

12 reasonable doubt instruction from the model subcommittee for

13 2013, but I understand that the instruction -- and so I

14 proposed it, and I guess I object that you didn't choose that

15 one, but I also know that the instruction that is from the 2011

16 edition is obviously good law here in the Eighth Circuit, and

17 so I recognize that.

18          THE COURT:  Right.  Okay.  Thank you.  Mr. Lynn, I'm

19 going to be here, so if you want to take a few minutes and look

20 them over.  I would kind of urge you to do that because I

21 really want to have a final copy at 8:30 tomorrow morning.

22          MR. LYNN:  I've been perusing them as we've been

23 speaking, and I don't have anything I have any problem with.

24          MR. STABENOW:  So I would say, Your Honor, maybe

25 five minutes to give them one last look, and then I think we're

 1  good.

 2          THE COURT:  Okay, sounds good.

 3          MR. STABENOW:  As a matter of fact, I would say if

 4  you don't hear from us, we're good.

 5          THE COURT:  Okay.  For purposes of the record, I am

 6  going to overrule your motion for judgment of acquittal at the

 7  close of all the evidence.  Okay.

 8          Well, again, I will be here.  If you want to discuss

 9  the instructions, please let me know.  If I don't hear from

10  either of you, I will assume that there are no additional

11  comments and I will see you all -- let's again do tomorrow at

12  8:30 again just in case something comes up, but we'll plan on

13  calling the jury back in at 9:00 and begin immediately with the

14  reading of the instructions and closing arguments.

15          MR. STABENOW:  Your Honor, I have one question.

16  Some judges read the instructions and they also tell the jury

17  that a written copy will be provided to them, and I can't

18  remember what you indicated your preference is.

19          THE COURT:  I'm going to read them to them.  I will

20  let them know that a written copy will be provided.  I'm toying

21  with the idea of -- and I haven't told Darin this, but having

22  Darin put the instructions on the Elmo as I read them.

23          MR. STABENOW:  I think that's a good idea.

24          THE COURT:  I've seen Judge Fenner do that, and

25  thought that it was helpful for people who learn through

different senses. So that's what I'm thinking about doing at
this time. I am not going to give them a copy of the
instructions to read while I'm reading them, but they will each
have a copy of the instructions in the jury room. But only one
verdict form.

MR. STABENOW: Did we ever resolve the video issue?
Are you more --

THE COURT: That's a good point. Jim, it was my
recollection that at some time the U.S. Attorney's Office was
talking about getting a computer, some type of system that you
could give pretty strong assurances that there was nothing on
the computer and no way that they could access the internet.
Has that been accomplished?

MR. LYNN: Not to my knowledge. And I thought that
the court here had some system.

MR. STABENOW: I can tell you this, Your Honor.
Just from my own complaints this morning, they wouldn't be able
to access the internet. Even my laptop here, you have to have
the password to access the internet here, and it kicks you off
every five minutes. You have to relog on with the password
every five minutes; which, given the amount of difficulty I
have had getting on the internet, I'm confident jurors would
not be able to.

THE COURT: You mentioned previously sending a
computer back to --

1          MR. LYNN:  I had a case that I thought there was --

2  I don't know.

3          MR. STABENOW:  I know we did it in December in Judge

4  Laughrey's case where we tried Eddie Prince Roberts, it was a

5  bank robbery, and they were provided a laptop.

6          MR. LYNN:  I had a child pornography case where we

7  had things on disks.

8          THE COURT:  Let me talk to IT, it sounds like we

9  have something here in the court with the IT --

10          MR. LYNN:  We had to give them instructions on how

11  to access files and et cetera, but they had a computer back

12  there.

13          THE COURT:  Let me talk with IT.  That would

14  obviously be preferable, but it doesn't sound like you're going

15  to lodge any objection.

16          MR. STABENOW:  I did not object to the disk, and

17  I've used it myself, those same files.  It either works and you

18  see what you're supposed to see or nothing happens.

19          THE COURT:  Okay.  I'll talk with IT and try to

20  determine what they've used here in the past.  Any other

21  issues?

22          MR. STABENOW:  No, ma'am.

23          THE COURT:  Okay.  Then I'll see you tomorrow

24  morning.

25          (Trial adjourned for the evening.)

- - -

- - -

## CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

July 9, 2013

/s/_____
Kathleen M. Wirt, RDR, CRR
U.S. Court Reporter