IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

UNITED STATES OF AMERICA,            )
                                     )
                 Plaintiff,          )  No. 12-04043-01-CR-C-BP
                                     )  April 24, 2013
            V.                       )  Jefferson City, Missouri
                                     )  CRIMINAL
CHRISTOPHER CURTIS KELLEY,           )
                                     )  Volume III
                 Defendant.          )  (Pages 282-318)
                                     )


TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE BETH PHILLIPS
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer


<u>APPEARANCES</u>

For Plaintiff:          MR. JIM Y. LYNN, JR.
                        Assistant U.S. Attorney
                        80 Lafayette Street, Suite 2100
                        Jefferson City, MO 65101

For Defendant:          MR. TROY K. STABENOW
                        Assistant Federal Public Defender
                        221 Bolivar Street, Suite 104
                        Jefferson City, MO 65101

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
816-512-5608

1                          VOLUME III
                        (Pages 282-318)
2
        APRIL 24, 2013
3
        Government's closing argument                286
4       Defense closing argument                    296
        Government's rebuttal argument              306
5
        Verdict read                                314
6
                              - - -
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      APRIL 24, 2013

2              - - -

3          (The following proceedings were had in the courtroom

4   out of the presence of the jury:)

5          THE COURT:  You know, it just occurred to me as I

6   was walking down the hall, we didn't talk last night about the

7   amount of time for closing arguments.  I doubt it's an issue in

8   this case, and both of you are very experienced, and I'm

9   confident you won't go on till noon.  If so, I would have shut

10  you down.  Do you want to talk about time and give us some

11  warnings?

12         MR. LYNN:  I would ask for 20 minutes maximum.  I

13  don't think I'll use that, but fifteen and five with two-minute

14  warnings.

15         COURTROOM DEPUTY:  Two-minute warnings both times?

16         MR. LYNN:  Both times.

17         MR. STABENOW:  I don't even think I need a time

18  limit.  I have certain ideas that I want to talk about, and I

19  don't think --

20         THE COURT:  Okay.  Then we'll do a five-minute

21  warning.  We'll do fifteen and five -- so I'm sorry.

22         MR. LYNN:  Fifteen and five, and a two-minute

23  warning on both ends.

24         THE COURT:  Okay.  Sounds good.  Any other issues we

25  need to take up?

1          MR. LYNN:  Not by the government, Your Honor.

2          MR. STABENOW:  No, Your Honor.

3          THE COURT:  Great.  Bring the jury in.

4          MR. LYNN:  Judge, will we get copies of the written

5    instructions, or could we use the court's copy in closing?

6          THE COURT:  Yeah, what I would prefer is use the

7    court's.  We can give you a copy.  We have the copies we're

8    going to give the jury.

9          MR. LYNN:  That would be fine.

10         THE COURT:  I'll put them here and you can get them.

11   The copy that Darin has for the jury doesn't have the verdict

12   form, although I guess they could use your copy too.  Do you

13   want a copy, or do you just want to use the court's copy?

14         MR. LYNN:  I just need to reference a copy with the

15   number.

16         THE COURT:  Okay.  Why don't I just put them here.

17         MR. LYNN:  All right.

18         MR. STABENOW:  Is it the court's intent to use the

19   Elmo to show --

20         THE COURT:  Yes, right, starring Darin Shreves.

21         (The following proceedings were had in the courtroom

22   in the presence of the jury:)

23         THE COURT:  Well, good morning.  As I mentioned last

24   night, we have concluded the evidence in this case, and we're

25   now ready for closing arguments.  Before we begin closing

1  arguments, however, I have some instructions to read you.

2       I've read you nine instructions thus far.  The nine

3  instructions I previously read, along with the instructions I'm

4  going to read now, will be provided to you in the jury room.

5  Each of you will have a copy of those instructions in the jury

6  room.  In addition, as I read the instructions this morning, my

7  law clerk, Mr. Shreves, is going to -- actually, we're going to

8  start on Instruction 10 -- is going to put them on the Elmo so

9  you can also follow in a different fashion.  So we're going to

10 start with Instruction No. 10.

11       (Instructions were read by the court.)

12       THE COURT:  And that is all of the instructions in

13 this case.  Mr. Lynn, is the government ready for closing?

14       MR. LYNN:  We are ready to proceed, Your Honor.  May

15 I utilize the court's instructions?

16       THE COURT:  Sure.

17       MR. LYNN:  Thank you.  Your Honor, may it please the

18 court.

19       THE COURT:  You may proceed.

20       MR. LYNN:  Well, good morning, ladies and gentlemen.

21 We've reached the final stage of these proceedings.  This is

22 the closing argument.  This is the last opportunity for both

23 parties to speak with you about this case before it's finally

24 given to you for your deliberation and decision.  Very shortly,

25 12 of you will be retiring to the jury room to deliberate to

1  arrive at what you determine to be the fair and just verdict in

2  this case.

3       When you go back to that jury room, you're going to

4  take back with you a number of tools or aids to assist you and

5  guide you at arriving at just verdicts.  Okay.  One of those

6  tools you're going to take back with you is the evidence in

7  this case, your collective recollection of the evidence as it

8  was presented during the course of the trial, the testimony of

9  the witnesses from the witness stand, any exhibits that were

10  admitted into evidence.

11       Secondly, you're going to take back with you the

12  instructions that the court has read to you and will provide to

13  you in written form that will instruct you as to the law to be

14  applied in this case.

