1

2              IN THE UNITED STATES DISTRICT COURT FOR THE
                    WESTERN DISTRICT OF MISSOURI
3                        CENTRAL DIVISION

4
UNITED STATES OF AMERICA,      ) Case No. 12-04043-01-CR-C-BP
5                              )
            Plaintiff,         ) Jefferson City, Missouri
6                              ) December 10, 2012
v.                             )
7                              )
CHRISTOPHER CURTIS KELLEY,     )
8                              )
            Defendant.         )
9  _____)

10
            TRANSCRIPT OF HEARING ON ATTORNEY REPRESENTATION
11            BEFORE THE HONORABLE MATT J. WHITWORTH
                  UNITED STATES MAGISTRATE JUDGE
12
APPEARANCES:
13
For the Plaintiff:          Jim Y. Lynn, Jr., Esq.
14                          AUSA
                            80 Lafayette St., Ste. 2100
15                          Jefferson City, MO 65101
                            (573) 634-8214
16
For the Defendant:          Troy K. Stabenow, Esq.
17                          Federal Public Defender's Office
                            221 Bolivar St., Ste. 104
18                          Jefferson City, MO  65102
                            (573) 636-8747
19
Court Audio Operator:       Ms. Jackie Price
20
Transcribed by:             Rapid Transcript
21                          Lissa C. Whittaker
                            1001 West 65th Street
22                          Kansas City, MO  64113
                            (816) 914-3613

23

24
Proceedings recorded by electronic sound recording, transcript
25 produced by transcription service.

1          (Court in Session at 11:00 a.m.)

2          THE COURT:  Good morning.  We're here in the case of

3  *United States of America vs. Christopher Curtis Kelley*, Case No.

4  12-4043.  Appearing on behalf of the United States is Assistant

5  U.S. Attorney Jim Lynn.  And on behalf of Mr. Kelley is Troy

6  Stabenow.  I asked Jackie to set up this conference based upon

7  some concerns that have been conveyed to me about Mr. Stabenow

8  and his representation of Mr. Kelley.  Mr. Lynn, I am likely

9  going to be inquiring into attorney-client matters, so you'll

10  have to step out.  But I would like to know what the Government's

11  position is with respect to the withdrawal of Mr. Stabenow as

12  counsel of record and whether or not the Government is prepared

13  to go to trial in January?

14          MR. LYNN:  Your Honor, with respect to the counsel

15  issue, obviously we are not privy to the behind-the-scenes

16  discussions and events that occur there.  So generally, my policy

17  would be to defer to the Court after you've had a full hearing on

18  this matter as to whether there exists a conflict sufficient to

19  disqualify Mr. Stabenow.  As to the January trial date, we are

20  certainly ready to proceed to trial in January.

21          THE COURT:  All right.  All right.  And in this case was

22  indicted on June 27th, is that -- yeah, that's correct.  And then

23  -- all right, June 27th.  So, it's about six months old.

24          MR. LYNN:  Correct.

25          THE COURT:  All right.  Okay.  Thank you very much for

1  your time.

2          MR. LYNN:  Certainly.

3          THE COURT:  If we need to -- anything additional from

4  you, we'll call downstairs.  You can go on back down to your

5  office if you'd like.

6          MR. LYNN:  Very well.  Thank you.

7          THE COURT:  All right.

8              (Government Attorney Exits Courtroom)

9          THE COURT:  Okay.  I would note for the record the case

10  is set for trial on January 7th, 2013.  Who was case transferred

11  to, do you know?  Was it Beth Phillips or Judge Wimes?

12          MS. PRICE:  (Inaudible).

13          THE COURT:  All right.  It was assigned to Judge

14  Laughrey, but she's retired.

15          MS. PRICE:  Judge Phillips.

16          THE COURT:  Judge Phillips?  Okay.  The new District

17  Judge for the record is Judge Beth Phillips.  And I thought it

18  was important that we have this discussion this morning, Mr.

19  Kelley, to find out, you know, what the concerns were.  The only

20  thing I know in any detail is that apparently you want to get a

21  new attorney assigned to the case.  And for me to do that, I

22  first need to find out what the issues are.  But I should also

23  advise you up front that the case law is pretty clear that

24  certainly you don't have the right when you have appointed

25  counsel to have your choice of attorneys.  I mean the court

1  assigns one to you.  I assigned Mr. Stabenow to represent you in

2  this case because, first of all, he's an excellent lawyer who

3  probably has more federal criminal defense experience than

4  anybody in the Central Division, because he's in here every day

5  on different cases.  He's tried a lot of cases.  He knows what

6  he's doing.  And from what I can tell from looking at the docket

7  report so far, he's done what I would consider a competent

8  attorney would do under the circumstances in this case.  We've

9  had some evaluations done to kind of flesh out those issues.  And

10 of course, you came back that you were fine to proceed.  And so I

11 need to know what your concerns are.  And, Mr. Stabenow, do you

12 want to talk first on this point or do you want --

13         MR. STABENOW:  No, Your Honor.  My only concern is

14 insofar as Mr. Kelley might raise certain issues, whether that --

15 whether his intent is to waive the attorney-client privilege.

16 And normally, even if my client makes accusations, I don't

17 consider it waived unless the Court has a particular interest in

18 stuff --

19         THE COURT:  Right.

20         MR. STABENOW:  -- because I trust the Court knows my

21 work history.

22         THE COURT:  Right.

23         MR. STABENOW:  But I did bring some materials in case

24 there's something raised --

25         THE COURT:  Okay.

1    MR. STABENOW:  -- that would require a waiver and a

2  response.

3    THE COURT:  All right.  Mr. Kelley, certainly I'm not

4  one to freely inquire into the attorney-client communications.

5  Those are confidential matters.  And you understand that by

6  sharing discussions you may have had with Mr. Stabenow, you're in

7  effect waiving that as to at least this hearing.  There are

8  people sitting in the back of the courtroom, I don't know who

9  they are.  And are they family members?

10    MR. KELLEY:  Yes.

11    THE COURT:  Okay.

12    MR. KELLEY:  And my girlfriend.

13    THE COURT:  Do you have any objection if they're

14  present?