15       But finally, and I think most importantly in this

16  case, you're going to take your common sense back with you,

17  that knowledge, that wisdom that you've all gained through your

18  life experiences.  It's going to help you to sift through this

19  evidence, to evaluate the credibility of the witnesses, and to

20  consider all of the evidence within the framework of the

21  instructions.  So I hope to touch upon each of these elements

22  during the course of my argument.  Okay?

23       Now, with regard to the evidence, I'm going to get

24  back to that, but let me first kind of focus on the

25  instructions because the instructions are really your roadmap

to the verdicts in this case.  Okay?  And a couple of
instructions that I particularly want to focus on are the
verdict directors, and the verdict directors tell you the
elements of the offenses that apply in this case that you've
got to find beyond a reasonable doubt in order to return
verdicts of guilty.

And those instructions are Instruction 13 and 14.
They instruct you as to the elements of arson.  And she's
already read those to you, but let me kind of review those
again.  First, the first element is that on or about May 18,
2011, the defendant maliciously damaged a classroom building
located at 1400 Windsor Street, Columbia, Missouri, on the
Stephens College campus; two, by fire; and three, at the time
of the fire, the classroom building was used in interstate
commerce or was used in an activity affecting interstate
commerce.

Now, I really don't think there's going to be much
dispute that this classroom building on Stephens College was
maliciously damaged by fire.  I think that's pretty clear from
the evidence.  This wasn't an accidental fire.  This was an
intentional fire.  I mean, you heard the undisputed testimony
of the fire examiner, Fire Marshal Sorrell.  She was called to
the scene in the early morning hours.  You recall she entered
the premises, she went down in the basement, she looked along
the ductwork and along the electrical panel.  She was able to

1  definitively determine that those were not the cause of the
2  fire.  Then she was directed up to the source of the fire.  She
3  was able to identify the source of the fire as a box sitting on
4  the ground there in the southeast corner.  You saw the
5  photographs that were taken.  They ripped off the wallboard
6  there.  She was able to look at that to see if there was some
7  other source of the fire.  There was an electrical box there.
8  She was able to examine that and determine that it was not the
9  source of the fire.  She was able to definitively tell you that
10 this wasn't an accident, there were no other ignition sources
11 there.  This was an intentionally set fire.  This was an arson
12 fire.  I don't think there's any question about that.

13         Moreover, if you look at the circumstances
14 surrounding that, this was not just an accidental fire because
15 coincidentally with this fire, we have the theft of the
16 computer equipment.  Clearly, these two acts were coincidental,
17 they occurred contemporaneously.  This was not an accidental
18 fire.

19         The other element that I don't think there's really
20 going to be any dispute about is whether the classroom building
21 was used in interstate commerce or was used in an activity
22 affecting interstate commerce.  Again, you heard the testimony
23 of Leslie Willey.  She was a director of the children's school.
24 She told you about all of the national and international
25 activities, commercial activities undertaken by the children's

1　school.  You'll recall, first of all, they operated a
2　preschool.  It was tuition-based, so that was commercial
3　activity.  They acquired their books from other companies out
4　of state, they have out-of-state recruiting efforts, they
5　travelled, they stayed in hotels, they had out-of-state
6　students that came into Stephens College and paid tuition
7　there.  I really don't think there's going to be any dispute
8　about whether that school or that building was used in
9　interstate commerce.

10　　　　　So the issue in this case, the dispute in this case
11　is whether the defendant was the one that maliciously damaged
12　that building.  And I think the evidence on that issue is
13　abundant, it's overwhelming.

14　　　　　Now, first of all, again, I talked about the
15　computer stolen there.  And I don't think there's any question
16　that that computer theft occurred contemporaneously with that
17　fire.  First of all, you had the testimony of Debbie Sorrell
18　that -- you'll recall this photograph that she was able to --
19　you're actually able to see if you look at this photograph,
20　you're actually able to see -- why don't I put it on the
21　overhead.  You're able to see the imprint where that computer
22　was sitting, and she said that was soot that was surrounding
23　that area there.

24　　　　　Additionally, you had the testimony of the IT guy,
25　Chris Herbold was his last name.  He told you that computer was

1  hooked up to the system-wide internet -- or internet connection
2  or system-wide system, I guess is the word I'm looking for.
3  But the point is the computers were monitored, and their system
4  shows that the last time that communicated with the network --
5  that's the word I'm trying to find.  The last time the computer
6  communicated with the network was when?  3:45 a.m. on May 18th,
7  2011.  Clearly that computer was taken contemporaneously with
8  that fire.

9         And where did we find that computer ultimately?
10 Well, you learned that on February 1, 2012, officers went to
11 Mr. Kelley's residence and knocked on the door, they made
12 contact with him, they identified themselves.  They said, we
13 want to search your house, Mr. Kelley says no.  He called an
14 attorney, and he said no, leave my house.  So the officers left
15 his house.  But they told him, we're going to be back; and
16 we're going to seek a search warrant, and we're going to post
17 officers here.

18        A number of hours later, they returned to the
19 residence, search warrant in hand, and where did they find that
20 computer taken, stolen from Stephens contemporaneously with
21 that fire?  Up in the defendant's attic.  The evidence is
22 pretty overwhelming on that issue.

23        Finally, we've got the defendant's former girlfriend
24 who came in and testified, Brittany Carney.  You'll recall her
25 testimony.  She told you she had a relationship with Mr.