15    MR. KELLEY:  No, not at all.

16    THE COURT:  Okay.  Jennifer is here from the Public

17  Defender's Office, so she's certainly not -- she wouldn't be

18  excluded from this type of a hearing as an employee of that

19  office.  So, why don't you go ahead and tell me what's bothering

20  you.

21    MR. KELLEY:  Okay.  And I'm a little nervous.

22    THE COURT:  That's okay.

23    MR. KELLEY:  So, it might take me a minute.

24    THE COURT:  Just make sure you speak into the -- pull

25  the microphone up close --

1          MR. KELLEY:  Okay.

2          THE COURT:  -- so that we can --

3          MR. KELLEY:  Yes.

4          THE COURT:  -- record everything accurately.

5          MR. KELLEY:  Okay.  I've made a copy of these documents

6    for you as well.

7          THE COURT:  Okay.  Have you shown them to Mr. Stabenow?

8          MR. KELLEY:  Not yet, but I have made a copy for him as

9    well.

10         THE COURT:  All right.  Why don't you show those to him

11   first.

12         MR. KELLEY:  All right.

13         THE COURT:  And describe generally what those documents

14   are.

15         MR. KELLEY:  Generally, it's a distillation of trouble

16   that I've had communicating with Mr. Stabenow and other issues.

17   And how would I put it?  There are a lot of inconsistencies

18   between what Mr. Stabenow has said that he would do versus what

19   -- I mean, the difference between what's happened from what he

20   said he would do, to what has been done so far over, you know,

21   the several months that he's been assigned as my attorney.

22   It's --

23         THE COURT:  Well, why don't you -- Mr. Stabenow, do you

24   want to read that before it's given to me just to --

25         MR. STABENOW:  Yes, sir.

1    THE COURT:  -- make sure there's nothing you want to

2  advise him on?

3                    (Reviewing Documents)

4    MR. KELLEY:  I've also --

5    THE COURT:  I would likely take that document, most

6  likely, because it -- not having seen it yet, but there is a

7  chance I would seal it since I assume it involves discussions

8  you've had with your attorney, is that correct?

9    MR. KELLEY:  Yes.

10    THE COURT:  All right.

11    MR. KELLEY:  Would you not like --

12    THE COURT:  He's going to read it first --

13    MR. KELLEY:  Okay.

14    THE COURT:  -- and make sure that there's nothing in

15  there that could be harmful to you.

16    MR. KELLEY:  Okay.

17    THE COURT:  All right.

18                    (Reviewing Documents)

19    MR. STABENOW:  I'm done, Judge.

20    THE COURT:  Okay.  Is there anything in there that you

21  want to object to him providing, that might be harmful to his

22  criminal case?

23    MR. STABENOW:  I think he's making a poor decision in

24  providing this because it will require the waiver of privilege

25  and for me to provide you documents, putting into context the

1  stuff that was chosen from prior e-mails.

2         THE COURT:  Right.

3         MR. STABENOW:  But insofar as that's his choice to make,

4  that's his choice to make.

5         THE COURT:  That's up to you.  You make the decision.

6         MR. KELLEY:  I can provide you the e-mails from my

7  personal -- or my personal conversations with him to support

8  that.

9         THE COURT:  Okay.  Well, you understand that I may need

10  for -- to inquire of Mr. Stabenow of information concerning those

11  e-mails in order to make sure that I understand exactly what

12  happened or is happening, okay?

13         MR. KELLEY:  Okay.

14         THE COURT:  With that understanding, why don't you go

15  ahead and provide me with a copy of your written document there.

16         MR. KELLEY:  Sure.

17         THE COURT:  I am going to order that this matter, this

18  communication be sealed.  I'm going to mark it as a court

19  exhibit.  Thank you, sir.  Do you have an exhibit -- we'll just

20  make it Court's Exhibit #1.  I'm going to go ahead and read it.

21         MR. KELLEY:  I'm sorry.  Did you instruct me to read it?

22         THE COURT:  No, I'm going to read it.

23         MR. KELLEY:  Oh, okay.

24         THE COURT:  So you won't have to read it.

25                    (Court Reviewing Documents)

1    THE COURT:  Okay.  I've read the communication.  And

2 let's start first with the concern about the DNA evidence

3 relating to human feces that was left in the library.  It's my

4 understanding that that evidence was destroyed, is that correct,

5 Mr. Stabenow?

6    MR. STABENOW:  Yes, Your Honor.  I met with Mr. Kelley

7 on October 9th, and we discussed it.  Later that day, I requested

8 that the poop be DNA tested.  I e-mailed Mr. Kelley the next day

9 letting him know I had made that request through Mr. Lynn of the

10 U.S. Attorney's office.

11    THE COURT:  Right.

12    MR. STABENOW:  And it took them a while to get back to

13 me, because they were trying to look into who had preserved it or

14 where it had been preserved.  And ultimately they had informed me

15 that it had been destroyed.  I did not immediately call or notify

16 Mr. Kelley.  That was during the approximately 3½ weeks I was

17 trying to meet with him that he kept skipping our meetings.

18    THE COURT:  All right.

19    MR. STABENOW:  And so I just kept that as one of the

20 facts to discuss with him the next time we met.  We did meet in

21 November, I believe it was the 26th, speaking off the top of my

22 head.  And we talked for about two hours at that time.  I told

23 him that the feces had been destroyed.  But I also communicated

24 to him my belief that that feces was of minimal value in his

25 case.  The feces was found on the fourth floor and every single

1  fire in this case was on the first floor.  And so the only area

2  that's going to matter in his arson trial is the area where the

3  fires were set, because those areas were captured on video.  And

4  the only person going in or out of those rooms on video was Mr.

5  Kelley.  So, in order for our defense to be successful, we have

6  to come up with an alternate explanation for how the fires could

7  have happened in those rooms and that our focus has to be on the

8  first floor.  As I told Mr. Kelley, even assuming that we can

9  show the feces belonged to somebody else, the Government response

10 could be, well, some student went there and played a practical

11 joke before the library closed that night and nobody noticed.

12 It's not going to negate the arson cases unless we can deal with

13 the evidence on the first floor.

14         THE COURT:  Right.  Okay.  Now, and I also would note

15 that there's certainly nothing that Mr. Stabenow can do about the

16 fact that the investigators destroyed that evidence or somebody

17 at the -- maybe when they cleaned it up, somebody threw it all

18 away.  I'm not sure exactly what happened, but the fact that no

19 tests were done actually is to your benefit.