1  Kelley.  It had terminated, apparently, at the time of this

2  fire, but the two were still communicating regularly.  She told

3  you that in or around May of 2011 she had a telephone

4  conversation with Mr. Kelley, and he told her about stealing a

5  computer from Stephens.  Now, he wasn't completely forthcoming

6  because he didn't admit intentionally starting the fire, but he

7  alluded to the fire.  Do you remember that?  He told her that I

8  may have accidentally started the fire when I pulled the

9  computer out of the wall, and the wires may have started a

10 fire; and I know that because I live across the way, and we

11 heard the sirens coming.  We know he wasn't being completely

12 candid with her.  He was being forthright about Stephens'

13 computer, but this wasn't an accidental fire.

14         How do we know that?  No. 1, we know that from the

15 testimony of the examiner; but No. 2, the fire site was

16 completely removed from where the computer was taken.

17         So now you've got to determine whether she's being

18 truthful.  During his opening statement, the defense counsel

19 said that he would present evidence that she was a woman

20 scorned and she changed her story.  I heard not one word of

21 evidence about that, not one scintilla of evidence that she had

22 any motivation to lie, that she had any motivation to come in

23 here, fly across the country from Oregon and commit perjury in

24 federal court.  No reason whatsoever for her to lie.  She was

25 being truthful.  The defendant took that computer, the

1  defendant started that fire.

2          So let's turn next to the Ellis Library fires.  The

3  instruction related to that is Instruction No. 14, and it

4  parallels the instruction I just read to you, but relates

5  obviously to the Ellis Library fire.  One, on or about

6  September 10th of 2011, the defendant maliciously damaged the

7  Ellis Library building at the University of Missouri in

8  Columbia, Missouri; two, by fire; and, three, at the time of

9  the fire, the Ellis Library was used in interstate commerce or

10  was used in an activity affecting interstate commerce.

11          And as in the Stephens case, I don't think there's

12  going to be any question but that the Ellis Library was

13  maliciously damaged by fire.  I think that's pretty clear.

14  This wasn't an accident.

15          First of all, let's just look at -- first of all,

16  we've got the testimony again of the fire examiner.  Debbie

17  Sorrell came in, and she told you that she examined the scene,

18  she found seven different fire sites, and that she was able to

19  eliminate any accidental ignition sources and, thus, determined

20  that these were intentionally set fires, they were arson fires.

21  But honestly, we really didn't need her to tell us that.  We've

22  got seven different fires occurring at the same time.  I mean,

23  obviously these were set fires.

24          Additionally, circumstantial evidence showing these

25  were set fires is that contemporaneously, coincidentally with

1  these fires we had numerous property damage that occurred

2  there.  I mean, this was just a malicious act of property

3  damage.  You had the computers broken, the cameras broken.

4  This was just an act of destruction.

5          So the other element relating to interstate

6  commerce, I don't think we're going to have a whole lot of

7  disputes about that.  I don't think there will be much

8  disagreement about that.  Ellis Library -- first of all, we're

9  talking about an internationally known and connected

10 university -- does business with universities all across the

11 world.  You've heard about the interlibrary loan program where

12 they exchange materials.  This is a commercial activity because

13 this is a fee-based kind of activity, program.  We've got

14 students who attend Mizzou who pay tuition, and I know.  I've

15 got a student at Mizzou, so I know they charge tuition.  So

16 unquestionably this building was used in interstate commerce.

17         So again we get back to the issue of who did it, who

18 is responsible for this.  And, again, the evidence is

19 overwhelming, the evidence is abundant that it's the defendant.

20         So let's look at the evidence in that regard.  And I

21 think the video evidence is powerful evidence in this case.

22 Now --

23         COURTROOM DEPUTY:  Mr. Lynn, two minutes.

24         MR. LYNN:  All right.  Now, admittedly, the whole

25 area there wasn't covered by surveillance cameras, but those

1  areas right around, right around where the fires took place,

2  copy services, access services, it was heavily covered with

3  cameras.  Cameras 5 and 6, the north desk, the north exit

4  cameras.  You couldn't get in or out of there without being

5  captured by the cameras.

6          And Julie Rogers, this was her purview.  I mean, she

7  spent weeks and weeks of her -- she spent weeks, she said two

8  weeks, I believe she said, reviewing that video, scouring that

9  video.  She looked at that video every second of every minute

10 of every hour to try to identify who was on the video, and she

11 came up with one person, one subject on the video, and that's

12 the defendant, Mr. Kelley.

13         Now, the defendant suggests during his

14 cross-examination that he may try to suggest during his

15 argument that there must have been some sort of blind spot

16 there, some blind spot where some unknown phantom ghost would

17 be able to slip in there, start those fires, slip away without

18 ever being captured on video.  But Julie Rogers -- again, this

19 is her bailiwick, she works this every day.  She told you

20 there's no way that could happen, there's just no way that

21 could happen.  If they got in, they couldn't get out without

22 being captured on video.  So clearly the defendant was the only

23 one captured on video.  He's the one responsible.  I think that

24 the -- and how much time do I have?

25         COURTROOM DEPUTY:  You have a minute.

1          MR. LYNN:  A minute?  Okay.  The camera recording

2   the video damage I think is particularly revealing in this

3   case.  You recall that -- you recall at 3:07 a.m., the

4   defendant is observed there in the circulation area.  He's

5   wielding that metal pole.  He then proceeds behind the

6   circulation desk back toward the access services, the scene of

7   a number of these fires and a number of these incidents of

8   property damage.  And then five minutes later what happens to

9   those cameras?  He whacks them.  First camera 6 goes, and then

10  a second later camera 5 goes.  Five minutes, ample opportunity,

11  ample time to wander around back there and cause mayhem and

12  havoc and start fires and cause property damage and then try to

13  destroy those cameras to cover it up.  But fortunately, we've

14  got the video evidence, we've got the video evidence which

15  points to one person and one person only, and that's this

16  defendant.