20         MR. KELLEY:  I disagree.  And I --

21         THE COURT:  Well, and this -- there's nothing you can do

22 about the fact that the evidence no longer exists.  There's

23 nothing that can be done about that.

24         MR. KELLEY:  No.

25         THE COURT:  It's gone.  No tests can be performed when

1  they don't have the evidence.

2        MR. KELLEY:  That's --

3        THE COURT:  However, Mr. Stabenow, as your attorney, can

4  argue in the adverse inference that the Government did a very

5  poor investigation and by not preserving that evidence, that

6  creates reasonable doubt.

7        MR. STABENOW:  And, Your Honor?

8        THE COURT:  And so certainly you're able -- prepared to

9  make that argument?

10       MR. STABENOW:  Yes, Your Honor.  And in regards to the

11  video, the same thing applies.  I've talked to Officer Rogers,

12  who was the officer in charge of copying over video.  I met with

13  her on Friday, because I was informed last week that they had not

14  preserved all of the videos.

15       THE COURT:  Right.

16       MR. STABENOW:  And she told me that they -- what they

17  did is they -- she spent 14 hours that day reviewing their DVR

18  and she copied over to disk the parts that she thought people

19  would care about.

20       THE COURT:  Right.

21       MR. STABENOW:  And that's all she preserved.  Now, as I

22  have --

23       THE COURT:  So, the original recording was destroyed?

24       MR. STABENOW:  The original recording was just written

25  over --

1          THE COURT:  Okay.

2          MR. STABENOW:  -- like any other DVR would be after a

3    period of a week or two.

4          THE COURT:  Right.

5          MR. STABENOW:  All of which proceeded Mr. Kelley being

6    charged by nine months.

7          THE COURT:  So, that evidence is gone.  The original

8    record of that is --

9          MR. STABENOW:  It was gone before Mr. Kelley even had a

10   federal case.

11         THE COURT:  Okay.

12         MR. STABENOW:  And as I've instructed Mr. Kelley, you

13   know, if we choose to go to trial, I can certainly argue that,

14   you know, that creates an inference that they did not thoroughly

15   investigate the possibility of a third person.

16         THE COURT:  Right.

17         MR. STABENOW:  On the other hand, I've also communicated

18   to Mr. Kelley that Officer Rogers, you know, I didn't communicate

19   her name personally, because at the time I didn't know who it

20   was.  But that law enforcement watched the video that day from

21   the time the office -- the library was locked until the moment

22   the police officers came into the cameras in response to the fire

23   call.  And the law enforcement officers, in this case, Officer

24   Rogers, confirms that the only person she saw on any video camera

25   was Mr. Kelley.  So, that is the evidence I expect the Government

to present at trial.  Now, I can attack it.  I can attack her

testimony.

THE COURT:  Right.

MR. STABENOW:  But she will be allowed to testify to

that fact.

THE COURT:  Right.

MR. KELLEY:  May I?

THE COURT:  Yes.

MR. KELLEY:  Thank you.  On October 9th --

THE COURT:  You can seated if you like.

MR. KELLEY:  Okay.

THE COURT:  That's fine.

MR. KELLEY:  I audio recorded our first and November

22nd meeting, and I reviewed them yesterday.  On October 9th, Mr.

Stabenow said that in the event that I did commit the alleged

crimes, then perhaps the feces -- how do I put this?  This will

just take me a moment to think about it.  Considering what I'm

already charged with, doing the DNA test of the feces would not

hurt.  If it turned up to be someone else's, he agreed that it

would help the case, which is why he pursued it.  When he said

that, he did not tell me that it was Mr. Lynn that he'd

corresponded with.  He did not say when he corresponded with this

individual.  And I when I directly asked him how he knew that the

evidence was gone, because I thought this was valuable, because I

do not believe myself to have left that piece of evidence there,

1 he simply refused to communicate it with me very directly.  And

2 also on my audio recording of our November 26th meeting, he does

3 not address that the feces is gone.  He simply says that he does

4 not care about it.  So, I didn't learn about it being a non-issue

5 until I continuously asked him over e-mail.

6         THE COURT:  Right.

7         MR. KELLEY:  And even then he did not provide the

8 information regarding how he learned about any of it.

9         THE COURT:  Well, it's all on the record now.  I mean,

10 it's gone.  The evidence is gone.  There's nothing he can do

11 about that --

12         MR. KELLEY:  No.

13         THE COURT:  -- other than to point out to the jury -- a

14 jury if the case goes to trial, to point out to the jury that a

15 competent investigator would not have destroyed -- they would

16 have figured out, you know, they would have tried to retain that

17 evidence.  I'm not sure exactly what the facts were.  Did

18 somebody at the custodial staff or something clean it up or --

19         MR. KELLEY:  It was collected --

20         THE COURT:  Just go ahead.

21         MR. KELLEY:  It was collected into evidence is my

22 understanding.

23         MR. STABENOW:  It was not collected into evidence.  That

24 was what was originally communicated to me as was it was

25 originally communicated to me an impression that there had been

fires on multiple floors.  So, we had expected that if there was

fires on the fourth floor and there was feces present and we

could DNA test it and link it to somebody else, that would be

useful.  It later came out during the course of our investigation

that there were no fires on the fourth floor --

        THE COURT:  Right.

        MR. STABENOW:  -- and that the feces had not been

preserved.  It had been disposed of by campus security the same

night.

        MR. KELLEY:  My issue is that it was deficient

communication with me, because it was something that I've

hammered from the beginning was an important piece of evidence

that I -- he thought that we had it.

        THE COURT:  All right.

        MR. KELLEY:  I asked about it and he wouldn't tell me

about it when -- he would not communicate with me about evidence

that might have been exculpatory to me.

        THE COURT:  All right.

        MR. KELLEY:  That's --

        THE COURT:  Well, that issue is behind us now.  We know

what happened to it.  So, let's go to the tapes.  Again, it's the

same -- the same issue is the original recording of the tape

which would have covered the entire time frame from -- what was

the period of time?  Whenever the -- from the time that the

library closed until it opened?

1      MR. STABENOW:  It was from 2030 hours until 0333 the

2   next day.