17          I'm about to wrap up, I don't want to get into

18  something else.  I'm going to have a little more time to talk

19  with you, so I'm going to wrap it up for now, and I thank you,

20  and I'll be back.

21          THE COURT:  Mr. Stabenow?

22          MR. STABENOW:  Well, ladies and gentlemen, by now

23  it's probably pretty clear to you why during voir dire I asked

24  questions about would you understand if somebody did some

25  things that, you know, like stealing or breaking into a

building, would you still be able to look at that with a
neutral eye as to the charged offense, which is arson.  It is
undoubtedly clear to you at this point that Mr. Kelley broke
into buildings and that he stole stuff, that he had a pole,
right, and he was doing stuff with the pole.  That's clear.
It's in the evidence.

　　　　　But let's talk about what isn't in the evidence, or
some parts of the evidence that we need to get a little
perspective on.

　　　　　First, with all due respect to Mr. Lynn, we heard
with Ellis Library that Ellis Library, the building, engages in
interstate or foreign commerce.  We heard that Ellis Library,
within the building, they send books to other states, they get
books from other countries, people pay fees for that sort of
transaction.  So that is interstate or foreign commerce.

　　　　　But we didn't hear that as to the Audrey Webb
building.  What we heard is that Stephens College, the whole of
Stephens College has students from out of state and that they
recruit around the country.

　　　　　The stuff that we heard about the Audrey Webb
building is that they have glue and paper and pens that are
bought from out of state; and quite honestly, by that
definition, my children are engaged in interstate or foreign
commerce sitting in their playroom at home.  There has to be
something a little bit more to the idea of interstate or

1    foreign commerce than that an empty lab room at 3:45 or 4:00 in

2    the morning sitting there has some paper and pens in it that

3    were bought from out of state.  And what we heard about Audrey

4    Webb was much more generalized, that Stephens College does

5    those things, not that that Audrey Webb facility is affecting

6    interstate commerce.

7           We heard testimony from Fire Investigator Sorrell --

8    or Sorrell, I'm never quite sure how to say that -- about soot.

9    Well, she is an expert in terms of evaluating a fire, right?

10   Looking at the fire and evaluating it.  But I'll tell you that

11   one of the things Mr. Lynn told you not to forget is your

12   common sense, and common sense tells you that one part of her

13   testimony just doesn't make sense.

14          Let's look at that computer desk.  Now, Investigator

15   Coleman was the person responsible for investigating the

16   missing computer, and he referred to this stuff on the desk as

17   dust.  And he said that they could tell something had been

18   taken, and they investigated it.  Sorrell on her own came up

19   with this idea -- she admitted she didn't put it in her

20   report -- that this was black soot that showed that the

21   computer was taken after the fire had started.

22          I want you to look at the picture.  Ladies and

23   gentlemen, the darker spot is where the computer was.  It's not

24   surrounded by darker soot, it is a lighter color other than

25   where the computer was, and that's consistent with dust.  It's

also consistent with our common sense. Who would break into a building, set a fire, wait for the building to be burning, and then steal something? If somebody was going to start a fire, he would steal something and then start the fire. It doesn't compute.

But if you believe her testimony, then the government can't have it both ways. If you believe her testimony, then her testimony invalidates the government theory that Chris is the person who set the fires at Ellis Library. Because what she said about this soot is it wouldn't take more than just like a minute of a fire burning to get this level of soot down where you can then see an imprint and it would put this stuff on everything in the room. Well, if that's the case, then how is it that Chris could have moved around Ellis Library setting seven fires that were bigger than this one and have nothing on his clothing? And we don't see anything on his clothing in the videos. And they took his clothing the next day into evidence, and there wasn't any evidence of any soot or any fire debris on his clothing. You can't have it both ways, it's one or the other. Well, common sense tells us that that part of her testimony just doesn't make sense.

But let's -- while we're still on the issue of Investigator Sorrell, let's talk about one of the other things she said. She said that this fire, that the fires here in copy area 115 were loose paper. She said, well, there's lots of

1  oxygen in between, they burn quickly.  Well, the government's

2  theory has Mr. Kelley leaving the library at 3:24, and the

3  government's evidence has also a fire flaring up in the copy

4  services room around 3:40 to 3:45, so some twenty minutes

5  later.  And Fire Investigator Sorrell said it would only take a

6  matter of minutes for a paper fire with all of that loose

7  oxygen to flare up and burn up.

8            So we heard evidence that Chris is walking around

9  back in his apartment about 3:30.  We heard evidence from the

10 government he's out of the library at 3:24.  That means

11 somebody else is in copy services 20 minutes later setting a

12 fire, or at least there is a reasonable possibility that

13 somebody else was doing that.

14            Mr. Lynn said a minute ago that Ms. Rogers said it

15 would have been physically impossible for anybody to go in or

16 out of the circulation area without being on surveillance; and

17 that is what she said at first, until confronted with physical

18 evidence of photographs and maps, at which point she said,

19 well, yeah, it is possible, I just conclude it didn't happen.

20            But if we look at this evidence, if we look at this

21 area, we have the stairway here -- can you set it so I can --

22 it's not doing it again.