3      THE COURT:  All right.  So, the fact of the matter is

4   that the original tape is gone.  The only thing that they

5   retained was the parts of the tape that allegedly depicts that

6   you were in the library after it was closed and near where the

7   fires were started.  So, the only thing that Mr. Stabenow can do

8   at this point with that evidence is to again argue that an

9   adverse inference that, you know, the Government, the

10  investigator in this case should have kept the original tape.

11  They didn't do that.  That creates reasonable doubt and a jury

12  shouldn't convict based upon that fact that they destroyed that

13  evidence.  That's what a competent defense attorney would do.

14      MR. KELLEY:  My issue again here is not with the

15  logistics of the case.  But Mr. Stabenow has refused to provide,

16  in his words, he says I'm asking for detailed reports of every

17  interaction that I have with every other person regarding my

18  case.  But I actually asked what is his context when he's been

19  interacting with the ATF.  Has it been formal, informal?  Has he

20  made any documentation of who he called or when?  And when I

21  asked directly for who he's talking to, members of the

22  prosecution, members of law enforcement, he has not told me.  And

23  that's my issue.  It's not so much the dynamics of whether the

24  footage is gone or whether the evidence is gone, it's my

25  counsel's deficient communication --

1          THE COURT:  Right.

2          MR. KELLEY:  -- when directly asked about it.

3          MR. STABENOW:  And, Your Honor, --

4          MR. KELLEY:  So, this is going to be the first that I'm

5   hearing about, for example, Mr. Lynn.

6          THE COURT:  All right.

7          MR. KELLEY:  And if I have to bring him in front of you

8   for him to bring out this information, even though I've asked him

9   directly about it, I feel that that's deficient communication on

10  his part when I'm directly inquiring.

11         THE COURT:  All right.

12         MR. STABENOW:  Your Honor?

13         THE COURT:  Mr. Stabenow.

14         MR. STABENOW:  I've talked to him about Mr. Lynn in the

15  past.  The reason I had the issue about the waiver of attorney-

16  client privilege as we started this today is that I've noticed a

17  pattern in my client's communications with me.  He sends e-mails

18  that include lies and fraudulent misrepresentations of things

19  that have happened.  And he says I'm deficient in my

20  communications with him.  I had to spend three hours on

21  Thanksgiving night responding to one of his e-mails.  He had

22  skipped our meetings for 3½ weeks that I had tried to arrange.

23  With no notice, he would just skip them.  And then he sent me an

24  e-mail, for example, that day saying, I'm not casting any blame,

25  but due to scheduling conflicts, I've been deprived of meaningful

1  access to my attorney. As in this case, you know, he's saying

2  that I've never talked to him about Mr. Lynn and that I'm denying

3  a reasonable request just to know, you know, how I learned this

4  information. The actual context of his e-mails is that he

5  demanded that he be able to be physically present during all

6  interactions with anybody I had on his case whether it was law

7  enforcement or otherwise. And I told him that that is simply not

8  practical and I have no intention of hamstringing my ability to

9  work on any case by adopting such a procedure. Particularly, I

10  might note, when I can't even get the client to show up for a

11  month to talk to me, I'm not going to tell the prosecutor, well,

12  I can't talk to you until maybe three weeks from now. I have to

13  arrange to see if my client can be present for us to have a two-

14  minute conversation about video.

15  THE COURT: Right. Mr. Kelley, you should know that it

16  would be very unusual for an attorney in a criminal case to have

17  his client present in every conversation that he has when he's

18  investigating the case, when he's meeting with the prosecutor.

19  In fact, it's extremely rare, I don't think I've ever seen it.

20  MR. KELLEY: He is --

21  THE COURT: And I've been involved in criminal justice

22  in the federal system for 25, 26 years.

23  MR. KELLEY: He's misquoting me. And I requested to be

24  present during his interactions with the prosecution. And it's

25  my understanding that it is a right of a client. I may be wrong

in that.  But in regards to the Thanksgiving incident, Mr.
Stabenow offered an e-mail to work over Thanksgiving in response
to the questions that I had for him.

      THE COURT:  Well, let me ask you, did you miss some
meetings that he had scheduled with you?

      MR. KELLEY:  I delayed them with advance -- and then
when he changed the premise of a meeting --

      THE COURT:  No, wait.  Wait.  Stop right there.  Did you
miss meetings with your attorney?

      MR. KELLEY:  I notified him in each instance.  And he
keeps harping on three weeks.

      THE COURT:  No.  You're going too fast here.  So, the
answer is you did miss meetings and you told him in advance you
couldn't meet.  What were your reasons?

      MR. KELLEY:  One of them I was emotionally distressed.
And then on the second one, the premise of the meeting had
altered, because he said that he was obtaining new video footage
that he had reviewed, which we were going to discuss.  And when I
asked him if he had, you know, he scheduled the meeting at an
hour and a half before, I mean, the meeting was supposed to take
place even though I had asked him over the weekend when our
meeting would be.  Ninety minutes before he wanted the meeting to
take place, he e-mailed me to tell me to come down.  And before
coming down, I e-mailed --

      THE COURT:  Were you working?

1          MR. KELLEY:  No.  I live in Columbia.

2          THE COURT:  You had an hour and a half to get you and

3    you didn't make the meeting?

4          MR. STABENOW:  Your Honor?

5          THE COURT:  What?

6          MR. STABENOW:  I had let him know that we would be

7    meeting sometime on Monday, but that it would be subject to the

8    trial I had last week.

9          THE COURT:  Right.

10         MR. STABENOW:  And I set aside four hours last Monday

11   night, the night before a trial -- a jury began on a man who was

12   facing mandatory life, to meet with my client.  And he just kept

13   sending e-mails coming up with excuses of why he wanted to put it

14   off and then he just didn't show.

15         MR. KELLEY:  He e-mailed me instead of calling me 90

16   minutes before he wanted -- even though I e-mailed him over the

17   weekend asking approximately what time do you think you'd be able

18   to meet.  Ninety minutes before the meeting, he e-mails me

19   instead of calling.  And so I don't even see it 90 minutes

20   before.

21         THE COURT:  Well, your explanation at least on one of

22   the meetings, you were emotionally stressed, that's not -- Mr.