23            COURTROOM DEPUTY:  Reset it?

24            MR. STABENOW:  Yes, please.  I'll point out here,

25 what we have is -- I guess I have to wait for it to reset now.

1          While we're waiting on that, you heard evidence that
2   Mr. Kelley's the one who requested surveillance of the areas
3   around the building, he requested testing of the feces up on
4   the fourth floor, he requested DNA testing.  Why would he do
5   that unless it was to clear himself, unless he also believes
6   that there was another person who set the fires?  We heard
7   evidence that there was a broken handle, wooden handle
8   consistent with an umbrella, and fragments.  We heard that no
9   personnel from the library said that it belonged to them, and
10  we saw on the photos and video that it didn't belong to Chris.
11  So how did it get there and where did it come from and who did
12  it belong to?

13         Now, we heard that a metal pole was used to damage
14  all of the computer equipment and stuff back there.  I would
15  submit to you that the end of an umbrella is also the sort of
16  object that could damage those things in that way, and we
17  didn't see what happened to the rest of the umbrella.  Where is
18  the rest of the umbrella?  It wasn't collected.  Nobody found
19  it.  So somehow we ended up with a broken umbrella handle
20  underneath one of the broken cameras and not the remainder of
21  the umbrella.

22         We have an issue with the videos in that we don't
23  have the rest of the videos, and we didn't hear where any of
24  the other video cameras are.  So when we look at this area that
25  Investigator Rogers -- or sorry, Security Officer Rogers said

nobody could physically get in or out, we have this whole --
all right.  We have this whole area with the staircase here
with the elevator lobby, we have this whole corridor here that
she said was not under surveillance, this whole corridor here
which goes off the bottom of the map which was not under
surveillance, we have two doors that go back into the work area
and the interlibrary loan and go back into reserve and
circulation, none of which were under surveillance.  And if we
take a look at the pictures of this area and how wide the
hallway is, literally that is a hallway you could drive a truck
down.  It is a wide, large hallway, and none of that was under
surveillance.

When we look at the opposite side of the hall,
Security Officer Rogers said, well, camera 16 could see the
staircase, so we would be able to tell if anybody came in.  All
it saw was part of the staircase; but if you look at the map,
look, there's two arches and two set of doors.  So if somebody
was coming down the stairs from upstairs, they would go right
out these doors and they would not be seen.  And if we look at
the photo that we offered, you'll see the same thing.  There's
the arch here with one set of doors, there's the arch there
with the other set of doors, not under surveillance.  So on
both sides of the hall, there are fields that a person could
walk right through massive areas, they would be under no
surveillance.

1           We totally understand -- it's totally understandable

2  why the government fixated on Chris Kelley as their primary

3  suspect.  He's on the video, all right?  He's in pictures.  Why

4  wouldn't you -- the police would not be doing their job if they

5  didn't focus on him as their primary suspect.  The problem is

6  they stopped looking.  They stopped considering other evidence.

7  They didn't look -- they didn't keep the remainder of the

8  video.  They didn't look at outside surveillance, they didn't

9  consider these options.  Security Officer Rogers, who is the

10 one who decided what we should see in terms of what videos she

11 wasn't going to keep, said, well, it's physically impossible,

12 so I'm not going to keep stuff, and I'm just showing you what

13 was physically possible in a number of ways.

14          Where is Chris's motive to burn down the library?

15 We heard he loves books, we heard he loves libraries.  Ladies

16 and gentlemen, we offered, Chris offered evidence to you that

17 he breaks into buildings and wanders around.  I'm not going to

18 tell you that's a good thing, it absolutely isn't.  It's

19 totally illegal, as Mr. Lynn pointed out, but it doesn't mean

20 he committed the arson.  He put his character at issue to show

21 you, people know his character flaws, his family and friends

22 know his character flaws.  Fire isn't one of them.

23          Now, we saw some notes, and they're going to be back

24 in your, in the evidence for you to look at.  We saw his

25 handwriting from the police station, we saw handwriting on the

1  note that was two feet away from one of the fires.  All right.
2  It's the same handwriting because Chris wrote the note.  But
3  let me ask you.  Common sense, why would you write a note?  All
4  right?  If you write a note, you write it for somebody to read.
5  Why would you write a note and put the note down and then set a
6  fire right next to it that's going to burn the note up so that
7  nobody sees it?  It doesn't make sense.  It's more consistent
8  with somebody going in, wandering around, and they leave a
9  note, they think they're being a smart aleck, all right?  They
10 leave a note, and somebody else comes in and sets the fire.
11 All right.  That makes sense, that computes.

12           As you look at the evidence, it's totally
13 understandable why they looked at Chris as the primary suspect.
14 But reasonable doubt doesn't say, I think he probably did it;
15 and that's why during voir dire I asked you specifically, are
16 you going to be able -- if you sit here and listen to evidence
17 and look at the evidence and say, I think he probably did it,
18 but there are some -- not just like little tiny minor things,
19 there are some actual issues that should have been looked into.
20 All right?  Do I have the integrity and the fortitude to be
21 able to say, I think he probably did it, but I can't say it's
22 beyond a reasonable doubt.

23           Now, when you look at the instruction, it talks
24 about something that would make a person hesitate to act in
25 their normal life.  And I will tell you there's a sliding scale

1  of how that works.  If I say to my wife, how many calories are

2  in that brownie, and she says, well, it might be 200 or it

3  might be 300, the amount that that affects me hesitating to act

4  is different than if somebody hands me something and says, put

5  it up to your head and pull the trigger.  And I say, is there a

6  round in the chamber?  Well, maybe yes, maybe no.  I'm a lot

7  more hesitant in the second because it's a more severe

8  consequence, it's a bigger event.