23   Stabenow doesn't have any control over that.

24         MR. KELLEY:  No.

25         THE COURT:  But you have a responsibility to make the

1 meetings that your attorney has set up with you. He's a very

2 busy guy. I know that, because I see him in court every day.

3 And so when he sets aside time to have meetings with you, you

4 need to make those meetings.

5 MR. KELLEY: He postponed meetings for three months

6 originally. It was between -- my release was on July 3rd and I

7 couldn't meet with him until October 9th. And then he kept --

8 THE COURT: Well, I find that you're at fault in not

9 attending the meetings. All right. Let's go on to the issue --

10 there's an issue in here that you raised on the Federal

11 Sentencing Guidelines. Mr. Stabenow, have you had a chance to

12 calculate what you believe the Federal Sentencing Guidelines will

13 be and communicate that with your client?

14 MR. STABENOW: Yes, of course, there's a range. You

15 know, however, in response to his claim that I was deficient in

16 not calculating them until October, as Your Honor knows, I've

17 done a number of these arson cases. I didn't need to calculate

18 his guideline range ahead of time to know the ballpark of where

19 we were.

20 THE COURT: Right.

21 MR. STABENOW: And it would have been premature for me

22 to guesstimate guideline ranges before I had investigated the

23 case and talked to my client. It's my policy to always calculate

24 the guideline range for the first time at a meeting with the

25 client where we discuss the evidence and where we identify

1  potential enhancements.

2      THE COURT:  All right.  Do you want to respond?

3      MR. KELLEY:  I was surprised that three months had

4  elapsed before he had done that.  But if that's normal, then we

5  can move on.

6      THE COURT:  Have you provided him with what the

7  estimate, Mr. Stabenow?

8      MR. STABENOW:  Yes.  We've talked about it.

9      THE COURT:  All right.

10     MR. STABENOW:  And there is, as I said, there is a

11 range.  And in regards to the three months, after I got my client

12 out on bond, I let him know that since he had raised the issue

13 that he didn't think he was competent the night of the

14 allegations, that what we needed to do was have him evaluated

15 right away and we did promptly contract for an evaluation.

16     THE COURT:  Right.

17     MR. STABENOW:  Did the evaluation.  The evaluation was

18 completed in mid-September.  And as I told him then, I had 25

19 hearings at the end of September, early October.  It's the

20 biggest rush I've ever had.  And I told him as soon as that's

21 cleared up, we can meet and I can then work much more thoroughly

22 on your case and following that, we did.  We met on October 9th

23 and I worked 11 of the next 16 business days on his case.

24     THE COURT:  I'll let the record reflect that I took

25 probably took 10 or 15 of those guilty pleas on different cases

1  and also handled several motions that you were involved with

2  during that period of time.  I know that you were extremely busy.

3  All right.

4          MR. KELLEY:  There --

5          THE COURT:  Go ahead.

6          MR. KELLEY:  There have also been -- some of our

7  meetings were delayed, because Mr. Stabenow thought that his

8  investigator Greg should be present.  This was the case for our

9  October 9th meeting, and then Greg was not present at the meeting

10 even though the postponements until that date regarded all three

11 of us being able to meet together, Greg was not there.  So, that

12 was part of additional postponements.

13         MR. STABENOW:  And as I've advised Mr. Kelley, I make

14 the determination whether I think it's necessary for the

15 investigator to be present in a meeting or not.  I don't think

16 Mr. Wills needs to be present at our meetings for what we're

17 working on right now.  Now, you know, as we get closer to trial,

18 I mean, like I received new discovery today.  And as Your Honor

19 knows, that's not uncommon in the federal system as we near

20 trial.

21         THE COURT:  Right.

22         MR. STABENOW:  You know, if those meetings require Greg

23 to be present, then we will, you know.  And certainly it's always

24 preferable that he be there.  But sometimes I have other things

25 for him to work on.  And if I don't think it's valuable to the

1  investigation, then I have him go do those other things.

2      THE COURT:  Well, and I don't think it's appropriate for

3  me to dictate to you how your resources in your office should be

4  utilized.  I know Mr. Wills is a very -- extremely competent

5  investigator.  And I'm sure that Mr. Stabenow, based on what I

6  know and have observed over the years with respect to his

7  representation of defendants in criminal cases, is that he's

8  utilizing Mr. Wills where appropriate in investigation of the

9  cases he's assigned to and presenting defenses to those cases.  I

10  have no reason to doubt that if Mr. Stabenow tells me it wasn't

11  necessary for Mr. Wills to be present at that meeting, it wasn't

12  necessary.

13      MR. KELLEY:  He told me it was and that was the premise

14  for a delay.

15      THE COURT:  All right.

16      MR. KELLEY:  So, it's a breakdown of communication again

17  where we delayed meetings based on his assertion that Mr. Wills

18  -- Wills?  Wilson?  Wills, I believe -- needed to be there.  But

19  then it clearly was not the case once I arrived.

20      THE COURT:  All right.

21      MR. KELLEY:  So, it's a breakdown in communication as to

22  why we had delayed the meetings in the first place.  He had not

23  informed me that the investigator would not be there, because I

24  specifically had hoped he would be there.

25      THE COURT:  Well, okay.  Let's move on to -- there is

two other issues here.  One is a request for Mr. Stabenow to

provide you information on how to request substitution of

counsel.  That's why we're here today.  Mr. Stabenow notified the

Court that he needed to have a hearing on this issue which is the

normal and usual way that attorneys inform the court that there

might be potential problems with a client.  And so that's a

purpose for this hearing.  Second, there is a question concerning

you wanting to make a claim of ineffective assistance of counsel.

You can't raise the claim of ineffective assistance of counsel

prior to a finding of guilt in a case.  That can only be raised

in a -- what's called a §2255, which is a post-conviction hearing

or process -- procedure that when a defendant is convicted in a

criminal case, they can claim, following their appeal, direct

appeal on that conviction, assuming the case is affirmed, the

conviction is affirmed on appeal, the next thing that can be

raised is a §2255 claim alleging that your constitutional rights

were violated.  And one of the claims that's frequently raised is

ineffective assistance of counsel.  But you can't raise that

until there's been a conviction, the case has been affirmed on

appeal and you want to claim that your attorney was ineffective

in violation of the Constitution.  That's the only time you can

make that claim.

        MR. KELLEY:  Thank you for letting me know.  I did not

know that.  I was not informed.