9          This is a hugely important decision you're making.

10  So when you see these open hallways, these areas that were not

11  under access, these areas that weren't covered; and then the

12  inconsistencies, like the fact that there's a note right next

13  to a fire, why would somebody do that?  And Investigator

14  Sorrell's own testimony that within just like a minute of

15  starting a fire you would have soot that would get on stuff,

16  and yet we heard there was no evidence from our trace evidence

17  expert, no evidence of any soot on any of Chris Kelley's

18  clothing, no evidence of fire, flammable stuff, soot, anything,

19  then what we have is a reasonable doubt.  All right?

20          And so even though you might say, yes, the

21  government was right to fix on him as the primary suspect, even

22  though you might personally say, I think he probably did it, we

23  would put it to you that you can't say that beyond a reasonable

24  doubt in the face of this evidence.

25          Just a moment.  Nothing further, Your Honor.  Thank

1  you.

2         THE COURT:  Mr. Lynn?

3         MR. LYNN:  Thank you, Your Honor.  Well, I'm going

4  to come back to some of Mr. Stabenow's arguments, but I first

5  want to talk with you about the significance of the timeline as

6  it relates to the water flow alarm that was activated at 3:24.

7  You'll recall the evidence from Philip Thunhorst, he was the

8  fire protection --

9         MR. STABENOW:  Objection, Your Honor.  May I

10 approach?

11        THE COURT:  Sure.

12        (Counsel approached the bench and the following

13 proceedings were had:)

14        MR. STABENOW:  I think that's beyond the scope of

15 what I brought up.  I don't think it's appropriate rebuttal.

16 It's just additional argument on other topics that neither

17 party has discussed thus far.

18        THE COURT:  I think by arguing reasonable doubt,

19 it's broad enough that he can bring that up now.

20        (The following proceedings were had in open court:)

21        MR. LYNN:  As I indicated, you heard the testimony

22 of Philip Thunhorst, the fire protection technician who worked

23 for the University of Missouri.  He was in charge of that fire

24 panel at Ellis Library.  That panel showed that there was a

25 water flow alarm that was activated at 3:24, and he told you

what was required to initiate the activation of that alarm. He
told you, first of all, you had to have a fire, you had to have
a fire in that room, that fire had to heat up significantly
enough to cause that sprinkler head to heat up to, what was it,
160 degrees. And he told you that it would take some time for
a fire in a room of those dimensions to reach the proportions
that it would cause the fuse in that sprinkler head to melt.
You have to start the fire, and it would take some time for
that fire to build up, cause enough heat in that sprinkler
head, melt that fuse, and then initiate that water flow. But
even then that alarm wouldn't activate because it would take
30 -- 40 to 50 seconds of water flow before that alarm
indicated. So we had a fire that was actively going in that
circulation area there, back in the access area, before that
alarm activated. What time was that? 3:24.

        Now, what do we see on the video surveillance at
3:24? We see the defendant, we see the defendant quickly
walking toward those north doors. He walks to the doors.
They're obviously locked. He retreats, and then we see him
head out toward the west there toward copy services where he
made his way out, and he lit those last two fires there.

        Now, it would take awhile for those two fires to
actually initiate and gain substance and become fully involved.
So that, that explains why when Chris Brayer arrived -- and he
arrived fairly quickly. While he arrived, he entered, and he

1  was focused on the major source of the fire, which was back

2  there towards the east, or access services, toward the

3  interlibrary loan area.  That was where the fires were

4  initially started, that's where the smoke was.  These other

5  fires had only started going.  And it wasn't -- there's no

6  evidence that there was a 20 to 30-minute lag before officers'

7  attention was drawn to the fires.  No evidence that it took

8  that long.  Clearly those were the last two fires started.

9  That's why they were the last to be observed and noticed by

10 officers.

11        Now, Mr. Stabenow points out that the defendant had

12 no soot on his clothing.  Well, the fact of the matter is he

13 didn't stick around long enough to allow soot to accumulate on

14 his clothing.  He was a busy, busy guy that night.  He had a

15 lot to do, a lot of property damage to commit, and a lot of

16 fires to start.  He didn't stand around waiting for the fires

17 to become fully involved so he would be covered in soot.  We've

18 all started fires, and we don't get soot on us if we don't

19 stand around a fire.  So it's no wonder that the forensic

20 examiner didn't find soot on the clothing.

21        But what did the forensic examiner find on the

22 clothing?  What did the fire examiner find on the clothing?  He

23 found glass fragments.  He found glass from two different

24 sources, and he told you he was able to characterize those

25 sources as being windows.  And what did we see when they

examined the scene?  We saw two windows that were damaged.  The
window up on the fourth floor you'll recall was knocked out.
We saw the damage to this window.

Now, Mr. Stabenow brings up the possibility of some
umbrella.  That is grasping at straws.  We heard nothing
about -- we heard there were fragments there, but look at this
damage in 101A, look at that circular damage.  What was the
defendant wielding when he was captured on that video
surveillance camera at 3:07?  That big pipe.  Look at that
damage there.  Does that look like an umbrella caused that
damage, or does that look like a big pipe caused that damage?
A big pipe was used to strike that window, not an umbrella.