        THE COURT:  And quite frankly, from what I've heard and

1  seen on the record here today, I don't think you have a valid

2  claim for ineffective assistance of counsel in any sense of the

3  word.  I find that from what I'm hearing that Mr. Stabenow is

4  doing everything that I would expect a competent defense attorney

5  to do.  And I'll just tell you right now you're, quite frankly,

6  in my opinion, you're fortunate to have him as your lawyer,

7  because he's one of the best criminal defense attorneys in the

8  Midwest.  And you're nitpicking things from what I can see,

9  because he's not responding to every request that you have.  He's

10  busy.  I'll give you a chance to say anything else you want to

11  say.  But I don't see any reason for substitution of counsel at

12  this point at all.

13          MR. KELLEY:  In his investigation, I notified Mr.

14  Stabenow that, okay, here's the events as they are in my case.

15  The shirt that I'm wearing in the footage allegedly --

16          THE COURT:  Uh-huh.

17          MR. KELLEY:  -- is very clearly a brown shirt that

18  buttons.

19          THE COURT:  All right.

20          MR. KELLEY:  And the police confiscated my shirt,

21  shorts, shoes believing that the shirt, shorts and shoes that

22  they confiscated at the time that I went to the police following

23  the events, were the same clothes I was wearing on the night of

24  the incident.  But the shirt and the shoes were different.  Now,

25  in Mr. Stabenow's investigation, even though I told him that the

1  shirt that they have in evidence is blue and the shirt that, I

2  mean, there's a photo of that in our discovery that we've seen.

3  The shirt is clearly a blue-gray V-neck shirt.  And the shirt in

4  the footage is brown with buttons.  In his reports, he asserts

5  again that it is the exact same clothing that I was wearing on

6  the night of the incident.  Now, I've plainly told him that that

7  this is inaccurate and I'm -- and it's a completely valid claim

8  because it's true.  The police have the wrong shirt.  It's not

9  the some one.  And one is blue, one is brown.  But he's saying

10 that he agrees that it is the same shirt.  But it's, I mean, just

11 one look at it, they're very different.  The same with the shoes.

12         THE COURT:  Do you want to respond to that, Mr.

13 Stabenow?

14         MR. KELLEY:  I mean, right here that it's exact.

15         MR. STABENOW:  Yeah.  Your Honor, this is the sort of

16 stuff that, you know, frankly, some clients I struggle with

17 sometimes, and this is one of those clients.  Mr. Kelley doesn't

18 dispute that it's him on the videos.  So, whether they described

19 his shirt as blue or brown, ultimately is that something I can

20 argue about a deficiency in the investigation at trial?  Sure.

21 But he doesn't dispute he's the person on the videos in the

22 library.  So, the color of the shirt is really not that

23 significant.  Similarly, you know, you'll see in his written

24 submission to you today, he says that I'm refusing to file

25 motions.  But he's asked me to file motions to suppress summaries

1  of people's statements.  And I've told him that's not admissible
2  as evidence at trial.  They actually have to subpoena and produce
3  the people and put them on the stand subject to my cross-
4  examination.  And his response is, file the motions anyway,
5  there's nothing to lose by that.

6          THE COURT:  Well, Mr. --

7          MR. KELLEY:  That's not what I've said actually.

8          THE COURT:  Mr. Kelley.

9          MR. KELLEY:  Sorry.

10          THE COURT:  Mr. Stabenow can only file motions that he
11  believes in good faith constitute a basis for suppression of
12  evidence.  And based on what he's described to me would be
13  unethical or unprofessional of him to make -- file motions like
14  you're wanting to have filed.

15          MR. KELLEY:  On the 28th, I believe he said that he had
16  not identified any pretrial motions that he was going to file.
17  And I have subsequently asked him, like, could you please tell me
18  what pretrial motions you might find -- this is this month, and
19  he's not responded to that.

20          MR. STABENOW:  I -- I --

21          THE COURT:  Just a minute.  Go ahead.

22          MR. STABENOW:  I agree with that, Your Honor.  I have
23  found no valid pretrial motions to file in this case.  That's not
24  to say that the Government did a perfect case or a perfect
25  investigation.  But Mr. Kelley is operating under the false

belief that he will not -- and he will not accept correction of

this belief from me, that just because they did not do something

well in the case or made an error, does not give us a grounds to

file a motion to dismiss the Indictment or a motion to suppress

the rest of their evidence. And this is where you'll see from --

you have a little tiny snippet from one of my long e-mails, --

     THE COURT: Right.

     MR. STABENOW: -- this is not television. There are

rules that govern when I can file motions to suppress, when I can

file motions in limine, when I can file motions to dismiss. And

I can't just say, well, they made a mistake so make the case go

away. And Mr. Kelley keeps saying, well, if there's nothing to

lose, file a motion. But there is something to lose which is my

credibility with the court, my responsibility as an officer of

the court to only file meritorious motions and that is something

I will not compromise. And I've told him repeatedly, if we find

anything that warrants a continuance or a pretrial motion or even

some of these things are better -- are actually dealt with in

trial like hearsay objections, then I will pursue those things.

But I'm not going to say, well, the average case involves seven

pretrial motions so I'm going to create seven pretrial motions to

file in this case.

     THE COURT: Right. Mr. Kelley, I'm -- what I've seen

here in this submission, I can't see any basis for him to file

any motions to suppress.

1    MR. KELLEY:  I asked, along with the rest of that, for a

2  -- I admitted I don't understand.  I don't have a law degree or

3  anything like that.

4          THE COURT:  Right.

5          MR. KELLEY:  So, I was doing research and I saw motions

6  that seemed pertinent so I asked him about them.  Would this

7  pertain to this, would this pertain to this.  And he's blowing it

8  out of proportion as if I'm demanding that he file motions that

9  don't exist, which isn't true.

10          THE COURT:  Okay.

11          MR. KELLEY:  I can again give you the full e-mails for

12  you to review and the audio recordings of our meetings.