Now, then, Stephens College, out of state.  Well,
again, the testimony by Ms. Willey was that students utilized
that children's center.  Children used the school, but this was
a lab for Stephens students to utilize, and education students
from Stephens College used that building.  This was a student
classroom.  Stephens College students used that classroom and
those computers.  They came into Missouri, they paid tuition.
That building, that program acquired its materials from out of
state.  Unquestionably, that building was used in interstate
commerce or was used in activities affecting interstate
commerce.

Now, my time is running out, ladies and gentlemen.

THE COURT:  Mr. Lynn, your time is up.

1          MR. LYNN:  Out of time?

2          THE COURT:  Yes.

3          MR. LYNN:  Thank you.

4          THE COURT:  Well, that concludes the arguments in

5    this case.  As one of the attorneys made reference, there are

6    only 12 jurors who actually deliberate, and so one of you is

7    the alternate; and Ms. White, you are the alternate.  And so

8    I'm going to ask that the other jurors -- let me ask you first,

9    Ms. White, do you have any personal belongings in the jury

10   room?

11         JUROR:  I do.  My purse is in there.

12         THE COURT:  I'm going to ask that Ms. McIlvain take

13   the 12 jurors back.  And if possible, if you could get her

14   purse, that would be great.  If not, I need to have a quick

15   conversation with you; and after that, then Ms. McIlvain can

16   take you back to the jury room to get your purse.

17         Ms. McIlvain, if you could take the 12 jurors back

18   to the jury room, we will be in recess until we have a verdict.

19         (The jury retired to deliberate at 9:56 a.m.)

20         THE COURT:  Ms. White, how this works is you'll

21   remain an alternate during the deliberations.  In the event

22   that one of the jurors becomes ill or incapacitated in some

23   way, then we will ask you to join the deliberations.

24         JUROR:  Okay.

25         THE COURT:  I'm going to make sure that Ms. McIlvain

1  has your telephone number so she can call you when, No. 1, we

2  need you, or when the deliberations have concluded so you know

3  when your responsibilities have ended.

4            JUROR:  But I am able to leave now?

5            THE COURT:  Yes.  Yes.  You are able to leave.  I,

6  however, want to remind you that the instruction that you are

7  not to discuss this case with anyone else, including your

8  family and friends, still remains.  Do not e-mail, text

9  message, blog, engage in any other form of written, oral, or

10 electronic communication.  As I instructed you before, don't

11 read any media account of it, don't conduct any research, don't

12 consult with any other sources or people involved in the case

13 or the subject matter, and continue to keep your mind open and

14 free of outside information so that in the event you are called

15 back to deliberate with the jurors that you'll be able to

16 decide the case fairly and based solely on the evidence and my

17 instructions on the law.

18           JUROR:  Okay.  Okay.

19           THE COURT:  With that, I sincerely appreciate your

20 participation in this.  I can't tell you how many times we

21 actually do need to use the alternate, and may still need to in

22 this case.  So your time the past few days has not been wasted

23 in any way.  And, again, we may still need your services.  So

24 if you could hang tight for a few minutes until Ms. McIlvain

25 comes back, she'll either have your purse or take you back to

1  the jury room so you can get it.  Thank you.

2           JUROR:  Thank you.

3           THE COURT:  Here is Ms. McIlvain.

4           (Alternate juror left the courtroom.)

5           THE COURT:  Do the parties have the evidence

6  collected and ready to send back to the jury?

7           MR. STABENOW:  Yes, Your Honor.

8           MR. LYNN:  We are in the process of collating and

9  arranging, yes, everything.

10          THE COURT:  Any other issues that need to be taken

11 up?

12          MR. STABENOW:  No, Your Honor.

13          MR. LYNN:  No, Your Honor.

14          THE COURT:  Well, then, if you could continue to get

15 the evidence collected, and we'll wait for any questions.  I do

16 want to comment on, I appreciate the manner in which both

17 parties have presented the evidence.  I think that the evidence

18 was presented in a very, very efficient but effective fashion.

19 I appreciate how the attorneys have cooperated with one

20 another, while also maintaining inconsistent positions.  And so

21 I thank the parties and everyone who has been sitting in the

22 courtroom.

23          Unfortunately, I know that this is a very emotional

24 case, and sometimes people let emotions get the better of them.

25 So I appreciate how everyone has conducted themselves in a very

 1  professional fashion this week.

 2          (A recess was taken from 10 a.m. to 10:45 a.m.)

 3          THE COURT:  Kelly told you we have a note requesting

 4  not all of the evidence, but videos, pictures, and notes -- two

 5  handwriting is what it says.  So it looks as though in my

 6  review of it they want everything other than the evidence that

 7  was collected, the computer and the monitors and things of that

 8  sort.  They don't want the clothes, they don't want the

 9  diagrams of the library or the fire panel report or the --

10  yeah, handwritten note.  So have you got all of that together?

11          MR. LYNN:  We do.

12          THE COURT:  Okay.  Kelly, why don't you go ahead and

13  take that back.  Anything else?

14          MR. STABENOW:  No, ma'am.

15          MR. LYNN:  No.

16          THE COURT:  Okay.

17          (A recess was taken from 10:46 a.m. to 12:08 p.m.)

18          THE COURT:  Well, I understand that we have a

19  verdict in this case.  And before we call the jury in, I just

20  want to, I guess, address the issue that whatever the verdict

21  is, it's going to potentially evoke an emotional response from

22  individuals.  And I want to warn everyone that regardless of

23  the verdict, it is not appropriate to have any type of response

24  to the verdict.  Everyone, again, has acted appropriately

25  throughout this entire trial.  I don't doubt that will continue

1  to be the case; but again, I want to warn people, if they don't

2  feel as though they'll be able to refrain from having an

3  emotional response, I would just ask that you step out from the

4  courtroom for the reading of the verdict.