13          MR. STABENOW:  And, Your Honor, in this regard again, I

14  mean, I've probably sent 50 to 100 e-mails back and forth with

15  Mr. Kelley, some of which are five to ten pages long.  I have

16  made offers that I know no panel attorney will do.  For example,

17  I have offered that if he gives me one day notice, and I offered

18  this I believe on October 18th.  If he gives me one day notice, I

19  will lay out for him relevant chapters of how to defend a federal

20  case form the Federal Defender's Office in San Diego, the

21  Sentencing Guidelines, the appropriate jury instructions, the

22  appropriate statutes, all of them for him to review in our office

23  so that he can bring himself up to speed on these issues.  He

24  keeps making these requests.  I'm uneducated.  I don't know this

25  stuff.  And every time I offer, well, come in and I'll set this

1  stuff aside. And I've even made clear, by the way, this is not a

2  replacement for my advice, this is a supplement to my advice in

3  response to your request to get smart, we will lay this stuff out

4  for you. And he's never taken advantage of that opportunity.

5         MR. KELLEY:  I have.

6         MR. STABENOW:  So, when he makes these repeated, you

7  know, requests that he then says constitute deficient

8  performance, you know, frankly, that's not getting us to where we

9  need to go, which is to deal with the evidence in this case and

10 make a decision of either I'm preparing for trial or I'm

11 preparing for a plea and to make a decision based on the evidence

12 as it exists. There's one other thing I want to deal with on the

13 record and that is, he keeps having this insistence that I

14 subpoena records or that I formally document demands for records.

15 And as I've instructed him the past, except for the context of

16 your voluntary scheduling order that the Government chooses to

17 comply with, because they want the Court to appreciate that

18 they're choosing to do that, we don't have a statutory right to a

19 lot of this evidence even now. Technically, the Government does

20 not owe us this evidence until ten days from trial. So, the

21 appropriate way to get this evidence is not to file motions or

22 subpoenas to the Government, it is to work with Mr. Lynn and

23 Agent Holloway whom, although they are not friends to our case or

24 my personal friend, I've never been to either person's house,

25 they are people with whom I have a professional working

1   relationship and whom I have never had refused to give me
2   evidence when I have made an appropriate request as I have been
3   doing in this case.  Now, sometimes they don't it overnight.  But
4   then again, since they don't even have a legal duty to do it
5   until ten days before trial, if I have to wait a week or two for
6   them to respond with evidence, I just gently remind them and then
7   I accept the evidence when they give it to me and I thank them
8   for their time.

9       MR. KELLEY:  Regarding his investigation, and on October
10  9th, Mr. Stabenow said that he would pursue the footage.  And
11  it's not until December 7th that even asks the people at Mizzou
12  for the footage.  And I have no record, I have asked him what
13  he's done and he can't tell me what he's been doing between
14  December 7th and October 9th pertaining to his pursuit of the
15  footage.  So, when I thought he was going to Mizzou and trying to
16  investigate independently of what the prosecution is providing, I
17  find there's nothing I can hold in my hand.  There's nothing I
18  can read.  There's nothing that he will relate to me regarding --

19      THE COURT:  Well, let --

20      MR. KELLEY:  Also I'd like to note that he just threw
21  this packet at me.  He's hostile to me as indicated in the
22  comments on page 6 where he said -- where I asked, and the tone
23  of my e-mail which again, I can provide in my full.

24      THE COURT:  I disagree that he threw the document at
25  your.  For the record, he placed the document next to you on the

table.  And let me just state for the record that Mr. Stabenow
has no duty to respond immediately to whatever your inquiries may
be.  He's a very busy lawyer.  He gets to them when he can.  He
budgets his time appropriately from what I've observed to
investigate his cases.  I'm just going -- I've heard enough on
this issue, on this point, your request for substitution of
counsel.  I find that there is no basis for substitution of
counsel at all.  I handle these types of hearings all the time.
It seems to me that you should start working with Mr. Stabenow to
try to prepare your defense or decide whether or not you're going
to enter a plea.  There's no basis for me to appoint new counsel.
Of course, you're free to hire your own attorney and try to get
an attorney to represent you, but that's going to cost you money.
Under the law you have no right, when you receive appointed
counsel, to decide whether or not you get new counsel.  That's a
decision for the Court.  I find, for the record, I find that Mr.
Stabenow is doing an extremely competent job in representing you
from what I can see.  He has given you good advice.  He has
explained why he hasn't filed any pretrial motions to suppress
evidence.  I find those explanations are reasonable.  And based
upon a solid foundation on what the law is and what his
obligation is to do, to defend people in criminal cases and I'm
going to deny your request for substitution of counsel.  The case
is set for trial on January 7th of 2013.  I suggest that you
start preparing for trial.

1    MR. STABENOW:  Your Honor, there are two other things I

2  wanted to make a record of briefly.  The first is, as Your Honor

3  knows, and I wanted this on the record.  It is part of my

4  responsibility to my client, after I've investigated a case and

5  made an assessment of the facts for and against us, to advise

6  them how I think things will go at trial, how I think things will

7  be presented at trial, what I think their odds are at trial and

8  what my own personal interpretation of the evidence is.  As I've

9  informed Mr. Kelley, he has a right to competent representation,

10  not necessarily representation that believes he's innocent.  I

11  don't believe he's innocent.  Nevertheless, at trial, I am

12  totally prepared to argue that he's not guilty and to attack all

13  of the deficiencies in the Government's evidence.  There is a

14  separation between my duty of what I tell my client and what I

15  say in front of a jury.  And those two things can often be quite

16  dissimilar.  And that is the nature of being a professional

17  defense attorney.

18    THE COURT:  Right.

19    MR. STABENOW:  You have to be able to do those two

20  things.  The other thing I would say is, Your Honor, we need to

21  deal with the scheduling of the trial.  My understanding, from

22  speaking to Mr. Kelley before this, is one of the reasons he

23  wanted to ask for replacement of counsel is that he wanted a

24  delay to investigate his recent diagnosis of autism, to see how

25  that would affect the trial.  I've looked into the issue.  I've

1  spoken to a forensic psychologist about it.  I've done research

2  about it.  I've looked into the medicines he was on.  I don't

3  believe there is anything that would warrant a continuance at

4  this point.  But I don't want to leave the courtroom and

5  immediately have the issue of he's wanting a continuance for that

6  and I'm telling him it's not meritorious and then we have to come

7  back into court on that issue a couple of days from now.

8      MR. KELLEY:  I no longer desire that particular

9  continuance and I don't feel that I'm incompetent to stand trial

10 based on this.