5          With that, will you get the jury?

6          (The following proceedings were had in the courtroom

7  in the presence of the jury:)

8          THE COURT:  It's my understanding that the jury has

9  arrived at a verdict.  Who is the foreperson?  And I'm sorry, I

10 don't have my seating chart in front of me.  What is your name?

11         FOREPERSON:  I'm sorry?

12         COURTROOM DEPUTY:  Your name.

13         FOREPERSON:  Rodger Cobb.

14         THE COURT:  Mr. Cobb, has the jury arrived at a

15 verdict?

16         FOREPERSON:  Yes, we have, Your Honor.

17         THE COURT:  I would ask that you provide the verdict

18 form to Ms. McIlvain, the CRD.

19         (So done.)

20         THE COURT:  Well, the verdict form appears to be in

21 order, and so I will read the verdict at this point.

22         On Count One, we, the jury, find the defendant,

23 Christopher Curtis Kelley, guilty of the crime of arson as

24 charged in Count One.

25         Count Two, we, the jury, find the defendant,

1   Christopher Curtis Kelley, guilty of the crime of arson as

2   charged in Count Two.

3           The Indictment is signed by the jury foreperson,

4   Rodger C. Cobb, and dated 4/24/2013.

5           Would either of the attorneys like to have the jury

6   polled?

7           MR. STABENOW:  Yes, Your Honor.

8           THE COURT:  What I mean by polling the jury is that

9   I'm going to ask each of you whether or not the verdict that I

10  just read is your individual verdict.  And so I'm going to go,

11  starting in the front row with the first person to my left, and

12  ask you.

13          (The jury was polled by the court.)

14          THE COURT:  Well, it appears as though this is a

15  unanimous verdict.  It will be accepted by the court.  Is there

16  any other issue that needs to be taken up with the jury

17  present?

18          MR. STABENOW:  Your Honor, the only thing is it's

19  customary in every case that I always ask if there are any

20  jurors who would be willing to stay after, not that I would ask

21  them about the specifics of this case, but if they would be

22  willing to give me feedback on things, good or bad, that I

23  could use to improve in the future, I always welcome that, if

24  anybody would be willing.

25          THE COURT:  Okay.  Anything on the part of the

1 government?

2        MR. LYNN:  No, Your Honor, thank you.

3        THE COURT:  Well, I thank you very much for your

4 service.  I know that it is a sacrifice, but it is a very

5 important sacrifice, so I appreciate that.

6        What I'm going to ask that you do is return to the

7 jury room.  We do have a questionnaire that we'd like for you

8 to fill out for future juries to make sure that we're doing

9 everything we can to make your service as a juror as painless

10 as possible.  So if you would retire to the jury room, I will

11 then come back and talk with you, and you can share with me

12 whether or not you want to talk with either of the attorneys

13 after we've concluded.

14        So Kelly, if you could take them back to the jury

15 room.

16        (The following proceedings were had in the courtroom

17 out of the presence of the jury:)

18        THE COURT:  We do obviously need to address the

19 issue of detention.  Mr. Lynn, what is the government's

20 position with respect to detention?

21        MR. LYNN:  Your Honor, Mr. Kelley has now been

22 adjudged guilty by a jury.  We would recommend that he be

23 remanded into custody.

24        MR. STABENOW:  Your Honor, we would note that he's

25 been under supervision for over a year without any issues

1  whatsoever.  He is on electronic monitoring, and we believe

2  those are conditions that are sufficient to guarantee his

3  presence at sentencing.  And obviously, he has family support

4  in the area; and given his lack of any problems so far, we

5  would recommend that you continue him on release pending

6  sentencing.

7          THE COURT:  I recognize that the defendant has not

8  had any issues on supervision and has not presented any type of

9  problems on supervision.

10          I also recognize, however, No. 1, he is now

11  convicted of a crime and is looking at a significant potential

12  range of punishment.  I also believe that under federal law,

13  this would be considered a crime of violence; and so I think

14  that there's at least an argument that federal law requires

15  that he be taken into custody.

16          And so for both of those reasons, I am going to

17  remand the defendant into the custody of the United States

18  Marshal.  I am going to also order the Office of Probation and

19  Parole to complete a presentence investigation.  At this time I

20  would typically set the sentencing date.  I want everyone to

21  know when the next stage in this proceeding is going to occur.

22  Unfortunately, in order to do that, I need Ms. McIlvain here,

23  and she's not here.  So I assure you that I will in very short

24  order set sentencing in this case and obviously let both of the

25  parties know when the sentencing is set.

1    With that, is there anything further from the
2  government?

3    MR. LYNN:  Your Honor, I would request leave to
4  withdraw exhibits and maintain custody and possession of our
5  exhibits.

6    THE COURT:  Please do.

7    MR. STABENOW:  That's what I was going to request,
8  as well.

9    THE COURT:  Anything further?

10    MR. STABENOW:  No, Your Honor.

11    THE COURT:  I will see you at sentencing.

12    (Hearing adjourned.)

13                    - - -

14                    - - -

15                **CERTIFICATE**

16    I certify that the foregoing is a correct transcript
17  from the record of proceedings in the above-entitled matter.

18

19

20  July 9, 2013

21                    /s/_____
                      Kathleen M. Wirt, RDR, CRR
22                    U.S. Court Reporter

23

24

25