11     THE COURT:  Okay.  All right.  Thank you.

12     MR. KELLEY:  Uh-huh

13     THE COURT:  Okay.  Well, Mr. Kelley, you know, Mr.

14 Stabenow is not going to get in court and say he thinks you're

15 guilty at trial.  He's going to do his best to defend you.  I

16 don't have any doubt about that.  He's going to present any

17 meritorious defense that you have on your behalf and he'll do a

18 very good job of it.  He'll argue -- it sounds like he's already

19 figured it out.  He's got some stuff -- he has some things to

20 work with based on the fact that the Government did not preserve

21 the DNA evidence and also did not preserve the original tapes.

22 He'll argue that to the jury as an adverse inference and to

23 enforce his argument that there is reasonable doubt in the case.

24 And I wouldn't expect him to do anything else.  I mean, that's --

25 he knows what he's doing, he's a good lawyer.  And instead of

1  wasting all this energy, you know, having conflicts with your

2  counsel, you need to work with him.  And you're looking at some

3  serious -- you know, you're facing some serious time here and you

4  better start working with him.  Anything else you want to say?

5          MR. KELLEY:  I was -- well, I --

6          THE COURT:  I realize this is stressful for you.

7  Anybody facing this kind of a charge would be stressed out.

8          MR. KELLEY:  Uh-huh.

9          THE COURT:  But, you know, he is your advocate.  He

10  wants to help you, but you've got to be willing to work with him.

11          MR. KELLEY:  I don't trust him.

12          THE COURT:  Well, --

13          MR. KELLEY:  I can't check on what he's been working on

14  my case.  That's my issue.  And I also feel again that he's been,

15  for lack of a better -- oh, no.  Like page 6, where he said, "I'm

16  your attorney, not your servant," when I made a reasonable

17  request.  I feel like that's unnecessarily hostile to me.

18  Perhaps there's an animism that I don't understand the root of

19  it, because I feel like I'm asking, I mean, I'm asking reasonable

20  questions and making reasonable expectations and that's the

21  difficulty and that and the communication, there's communication

22  difficulties that's the heart of the matter to me.

23          THE COURT:  Well, there's nothing that I can do about

24  your perception of what kind of a job he's doing for you.  That's

25  something you're going to have to deal with yourself.  From what

I can observe as, you know, kind of an independent observer, he's
doing everything that I would expect a lawyer to do representing
somebody faced with the kind of charges that you're facing. And
so that as far as, you know, my weighing the situation between
you and him and how he's representing you, I think that he's
doing a very good job on your behalf. Mr. Stabenow, I assume
you're still willing to work with Mr. Kelley and to try to do the
best you can for him at trial?

MR. STABENOW: Your Honor, I'm always willing to do that
with all my clients. I mean, I am frustrated by Mr. Kelley,
although he is not the first client who has caused me
frustration. And as you know, I have routinely had clients come
in and say things like, I did it, help me get off. And I go in
and I argue they're not guilty. I understand Mr. Kelley that's
not -- I understand that's not Mr. Kelley's position.

THE COURT: Right.

MR. STABENOW: I am willing to work with him. I am
willing to go to trial. I am ready for trial. Part of the
reason I have not wanted to do continuances and part of the
reason I have danced delicately on some of these evidentiary
issues is, for example, Mr. Kelley wants the DNA, that poop DNA
tested, but he's told me there was a tin found out -- right
outside the window that they believe is the fire accelerant at
the start of the case. He said, well, don't let them test that
because that might link me to the crime. So, I can't say to the

1  prosecutor, I want everything tested in a written motion, because

2  then they're going to test everything.  They're going -- if they

3  notice something I left out, they're going to think it's peculiar

4  I left that out and then they will test that and --

5         THE COURT:  Right.

6         MR. STABENOW:  I mean, this is a delicate dance.  And I

7  think Mr. Kelley does not understand that it is a delicate dance.

8  I will do everything I can to either get him acquitted.  Or if

9  that does not work, get him the lowest possible sentence.  But it

10 is important that he be focused on that goal, too, not trying to,

11 you know, see something he sees on television and fabricate an

12 issue.  And it has happened in his e-mails that he has

13 misrepresented our prior meetings or he's misrepresented

14 situations or he's written things in a way that would lead people

15 to draw bad conclusions.  That does cause me some concern going

16 forward, because I need to be focused on his case, not spending

17 all my time documenting what didn't happen in this case.

18        THE COURT:  Right.

19        MR. KELLEY:  If you're interested, I do again have the

20 meetings in full audio recorded and the e-mails as well.  So, if

21 you wanted to check those and compare his claims versus mine,

22 that would be something we could do.

23        THE COURT:  It sounds me like, you know, he's trying to

24 help you and you're the problem, not him.

25        MR. KELLEY:  But I believe that if you listen to it and

1  read all of the e-mails, that you could see it from my

2  perspective, because I have nothing against him in this regard.

3  But, of course, that would be his angle that he's being effective

4  and I feel otherwise, so we disagree on that.

5          THE COURT:  Well, I find that Mr. Stabenow is being very

6  effective in his representation of you.  I disagree with that

7  statement.  I'm suggesting to you that you should start -- quit

8  wasting all this energy fighting with your lawyer and try to help

9  him do his job and prepare your defense.  So, I'm going to deny

10 the request.  The case is set for trial on January 7th.  And I

11 wish you the best of luck in that case.  And what I'm going to

12 do, Mr. Stabenow, is I'm going to order that this transcript be

13 sealed, as well as the communication that I received from your

14 client.

15         MR. STABENOW:  Yes.  I think that's vital.  Thank you,

16 Your Honor.

17         THE COURT:  And that, of course, if there would be an

18 ineffective assistance claim at a later time, post-conviction,

19 assuming there's a conviction, I don't know if that's going to

20 happen or not, that, in that event I would, upon request, unseal

21 this transcript.  All right.  Anything further?

22         MR. STABENOW:  No, Your Honor.

23         THE COURT:  All right.  Mr. Kelley?

24         MR. KELLEY:  Thank you for your time.

25         THE COURT:  All right.  Thank you.

1    (Court Adjourned at 12:01 p.m.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


              /s/ Lissa C. Whittaker        August 26, 2013
              Signature of Transcriber       Date